UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | | |
|---|---|---|
| PAUL LUMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 4:08-cv-00514-C-W-HFS (Consolidated) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| PAUL G. ANDERSON, et al., | ) ) | |
| Defendants. | ) ) ) | |

**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of FCStone Group, Inc. ("FCStone" or the "Company") between November 15, 2007 and February 24, 2009, inclusive (the "Class Period"), against FCStone and certain of its officers and directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      FCStone is a small integrated commodity risk management company providing risk management consulting and transaction execution services to commercial commodity intermediaries, end users and producers.  The Company is headquartered in Kansas City, Missouri, and has about 440 employees.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  As a result of defendants' false statements, FCStone stock traded at artificially inflated prices during the Class Period, reaching its Class Period high of $52.40 per share in January 2008.

4.      First, defendants misrepresented that the Company was hedged against a drop in short term interest rates.  FCStone is a clearing broker, acting on behalf of its customers for trades consummated on commodities exchanges.  As such, the Company is responsible for its customers' positions, and must cover any losses those customers suffer on trades.  In order to mitigate this risk, FCStone requires its customers to place security deposits with the Company.  Because FCStone holds large customer cash deposits, its earnings are heavily influenced by changes in short-term interest rates.  For example, in fiscal 2007 interest income contributed about 80% of the Company's pretax income.  FCStone holds customer deposits in high-quality, short-term assets.  During fiscal 2007 and throughout the Class Period, approximately 60% of FCStone's customer assets were held in short-term United States Treasury securities, with the other 40% being held in institutional money

market funds in major investment banks. Therefore, any downward change in short-term interest rates had the potential to significantly affect the Company's financial results.

5. In September 2007, short-term interest rates in the U.S. began to decline. The U.S. Federal Funds Target Rate, which banks charge each other for loans, dropped from 5.25% to 4.75% from September to October, and then to 4.50% in November. This precipitous decline continued through 2008, finally hitting 0% in January, 2009. In order to compensate for this reduction, defendants claimed that they had hedged the Company's exposure against rate deductions. For example, in a press release announcing the Company's 2007 fiscal year results issued on November 15, 2007, defendants represented that "Interest rates have softened recently, but that weakness should be offset by growth in customer funds and ***direct hedging of interest rates.***"[1] During a conference call with analysts on January 14, 2008, defendant Dunaway stated "[a]nd I think that short-term interest rates are a concern, but we are doing what we need to in order to protect ourselves."

6. The Company did not disclose, however, the true nature and risks associated with the hedge. According to the Company, the hedged position would directly mitigate the risk of interest rate reductions on its interest income. This was not true. Defendants misrepresented the nature of the hedge, which did not, in fact, hedge directly against declining U.S. short-term interest rates. Instead, the hedge was a risky bet that the LIBOR rates and the United States Federal Reserve Rates would remain roughly equivalent. When the yield spread between the rates widened in April and May 2008, the Company was forced to take a $3.1 million loss. The Company unwound its position early – as the hedge was for a 24-month period – in the third quarter of 2008, reversing its previously unrealized gains on the hedge.

---

[1] Here, as elsewhere, emphasis has been added.

7.      Defendants also made false statements and material omissions regarding the Company's exposure to bad debts resulting from its customer's trading positions. At the time FCStone filed its Form 10-Q for the second fiscal quarter (on April 14, 2008), defendants knew of, but did not disclose, a $1.1 million loss the Company had suffered as a result of extraordinary cotton trading activity on March 3 and 4, 2008.

8.      Moreover, the Company's failure to adequately disclose its bad debt losses related to trading in the cotton market violated Generally Accepted Accounting Principles ("GAAP"), causing its financial results to be materially misstated.

9.      In addition, on November 3, 2008 the Company announced that it would suffer a $20 million bad debt provision from losses sustained by a customer's energy trades. The Company stated that "[t]he estimated bad debt provision is expected at this time to be adequate for all known existing credit contingencies for the first quarter of fiscal 2009" and that "FCStone has taken and is taking appropriate actions to mitigate these exposures. The Company has taken specific steps intended to reduce the market risk associated with the trading position of the energy account." During a November 4, 2008 conference call to specifically address the issue of the bad debt provision, defendant Anderson stated "in fact, about six weeks ago – we recognized that there was substantial risk in this specific account and potential for a substantial debt. Basically at that time, we took measures to really mitigate or neutralize the position as effectively as we could and we believe we have done that to a large extent." Defendant Anderson concluded, "we think that what we have reserved is sufficient to cover that specific risk. . . . We dropped the ball with this account."

10.     Defendants' claim that they had adequately reserved for the energy trading loss disclosed on November 3, 2008 was false and misleading. The trader, who was the Company's largest and most important client, had actually exposed FCStone to $110 million in losses, $90 million more than defendants had disclosed. Moreover, defendants knew at least as early as

June 2008 the true scope of the risk associated with the customers' trades. The Individual Defendants were provided daily reports detailing the risk associated with the energy trades, and the fact that the client had only deposited $10 million to cover his losses. It was not until March 2009 that the Company finally disclosed the true amount of its losses and actually closed out the trader's positions.

11. As a result of defendants' false statements, FCStone's stock traded at artificially inflated levels during the Class Period. After the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down from their Class Period high of $52.40 per share in January 2008 to $1.94 per share in February 2009.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

13. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

14. FCStone's principal executive offices are located at 10330 NW Prairie View Road, Kansas City, Missouri.

## PARTIES

15. Lead Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. purchased FCStone common stock and was damaged thereby.

16. Lead Plaintiff Thomas Lucas purchased FCStone common stock and was damaged thereby.

17. Defendant FCStone is an integrated commodity risk management company providing risk management consulting and transaction execution services to commercial commodity intermediaries, end users and producers. It assists primarily middle market customers. In addition,

- 4 -

to its risk management consulting services, the Company operates independent clearing and execution platforms for exchange-traded futures and options contracts. FCStone stock trades under the symbol FCSX on the Nasdaq.[2]

18.  Defendant Paul G. Anderson ("Anderson") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of the Company. During the Class Period, Anderson sold 152,187 shares of his FCStone stock for proceeds of nearly $7.2 million.

19.  Defendant William J. Dunaway ("Dunaway") is, and at all relevant times was, Chief Financial Officer ("CFO") of the Company. During the Class Period, Dunaway sold 12,000 shares of his FCStone stock for proceeds of $487,423.

20.  Defendants Anderson and Dunaway (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of FCStone's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

---

[2]  FCStone's fiscal year starts on September 1 and ends August 31.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

21.    Defendants are liable for: (i) making false statements; and (ii) failing to disclose adverse facts known to them about FCStone.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of FCStone common stock was a success, as it: (i) deceived the investing public regarding FCStone's prospects and business; (ii) artificially inflated the price of FCStone common stock; (iii) allowed the Individual Defendants to sell $7.6 million worth of their FCStone common stock at artificially inflated prices; and (iv) caused plaintiffs and other members of the Class to purchase FCStone common stock at inflated prices.

## SUMMARY OF THE CASE

22.    FCStone  is a commodity risk management company providing risk management consulting and transaction execution services to commercial commodity traders, end-users and producers.  The Company, through its subsidiaries, assists primarily middle market customers in optimizing their profit margins and mitigating their exposure to commodity price risk.

23.    FCStone works with professional traders to provide inexpensive and efficient clearing and execution of commodities futures and options.  These commodities include corn, coffee, lumber, weather derivatives, wheat, and all types of energy, such as natural gas and oil.  The Company accepts customer orders, directs those orders to the appropriate exchange (such as Chicago Mercantile Exchange or the Chicago Board of Trade) for execution, then it facilitates the clearing of those customers' transactions.  As the Company explains it, "[c]learing involves the matching of our customers' trades with the exchange, the collection and management of margin deposits to support the transactions, and the accounting and reporting of the transactions to our customers."

24.    As a clearing broker acting on behalf of certain of its customers for trades consummated on commodities exchanges, the Company is responsible for guarantying those customer's positions with those exchanges.  In order to mitigate the risk of a customer over-

- 6 -

extending their credit, the Company requires its customers to place security deposits as collateral for their trades. FCStone generates a large percentage of the Company's earnings by holding these deposits in interest-bearing accounts. For example, in fiscal 2007 (September 1, 2006 to August 31, 2007) interest income contributed about 80% of the Company's pretax income. During fiscal 2007 and throughout the Class Period, approximately 60% FCStone's customer assets were held in short-term United States Treasury securities, with the other 40% being held in institutional money market funds with major investment banks. Therefore, any change in short-term interest rates had the potential to have a significant effect on the Company's earnings.

**Defendants Misrepresent the "LIBOR Hedge" and FCStone's**
**Hedging Against Falling Interest Rates**

25.     In mid-2007, short-term interests rates in the United States began to decline. The U.S. Federal Funds Target Rate, the rate banks charge each other for loans and which interest rates generally are based, dropped in September 2007 for the first time in three years, from 5.25% to 4.75%, and then again in November to 4.50%. The Federal Funds Target Rate continued to fall through 2008, finally hitting 0% in January 2009.

26.     During the Class Period, the Company made a series of statements representing that it had hedged its exposure against declining interest rates. In fact, defendants misrepresented the nature of the financial vehicle they had entered into, and failed to hedge the Company against short-term interest rate declines.

27.     For example, in November 2007, in FCStone's Form 10-K for fiscal 2007, defendants falsely stated that "[w]e currently hedge a portion of our portfolio against [interest] rate reductions." During a conference call with analysts on January 14, 2008, defendant Dunaway stated "[a]nd I think that short-term interest rates are a concern, but we are doing what we need to in order to protect ourselves." Moreover, during an April 10, 2008 conference call with analysts, Chris Donat, an analyst with Sandler & O'Neill Partners, asked defendants whether, in light of the $4.4 million gain

the Company had recorded in the second quarter as a result of its purported interest rate hedge, whether the market should be expecting single digit million dollar gains in the future, defendant Dunaway stated "you're on the right track."

28.     These statements, however, were false and misleading.  Instead of simply providing downside risk against generalized interest rate declines, defendants chose a hedge vehicle (hereinafter referred to as "the LIBOR Hedge") that was a highly risky bet on the correlation between the interest rates set by the U.S. Federal Reserve ("Fed. Funds Rate") and those set in the United Kingdom, and known as the London Inter-Bank Offered Rate, or "LIBOR."  Thus, the LIBOR Hedge did not truly hedge against declines in U.S. interest rates as defendants represented, but rather was a gamble on *the spread between* the Fed. Funds Rate and U.K. interest rates.  The LIBOR Hedge remained profitable to FCStone as long as the Fed. Funds Rate and the LIBOR rates were roughly equivalent.  If the rates diverged, however, the LIBOR Hedge would lose value.

29.     Analyst Mark Lane of William Blair & Company sought clarification of the LIBOR Hedge from defendant Dunaway on an April 10, 2008 conference call.  Defendant Dunaway's responses to Lane were intentionally false and misleading, as they hid the fact that FCStone was gambling with shareholder money on a bet concerning the spread between the Fed. Funds Rate and the LIBOR rate:

> MARK LANE: Okay, LIBOR hedge.  So, I mean, if LIBOR hadn't changed between today and the end of the quarter, I mean, you'd have zero mark-to-market gains, right?  I mean, the way that that hedge is set up?
>
> [DEFENDANT DUNAWAY]:  Well, yes, the way the hedge is – yes, the way a hedge works – *yes, if there's no change in LIBOR between the beginning and end of the  quarter, yes, you'll be virtually flat there.*

30.     Dunaway's statement was untrue.  The LIBOR Hedge would only remain "flat" or profitable if the spread between the Fed. Funds Rate and LIBOR Rate remained small.  There was, however, no guarantee that losses would be avoided or gains would be made in the future if rates

- 8 -

stayed low or fell further because the LIBOR Hedge was not really a hedge against falling interest rates in the U.S. but rather a bet that Fed. Fund and LIBOR Rates would correlate.

31.     Due to defendants' misrepresentations in failing to reveal the true risks of this hedge instrument, investors were falsely led to believe that the Company was hedged against short-term interest rate declines in the U.S., causing FCStone's stock to trade at inflated levels.

32.     In the fiscal second quarter ending November 30, 2007, both the LIBOR and Fed. Funds Rates declined slightly, but the ratio between the American and British rates did not radically change.  Therefore, for that quarter, FCStone recorded a $650,000 mark-to-market gain on the LIBOR Hedge.  This represented 5% of the net income for that second quarter, based on $13 million in net income.

33.     In the third fiscal quarter, both American and British interest rates declined sharply, and the ratio or "spread" between American and British rates did not radically differ.  As a result, FCStone booked a gain of $4.4 million.  In fact, 31% of the Company's net income in the quarter was attributable to LIBOR Hedge.  This attracted the attention of analysts who raised questions about the LIBOR Hedge on a conference call held on April 10, 2008, as alleged above.  At no time during this period did defendants reveal that the LIBOR Hedge did not protect the Company from falling U.S. interest rates only if the LIBOR rates correlated with U.S. Fed. Fund Rates.  In other words, defendants never revealed that the Company was not really protected if rates in the Fed. Fund Rate fell but did not stay within the "spread" of the LIBOR Hedge.

34.     In April and May 2008, the yield spread between the Fed Funds Rate and LIBOR rates widened, causing the LIBOR Hedge to plummet in value.  For the value of the LIBOR Hedge to stay profitable, the difference between the Fed Funds Rate and the LIBOR rate would have had to be minimal. But if the Fed Funds Rate dropped significantly while the LIBOR rate stayed about the same, the LIBOR Hedge would lose value and thus not be a hedge against falling U.S. rates.  During

FCStone's third fiscal quarter, the LIBOR 12-month rate went from approximately 2.6% to 3%. The Fed. Funds Rate, however, **dropped** during that same period from 3% to 2%. Thus, the quarter began with these two rates – the Fed Funds Rate and the LIBOR rate – practically in synch, but ended with LIBOR rates **50% higher** than the Fed Funds Rate. This caused the LIBOR Hedge to plummet in value and thereby **not** protect the Company from falling U.S. interest rates. Contrary to what investors had been led to believe, the LIBOR Hedge did not protect the Company against interest rate reductions.

35.     Indeed, unbeknownst to shareholders, by May 31, 2008 FCStone had "closed out" the LIBOR Hedge, wiping out the $650,000 first quarter gain, and the $4.4 million second quarter gain, and instead posted a third fiscal quarter loss of $3.1 million. Based on statements made by the Company, analysts had expected FCStone to report earnings of 47 cents per share for the third fiscal quarter in large part because of expected gains form the LIBOR Hedge in a falling interest market.

36.     Between April 10, 2008 and July 9, 2008, Defendants were completely silent about the LIBOR Hedge, its closing, and the huge loss it had caused. The Company's quarterly report on SEC Form 10-Q filed on April 14, 2008 did not discuss the attributes and risks of the LIBOR Hedge, and misleadingly stated that defendants were hedging **"against rate reductions**." Had the truth about the LIBOR Hedge and its then current loss in value been known to analysts and investors they would have realized that the LIBOR Hedge was not a hedge against falling interest rates but rather something very different. Defendants failed to disclose the truth and correct the false information they had told the market about the LIBOR Hedge's terms, and the actual elements of its risk profile.

37.     On July 10, 2008, before the market opened, the Company issued a press release announcing its third fiscal quarter 2008 results, which finally admitted that FCStone would miss its earning projections after suffering a "$3.1 million decline in the fair value of interest rate derivative hedge instruments which had the effect of reversing previously recognized unrealized gains. These

- 10 -

derivative instruments were liquidated during the three months ended May 31, 2008 and were entered into to manage FCStone's consolidated exposure to short term interest rates."

38.     Upon this partial disclosure, FCStone's stock dropped $12.26 per share to close at $17.64 per share on July 10, 2008, a one-day decline of 41% on extremely high volume.  Much of the loss was due to the revelations concerning the LIBOR Hedge.  This disclosure was shocking in light of the Company's previous representation that the LIBOR Hedge was protection against falling interest rates and was linked to low or static LIBOR interest rates, which had *not* materially changed during the third quarter.

**Defendants Did Not Disclose or Properly
Account for Cotton Bad Debt Losses**

39.     At the time FCStone filed its Form 10-Q for the second fiscal quarter of 2008 on April 14, 2008, defendants knew of, but did not disclose, material bad debt losses the Company faced resulting from cotton trading activity that occurred over a month earlier.  The losses stemmed from the artificial settlement of cotton prices by the exchange Intercontinental Exchange ("ICE") after a sudden 31% jump in prices over a two day period on March 3rd and 4th, 2008.

40.     This unprecedented jump in cotton prices and the effect on the market was summarized in a August 13, 2008 investigative report in *The Wall Street Journal* entitled "In Mystery Cotton-Price Spike, Traders Hit by Swirling Forces."  The article stated:

> The price spike was extraordinary because U.S. cotton inventories were at their highest in four decades, and the housing slump weakened sales of towels and other fabrics.  Global supplies were also high, buoyed by better farming techniques in India.
>
> *             *             *
>
> The market had long been dominated by industry players such as cotton merchants, who buy farmers' growing crops and sell futures to lock in a profit.  But this year, merchants stepped up their own trading, partly because there was a record crop to hedge.  By late February, merchants held more than twice as many contracts to sell cotton as at that time in 2007 and 2006, says Jeffrey Korzenik, a money manager who has analyzed CFTC data on the cotton market.

While they were selling, institutional investors were buying. Their bullishness rose after a crop report in February said U.S. farmers would plant the fewest cotton acres in 25 years. The investors poured new money into bets on indexes representing baskets of commodities.

*  *  *

In February, cotton futures rose 18%. The contract for May delivery stood at 81.86 cents a pound at month's end. At that point, the ICE, which had bought the old New York Board of Trade, ended a 138-year-old tradition of floor trading in the cotton pit.

The next Monday, March 3, it switched to all-electronic trading, which then began at 1:30 a.m. Eastern time. Between 1:30 and 4:33 a.m., May cotton shot up three cents a pound – the limit the futures contract could rise that day under ICE rules.

When U.S. traders awoke, phone lines were soon abuzz between New York and the cotton-trading hub of Memphis, Tenn. Frantic investors wondered where the price pressure was coming from. But with no more floor traders to consult for scuttlebutt, they were in the dark.

The futures market was dormant because the cotton contract had moved by its daily limit, but the ICE's options pit would soon open. It offered a way to keep trading. Options offer their purchaser the right to buy or sell something at a certain price in the future. Traders can duplicate the purchase of a futures contract by acquiring an option to buy cotton at a given price and selling someone else the right to sell cotton at that same price.

Such combo trades are known as "synthetic futures." On March 3 and 4, they tripped up unwary cotton merchants.

Commodity investors trade on margin – that is, put up only part of the cost of the trade, usually 5% to 10%. If the price moves against them, they face a margin call, or demand for more cash collateral. The more the price moves against them, the bigger the margin call.

What some merchants didn't focus on was a rule that allows the exchange to use the options market's synthetic futures to decide what cotton's price is at the end of a day, for purposes of determining margin. Merchants had been among those supporting adoption of this rule back in 2003. The problem: The options market doesn't limit how much prices can move.

When the options market closed in midafternoon, the ICE jolted traders with an announcement: The day's price of the May contract was 93.90 cents -- 12 cents above the prior Friday.

Traders faced huge margin calls from clearing brokers, the firms that execute their trades and stand behind their obligations. Traders had to put up four times as

- 12 -

much new money as they typically would need to in one day. All afternoon, traders shuttled in and out of meetings with incredulous bankers, with only hours to obtain giant new loans or have their trading positions closed out.

Margin calls ran to hundreds of millions of dollars collectively for large merchants, including Memphis giants Dunavant Enterprises and the Allenberg Cotton Co. unit of France's Louis Dreyfus Group, according to people familiar with the matter. Dunavant and Allenberg declined to discuss their trading.

\*      \*      \*

By the next morning, March 4, merchants who had maxed out their credit prepared to exit their futures trades via offsetting options trades. Since the trades they had to unwind were sales of futures, to get out of them they were forced to buy futures, en masse. At 10:56 a.m., the barrage of forced futures buying drove May cotton to $1.09 a pound, even though cash cotton was in the mid-60-cent range.

41.     These events in the cotton trading market caused several of FCStone's customers to fail to meet their margin posting requirements, requiring FCStone to cover the margin calls and suffer bad debt losses totaling $1.1 million. Despite the fact that these losses were fully known to defendants prior to the Company filing its April 14, 2008 Form 10-Q, the Company did not disclose the losses in either its filing with the SEC or to investors on an April 14, 2008 conference call with analysts. Defendant Anderson later admitted during a July 10, 2008 conference call, however, that defendants knew about these losses prior to the Company issuing its April 14, 2008 Form 10-Q:

*In early March* the Exchange settled a cotton contract synthetically, leaving the commercial industry and market participants unprepared or unable to meet the margin call. *As a result of the situation, FCStone experienced bad debt write-offs of $1.1 million, or $0.03 per diluted share for the quarter*.

42.     Although these losses occurred subsequent to the end of FCStone's fiscal second quarter, as detailed in ¶¶94-101, FCStone was required, under GAAP, to disclose the nature and extent of these losses in its April 14, 2008 Form 10-Q. Defendants did not.

**Defendants Failed to Disclose Loss Exposure and Record**
**Bad Debt Provisions Related to an Energy Trading Account**

43.     On November 3, 2008, the Company disclosed for the first time that it had incurred a bad debt provision of $25.7 million as a result of three customers being in danger of defaulting on

- 13 -

trading accounts for which FCStone served as the clearing firm. The Company stated that the largest of these three customers had taken positions in the energy trading market and had losses of $20 million. In its press release, the Company stated, "*FCStone has taken and is taking appropriate actions to mitigate these exposures. The company has taken specific steps intended to reduce the market risk associated with the trading position of the energy account*." In a November 4, 2008 conference call with analysts, defendant Anderson stated that defendants had known about the energy trading losses for at least six weeks, and that "we took measures to really mitigate or neutralize the positions as effectively as we could and we believe we have done that to a large extent." On January 8, 2009, the Company reaffirmed its estimate that the loss would not exceed $20 million.

44. These statements, among others, were intentionally false and misleading when made. Defendants lied about when they became aware of the losses. According to a former employee of FCStone defendants, had known about energy trading losses approximately six months before they announced them, rather than the six weeks they claimed. In addition, defendants lied about the extent of their losses – they were actually much higher. On February 24, 2009, the Company subsequently disclosed that it expected to incur *an additional $60 to $80 million* bad debt provision on these same energy trades. This news shocked the market, sending the Company's stock price down from $3.95 to $1.94. Analysts stated that FCStone's management "has completely lost its credibility" and that the additional loss was the result of "[p]oor risk management or inexcusable risk assumption." But even the additional $80 million was not enough to cover the Company's losses. On March 12, 2009, the Company announced that it had "eliminated" the energy trading account and would incur an additional *$90 million* loss on top of the $20 million announced in November 3, 2008, for a staggering total loss of $110 million.

- 14 -

45.     A former FCStone employee ("Confidential Witness 1" or "CW 1"), who worked in a "trade support role" clearing customers trades with various clearinghouse exchanges throughout the Class Period up until the end of January, 2009, and who was "100% familiar" with the bad debt provisions taken by the Company in relation to these trades, stated that the $110 million loss came from trades made by Scott Adams ("Adams"), an energy trader associated with FCStone's Geldermann subsidiary. Adams worked as a independent trader who utilized Geldermann to enter into futures positions on several natural gas products which had suffered huge losses.

46.     Traders like Adams deposited capital with FCStone as collateral to trade on margin in commodities futures. These trades had margin calls that had to be settled on a daily basis with the clearinghouse exchanges. FCStone was responsible for ensuring that the clearinghouse exchanges received the cash necessary to satisfy any margin calls. All members of an exchange are required to clear their trades through the clearinghouse at the end of each trading session and to deposit funds sufficient to cover the member's debit balance. Because all members are required to clear their trades through the clearinghouse and must maintain sufficient funds to cover their debit balances, the clearinghouse is responsible to all members for the fulfillment of the contracts. The margin calls are first paid with any capital in a trader's account, and if there are insufficient funds to meet the margin call FCStone had to pay the difference to settle them. The responsibility to make sure the clearinghouse was paid was on FCStone if the trader could not cover his margin.

47.     Given the inherent risk that meeting a margin call might exceed the amount of deposited capital, FCStone had a so-called "Margin Department." It was responsible for monitoring the positions taken by its traders and determining if and when it might be necessary to liquidate a position at a loss so as to avoid incurring potentially even greater losses because the position was simply unlikely to turn around and recover. According to CW 1, the Margin Department was obligated to liquidate money-losing positions "no matter how big" they were.

- 15 -

48.     According to CW 1, Adams had entered into the energy positions that caused bad debt *more than 6 months* before the Company's announcement on November 3, 2008.  Moreover, Adams only had $10 million in his account with FCStone, but *quickly began incurring daily margin calls that exceeded this amount*, according to CW 1.  CW 1 stated the future values of the underlying natural gas products had gotten "so far from [Adams'] contracts" that there was no way that major losses could be avoided.  According to CW 1, Adams' position was "flawed from the get go."  And, dangerously for FCStone, the amount of losses for Adams' positions greatly exceeded the amount of capital that Adams had deposited with the Company.  In fact, a series of very large margin calls created a deficit in Adams account of between $20-$30 million at least *four months before the Company's announcement* according to CW 1.  These losses alone were enough to require the Margin Department to liquidate his positions but it did not.

49.     According to CW 1, Adams was FCStone's biggest and one of its oldest clients.  Management permitted Adams to simply "do what he pleased" despite his huge losses and regardless of the continuing risk that Adams' activities imposed on FCStone, in the hope Adams' trading position would improve.  The fact that Adams was the Company's largest client was later confirmed by defendants in the November 4, 2008 conference call.

50.     Losses of the size Adams was incurring were a subject of major concern within the Company and were, in fact, communicated to defendants Anderson and Dunaway, according to CW 1.  Defendants Anderson and Dunaway were aware of the losses because they were provided with "Deficit Sheets" that the Company generated on a daily basis.  These Deficit Sheets were generated using the Company's software system, known as SCAN or RISK.  The daily Deficit Sheets identified traders whose losses exceeded their capital accounts and by exactly how much.

- 16 -

51.     As such, defendants were aware that their statements that the Company was mitigating its credit risk through sufficient credit protections and that the bad debt from Adam's trades only totaled $20 million were false and misleading when made.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

52.     On November 15, 2007, FCStone issued a press release entitled "FCStone Group, Inc. Announces Record Fourth Quarter and Fiscal Year Results," and held a conference call with analysts.  During that conference call, defendant Anderson stated, "Interest rates have softened recently, but that weakness should be offset by growth in customer funds and ***direct hedging of interest rates***."

53.     On November 29, 2007, FCStone filed its Form 10-K for fiscal 2007, including its financial results from the fourth fiscal quarter of 2007, which included the same financial results as previously reported.  The Form 10-K also included the following:

> ### Interest Rate Risk
>
> In the ordinary course of our operations, we have interest rate risk from the possibility that changes in interest rates will affect the values of financial instruments.  We generate interest income from the positive spread earned on customer deposits.  ***We currently hedge a portion of our portfolio against rate reductions***.

54.     By the end of November 2007, FCStone's share price had closed at $42.21 per share up from $38.31 per share on November 14, 2007.

55.     On January 14, 2008, the Company issued a press release entitled "FCStone Group, Inc. Announces Strong First Quarter Results."  Defendants announced higher quarterly revenues and net income for its fiscal first quarter ending November 30, 2007.  After the press release, the Company hosted a conference call with analysts, during which defendants made the following statements:

[DEFENDANT ANDERSON]: One last area of importance for FCStone is interest rates, which continue to soften, but *that weakness in interest income should be offset somewhat by* the growth in customer funds, investment in alternative instruments, and *continued direct hedging of interest rates*.

\* \* \*

MIKE VINCIQUERRA, ANALYST, BMO CAPITAL MARKETS: Should we anticipate, just looking forward, that your rate earned is going to come down a bit, and if you continue to grow balances, hopefully that offsets the decline from rates? You will be affected by lower rates, I guess is the point.

[DEFENDANT DUNAWAY]: Yes, I mean, we will be affected by lower rates. We have done some things to try to mitigate that. As Pete mentioned in his call, *there is a portion of our interest rate exposure that we have done direct hedges on. So that should continue to benefit us going forward*.

\* \* \*

ROB WOLGEMUTH, ANALYST, INSIGHT INVESTMENTS: Nice quarter. Just had a couple quick questions for you. One was related to lower interest rates. *You had mentioned that you had some hedges in place and some other programs to mitigate some of the effects of lower interest rates on your interest income. Can you maybe just tell us a little bit more about some of those hedges and when you actually took some of those positions?*

[DEFENDANT ANDERSON]: *No, I don't think we would want to disclose our position* or when we put those on, necessarily, but it's pretty typical or common, I think, positions of utilizing swaps and collars or really locking in a floor with a cap, and we have done that over a period of time.

ROB WOLGEMUTH: And then, Bill, when I spoke with your predecessor probably about six months ago, he seemed a bit concerned about lower interest rates, if that were to happen in the future, which of course it has started to happen. And *you guys don't seem as concerned, and I just wondered if that is because of some of these hedges you guys put on, or if there are some other factors?*

[DEFENDANT DUNAWAY]: We're obviously concerned because it does drop to the bottom line, but we have actively managed the risk and looked at ways that we could protect ourselves through different investments and the hedging aspect of it. So he participated in those conversations as well, so it was kind of a strategy with all of us looking at it. *And I think that short-term interest rates are a concern, but we are doing what we need to in order to protect ourselves*.

56.     Following the release of the Company's positive first fiscal quarter earnings, FCStone's stock shot up in one day from $46.52 to $52.40 per share on high volume – a one day increase of 13%. This was the Class Period and all-time share price high for FCStone's stock.

- 18 -

57.     On January 14, 2008, the Company filed its Form 10-Q for the fiscal first quarter 2008, which included the same financial results as previously reported.  The Form 10-Q also included the following:

**Interest Rate Risk**

In the ordinary course of our operations, we have interest rate risk from the possibility that changes in interest rates will affect the values of financial instruments.  We generate interest income from the positive spread earned on customer deposits.  **We currently hedge a portion of our portfolio against rate reductions**.

58.     On April 10, 2008, the Company issued a press release entitled "FCStone Group, Inc. Reports Record Second Quarter Revenues," which stated in part:

FCStone Group, Inc., a commodity risk management firm, today announced record quarterly revenues and net income from continuing operations for its second fiscal quarter ending February 29, 2008.

Second Quarter Results

Revenues, net of cost of commodities sold, a non-GAAP financial measure, were $91.2 million in the three months ended February 29, 2008, compared to $60.1 million in the prior year quarter, an increase of 52%.  Net income increased to $12.1 million, or $0.42 per diluted share, for the second quarter, compared to $6.9 million, or $0.32 per diluted share, in the prior year quarter.

Net income from continuing operations increased to $17.8 million, or $0.61 per diluted share for the second quarter, compared to $7.0 million, or $0.32 per diluted share, in the prior year quarter.

*       *       *

Year-To-Date Results

Revenues, net of cost of commodities sold, a non-GAAP financial measure, were $164.8 million for the first six months of fiscal year 2008, compared to $117.5 million during the same period of fiscal year 2007, an increase of 40%.  Net income increased 90% to $25.2 million for the first six months of fiscal year 2008, or $0.87 per diluted share, compared to $13.2 million, or $0.61 per diluted share during the same period of fiscal year 2007.

Net income from continuing operations increased to $30.9 million, or $1.07 per diluted share for the first six months of fiscal year 2008, compared to $13.3 million, or $0.61 per diluted share during the same period of fiscal year 2007.

- 19 -

59.     Also on April 10, 2008, the Company hosted a conference call with analysts.  During

that call, defendants stated:

> [DEFENDANT ANDERSON]:  The last area of importance for FCStone is
> interest income.  ***Interest rates continue to soften, but that weakness in interest
> rates has been offset by*** the significant growth in customer funds, prudent investment
> management in secure lawful investments, and ***continued direct hedging of interest
> rates***.  Customer funds have grown to $1.45 billion at the end of our second fiscal
> quarter 2008 versus $861 million during the same period a year ago.  The Company
> invests a majority of customer funds and exchange-approved money market funds
> and treasuries, with a smaller portion placed in overnight reverse repurchase
> agreements on treasuries.  Hedge gains were accrued on a mark-to-market basis for
> the second fiscal quarter of 2008; all of this is reflected in interest income of $18.8
> million for second quarter fiscal 2008 versus $10.7 million for the same period in
> 2007.
>
>                         *      *      *
>
> CHRIS DONAT, ANALYST, SANDLER O'NEILL & PARTNERS:  Okay.
> And then just on the interest expense, I want to make sure I got this right.  ***You said
> the 4.4 – or interest income – $4.4 million mark-to-market gains from hedging?***
>
> [DEFENDANT DUNAWAY]:  ***Yes***.
>
> CHRIS DONAT:  Okay.  And that's – as we sit from outside the Company
> and try to model, any suggestion for – I know you've hedged it going out, but how
> far out are these hedges?  Can we expect similar sorts of things in future quarters or
> how should we look at it?
>
> [DEFENDANT DUNAWAY]:  I mean, generally, we've gone out about two
> years with the hedges.  One thing that we will see going forward is because of FASB,
> we have mark-to-marketed these interest rate derivatives that we have in place.  So,
> you're not going to quite get the smoothing that's intended from a true hedged
> position, but you realize the mark-to-market gain here at February 28.
>
> CHRIS DONAT:  Okay.  When you say you've gone out two years, you put
> some of these on six months ago, a year ago?
>
> [DEFENDANT DUNAWAY]:  We started right at about the end of last fiscal
> year.
>
> CHRIS DONAT:  Okay.  Does that mean – ***would I be correct then in
> thinking about this as you had $4.4 million in gains, we should expect to see low
> single digit millions of gains going forward from hedging for a few quarters?***
>
> [DEFENDANT DUNAWAY]:  You know, we can't really predict what the
> interest rate environment will do.  But ***I would say that you're on the right track***, as
> far as I don't think you'll continue to see, unless there's significant drops; because

- 20 -

it's all mark-to-market in this quarter, I don't think you'll see the sizable gain going forward from the collar.

CHRIS DONAT: Okay. So if, yes, because of the collar, if rates are similar to where they were before, you've marked it to market and there we are.

[DEFENDANT DUNAWAY]: Yes.

\*       \*       \*

MARK LANE, ANALYST, WILLIAM BLAIR & COMPANY: Okay. Back on the interest income. So, what is the collar tied to, treasury rates? Or what is it tied to?

[DEFENDANT DUNAWAY]: It's a LIBOR hedge.

MARK LANE: Okay, LIBOR hedge. *So, I mean, if LIBOR hadn't changed between today and the end of the quarter, I mean, you'd have zero mark-to-market gains, right? I mean, the way that that hedge is set up?*

[DEFENDANT DUNAWAY]: *Well, yes, the way the hedge is – yes, the way a hedge works – yes, if there's no change in LIBOR between the beginning and end of the quarter, yes, you'll be virtually flat there*.

60.    Following the release of the Company's positive second quarter earnings and defendants' statements, FCStone's stock again rose sharply from $30.59 to $36.90 per share on high volume – a one day increase of 20%.

61.    On April 14, 2008, the Company filed its Form 10-Q for the second fiscal quarter 2008, which included the same financial results as previously reported. The Form 10-Q said nothing about a material $1+ million loss in cotton trading incurred by the Company in early March 2008. But the Form 10-Q stated in part:

*Interest Rate Risk*

In the ordinary course of our operations, we have interest rate risk from the possibility that changes in interest rates will affect the values of financial instruments. We generate interest income from the positive spread earned on customer deposits. *We attempt to mitigate this risk by hedging a portion of our investable funds against rate reductions*.

\*       \*       \*

- 21 -

*Customer and Counterparty Credit Risk*

As a clearing broker, we act on behalf of our customers for all trades consummated on exchanges. Accordingly, we are responsible for our customers' obligations with respect to these transactions. ***We attempt to mitigate our credit risk by requiring sufficient margining or security deposits***.

62.     The statements alleged in ¶¶52-61 were each materially false and misleading when made because:

(a)     As more fully alleged in ¶¶25-38, FCStone was not hedging against interest rate reductions but had actually made a risky bet on the spread between the Fed. Funds Rate and the LIBOR Rate;

(b)     At the time the Company filed its Form 10-Q for the second fiscal quarter on April 14, 2008, FCStone failed to disclose a $1.1 million bad debt expense as a result of volatility in the cotton market in early March 2008, which caused several of FCStone's customers to fail to meet margin calls and thereby requiring FCStone to cover the calls and suffer the loss. As more fully alleged in ¶¶94-101, defendants' failure to report these losses in the April 14, 2008 Form 10-Q violated GAAP; and

(c)     The Company did not require sufficient security deposits to cover its customer's margin obligations from trading on exchanges. In fact, the Company allowed customers to enter into risky, unhedged positions that greatly exceeded the customers' deposits, as alleged in ¶¶39-51.

## THE TRUTH BEGINS TO LEAK OUT

63.     On June 22, 2008, an analyst with William Blair & Co. published a research note on FCStone. The note was in relation to a presentation given by defendant Anderson on June 18, 2008 regarding current volatility in the agricultural commodities market. According to the note, the volatility was making it more difficult for FCStone's customers to cover their margin requirements

- 22 -

and "increas[ing] the risk that FCStone could experience modest credit losses if customer funds are liquidated at a loss."

64.     In fact, volatility in the agricultural commodities market, namely the cotton market, had already caused FCStone to suffer credit losses stemming from its customers' inability to cover their margin requirements.

65.     After this partial disclosure regarding possible losses for the Company due to its customers' inability to fund margin requirements, FCStone's stock fell sharply $6.39 per share to close at $31.94 per share, a one-day decline of 17% on extremely high volume.

66.     On July 10, 2008, before the market opened, the Company issued a press release announcing its third fiscal quarter 2008 financial results, which stated in part:

> Results for the three months ended May 31, 2008 includes [sic] an after tax reduction in net income of $4.2 million, or $0.14 per diluted share. This after tax ***reduction in net income included a $1.1 million net bad debt write off primarily related to the consequences of unprecedented synthetic settlement pricing in the cotton market, and a $3.1 million decline in the fair value of interest rate derivative hedge instruments which had the effect of reversing previously recognized unrealized gains. These derivative instruments were liquidated during the three months ended May 31, 2008 and were entered into to manage FCStone's consolidated exposure to short term interest rates***. Excluding these items, net income for the three months ended May 31, 2008 would have been $12.2 million, or $0.42 per diluted share.

67.     That same day, on the Company's earnings conference call with analysts, the Individual Defendants essentially admitted that the LIBOR Hedge did not protect the Company from falling interest rates but was actually a bet on the spread between the Fed Funds Rate and LIBOR rates. In addition, defendants admitted that they knew of the cotton trading losses in March 2008, although they did not disclose the losses in April in the Form 10-Q:

[DEFENDANT DUNAWAY]: At the same time net interest rates began to decline, we began to scale on hedges on FCStone's exposure to short-term interest rates using three-month LIBOR instruments with a two-year tenor. While **the instruments were intended to be hedges against interest rate declines** over a two-year period in order to meet GAAP accounting standards, FCStone is required to mark the infrastructures to market at the end of each quarter.

During the current fiscal year, we recognized a 652,000 unrealized gain in our first quarter, or $0.014 per diluted share, and 4.4 million unrealized gain in our second quarter or roughly $0.10 per diluted share. The difficulty that this accounting standard presents is the fact that the hedge instrument is structured for 24 month period, but the gain is recognized at each snapshot in time.

While the three-month LIBOR settings were virtually unchanged during the third quarter, **the LIBOR curve steepened sharply with two-year LIBOR softs rising 106 basis points during the quarter. The entire structure was liquidated during our fiscal third quarter with substantially no gain, which had the effect of reversing all the previously recognized unrealized gains, reducing the Company's income for the third quarter by $0.11 per diluted share**.

\*      \*      \*

RICH REPETTO, ANALYST, SANDLER O'NEILL: Good morning. I guess the first question, I don't want to get too elaborate on the call, but on this hedge you said you reversed an unrealized gain. But you had – what I don't understand is that you had a realized gain in the prior quarter. So what was this unrealized portion that you had to reverse?

[DEFENDANT DUNAWAY]: It was unrealized in the fact that we had not – we had not liquidated or got out of the position. We mark to market the position at the end of each reporting quarter. So technically an accounting standpoint, it's not realized. It's recognized as a marked to market valuation of the interest rate derivative, but the only way of – technically be a realized gain is in fact if you closed it out, if that makes sense. We saw the first quarter, the value of those instruments rose 652,000, but we did not close them out. It's an unrealized appreciation in the fair value of the instrument.

RICH REPETTO: So the 4 point – I think it was 4 million in the first quarter, are we not talking about the same instruments or not?

[DEFENDANT ANDERSON]: It was 652,000 in the first quarter. It was a 4.4 million in the second –

RICH REPETTO: Right, in second quarter. Exactly.

[DEFENDANT DUNAWAY]: And in the third quarter we liquidated it, and it becomes a recognized realized gain because we closed it out and in effect reversed out those previously unrealized but recognized gain.

- 24 -

[DEFENDANT ANDERSON]: Rich this is Pete. The issue I think from second quarter to third quarter was at end of the second quarter it's brought to market, but we still looked at it in terms of there's 24 month hedge position. And at that time, ***all indications were that fed fund rates were going to continue to decline, which they did over time. But at the same time there became really a disconnect between fed fund rates and LIBOR, which is what the hedge position was in or the collar was in***.

***And so as that disconnect became more dramatic, really we looked at it in terms of at some point, we had to make a determination that is there value in keeping that position on or is there real substantial risk incurring that position forward? And we really made the determination that there was far more risk carrying it forward than there was to maintain the hedge going forward.*** Hindsight is always 20/20. Had we picked a time or spot in time where we should have liquidated it, probably at the end of the second quarter would have been that time.

\*      \*      \*

CHRIS ALLEN, ANALYST, BANC OF AMERICA SECURITIES: How are you doing? Could we just start on the bad debt expense? If you could give us a little bit more color on what actually occurred, because I know I don't understand when you say synthetic settlement of cotton prices.

[DEFENDANT ANDERSON]: ***Basically the cotton over a period of time in early March was moving limit higher. And as it moved limit higher it continued to trade in the option market. And so the exchange settled, basically, versus the option trading and marked or settled the futures contract versus that option trading or structure synthetically***. They basically took an estimated price out of the options trade, or pit, and brought it back to the futures settlement price.

And the industry looked at really locked limit prices for their – for a number of days, and the real confusion I think became for the customer as well as the lender, the bank. Providing capital to make those margin calls got confusing enough that it got to the point where basically lenders just stopped making loans for margin requirements.

And we were fortunate, as we went through that process, that it really only amounted to a handful of accounts that it affected, and just didn't have the leverage or the capital to adequately margin the account. But that was caused by the confusion of just settlement pricing. You would see a limit move, and a significantly higher price would be what the settlement was required on.

68.     In these disclosures on July 10, 2008, defendants admitted for the first time that they were not, as they had previously represented, hedged against short-term interest rate declines, but instead had been betting on the yield between the Fed. Funds Rate and LIBOR rates. In April and

- 25 -

May 2008, the yield spread between the Fed Funds Rates and LIBOR rates widened, causing the LIBOR Hedge to plummet in value. Indeed, unbeknownst to shareholders, by May 31, 2008 FCStone had "closed out" the LIBOR Hedge, wiping out the $650,000 first quarter gain, and the $4.4 million second quarter gain, and instead posting a third fiscal quarter loss of $3.1 million from the LIBOR Hedge. Based on statements made by the Company, analysts had expected FCStone to report earnings of 47 cents per share for the third fiscal quarter in large part because of expected gains from the LIBOR Hedge in a falling interest rate environment which was then occurring. Between April 10, 2008 and July 9, 2008, however, defendants were completely silent about the LIBOR Hedge and the huge loss it had caused. In addition, the Company's quarterly report on Form 10-Q filed on April 14, 2008 did not discuss the attributes and risks of the LIBOR Hedge, and misleadingly stated that defendants were hedging "*against rate reductions*." The July 10, 2008 press release announcing the Company's third fiscal quarter 2008 results, disclosed that FCStone would miss its earning projections after suffering a $3.1 million loss on the LIBOR Hedge.

69. In addition, defendants admitted for the first time that they would suffer a $1.1 million bad debt related to cotton trades that had occurred on March 2 and 3, 2008 that had not been disclosed to investors in the previous quarter. Defendants knew about the extraordinary events that had caused the ICE to employ the synthetic settlement of cotton prices on March 3, 2008, and that many of their customers had failed to meet their margin calls and suffered huge losses, leaving FCStone responsible to cover the debts. Despite the fact that these losses were fully known to defendants prior to the Company filing its April 14, 2008 Form 10-Q, the Company did not make a single mention of the losses in either its filing with the SEC or the conference call with analysts. Defendant Anderson later admitted during the July 10, 2008 conference call, that the Company knew about these losses in March 2008, prior to the Company issuing its April 14, 2008 Form 10-Q. As discussed in ¶¶94-101, defendants' failure to disclose this loss violated GAAP.

70.     Upon these disclosures, FCStone's stock dropped $12.26 per share to close at $17.64 per share on July 10, 2008, a one-day decline of 41% on extremely high volume.

71.     On July 15, 2008, the Company issued its Form 10-Q for the third fiscal quarter of 2008, which included the same financial results as previously reported.  The Form 10-Q also stated in part:

> **Customer and Counterparty Credit Risk**
>
> As a clearing broker, we act on behalf of our customers for all trades consummated on exchanges.  Accordingly, we are responsible for our customers' obligations with respect to these transactions.  We attempt to mitigate our credit risk by requiring sufficient margining or security deposits.
>
> OTC derivative transactions are subject to credit risks, primarily the risk that a counterparty will fail to meet its obligations when due.  ***We attempt to mitigate our credit risk by ensuring the performance of our major counterparties through credit default swaps and outright trade credit insurance, with excess coverage in place for all major counterparties***.

72.     As detailed at ¶¶102-115, this disclosure and lack of other disclosures related to the energy trading account were in violation of GAAP and resulted in the Form 10-Q filed on July 15, 2008 being false and misleading.  In fact, defendants had not mitigated their credit risk on the energy trading account and it was then already experiencing major losses.  Moreover, as alleged in ¶¶43-51, defendants were aware of these losses and failed to disclose them.

73.     Subsequently, after the markets closed on November 3, 2008, the Company announced it would incur up to a $25 million pretax or $15 million after-tax bad debt provision, representing an after-tax loss of $0.56 per diluted share for the first quarter of fiscal 2009.  The Company represented that this bad debt provision was taken due to the impact of a significant energy trading account and, to a lesser extent, a renewable fuel account and a foreign exchange account.

74.     Specifically, in a November 3, 2008 press release filed with the Company's November 4, 2008 Form 8-K filed with the SEC, defendants stated:

## FCStone Group, Inc. Provides Update of Commodity
## Volatility and Credit Issues

KANSAS CITY, MO., November 3, 2008 – *FCStone Group, Inc.* (Nasdaq:FCSX), *an integrated commodity risk management firm, reported today that it expects to incur up to a $25 million pre-tax bad debt provision for the first quarter of fiscal 2009 in connection with losses by three domestic accounts for which FCStone serves as the clearing firm or counterparty*.  These losses, driven by unprecedented volatility in the commodity and foreign exchange markets, relate primarily to a significant energy trading account, and to a lesser extent, a renewable fuels account and a foreign exchange account.  *The estimated bad debt provision is expected at this time to be adequate for all known existing credit contingencies for the first quarter of fiscal 2009*.  This estimated bad debt provision is based upon currently available information, market conditions and account positions, which could change before the end of the first quarter on November 30, 2008.  The company experienced no material impacts from credit issues during the fourth quarter of our fiscal 2008 year ended August 31, 2008.  In addition, the company can report that it has no direct credit exposure relating to VeraSun Energy Corporation, which filed for bankruptcy protection last week.

These losses if realized on an after tax basis would be approximately $15 million, or $0.52 per share.  For comparison purposes, the company realized an average of $0.45 of net income per quarter from continuing operations through the first three quarters of fiscal 2008 for a total of $1.36 per share for the nine months ended May 31, 2008.

*FCStone has taken and is taking appropriate actions to mitigate these exposures.  The company has taken specific steps intended to reduce the market risk associated with the trading position of the energy account*.  Nonetheless, no assurances can be given that additional losses on this account will not be recognized.  FCStone may recover a portion of the losses on the energy account from the introducing broker of that account under a sharing agreement between FCStone and the introducing broker, but no assurances can be given as to the amount and timing of recovery that may be obtained under that agreement.

More generally, FCStone has added to its internal credit risk management staff and in addition to regular monitoring its clearing customers' accounts, it has concluded a complete review of those accounts.  The company has also retained an external consultant to review all of the company's credit risk procedures, processes and systems.  The company believes that it has made appropriate adjustments to its monitoring system designed to substantially reduce the risk of failures of these types in the future.

*        *        *

Pete Anderson, President and Chief Executive Officer of FCStone, stated "*We recognize that these charges are significant and we want to assure our customers, industry participants and shareholders that we take this situation very*

*seriously and will continue strengthening our credit risk procedures, processes and systems*. I want to assure everyone that FCStone's capital and liquidity positions remain strong and permit us to continue the growth of our core risk management business that our customers need and our shareholders expect. The need for the company's risk management services and products has never been greater than it is in these volatile times."

75. The next day, the Company held a conference call with investors to address the bad debt loss and credit exposure risk announced in the Form 8-K. During that conference call, defendant Anderson admitted that the Company had known about the bad debt weeks before:

Well, Rich, basically during this quarter – *in fact, about six weeks ago – we recognized that there was substantial risk in this specific account and potential for a substantial debit*. Basically at that time, we took measures to really mitigate or neutralize the position as effectively as we could and we believe we have done that to a large extent.

\*　　\*　　\*

Yes, in fact, *this was one of our largest customers and no other account is remotely close in size to this or anywhere close to the exposure that this has been*.

76. But in the same conference call defendants continued to deceive investors about the magnitude of the debt and about their efforts in mitigating the loss:

[DEFENDANT ANDERSON]: Based on our internal analysis, and really mitigating or neutralizing the position, their estimate of potential loss or risk, as well as ours internally, *we believe, at this point, it was appropriate to basically reserve, like I said, up to $25 million of potential bad debt for not only the energy account, but also the ethanol account, as well as the FX account*.

RICH REPETTO: Just to follow on that though, this specifically says about this additional loss on this account. Is the account not – the position is closed out and done or not?

[DEFENDANT ANDERSON]: *I am not going to get into specific positions with the account, but as I said, we think we have got it effectively neutralized and/or the risks mitigated to a large extent* and really the accounts – we are in the process of letting those accounts or those positions settle off over time.

RICH REPETTO: Okay. *And then my last question, Pete, it is a question of timing on the announcement here. You mentioned that you did, six weeks ago, have some – at least some awareness or some clue or something and it appears you have already done some of the credit risk management consulting work done*. So I

- 29 -

guess the question is when did this come up and how did you go through the thought process of choosing now to alert rather than earlier or later?

[DEFENDANT ANDERSON]: I think really once we recognized there was a substantial risk, we went through the process of really analyzing that risk and trying to quantify what our exposure or potential loss was, as well as, like I said, we engaged a consulting firm to help us really determine or give us an estimate or [probably] validate, verify what our analysis showed us and as I said, we just got that completed and made the determination that now was the time with the visibility we had to make that determination to reserve for the potential bad debt. *And we think that what we have reserved is sufficient to cover that specific risk*.

\*       \*       \*

*As we recognized that this was an issue, or this was a problem, we went through the process – in fact, I initiated basically the process of really scrubbing our book of business or looking at all of the accounts on the clearing and execution side, as well as the commodity risk management side. I specifically talked to our management staff on the clearing and execution side of the business and in clearing in general, we had our Vice President of Credit Administration and our internal regulatory accounting staff, looked at both the clearing and execution side of the business, as well as the commodity risk management side to determine if we had any accounts with margin issues, capacity issues, length of tenor or size of position to make sure that we didn't have any other substantial risk or exposure with other accounts to this extent*.

Since then though, we have also added additional capacity on our risk debt, both day and night, as well as additional credit capacity within our credit department to really review beyond the specific accounts, but really look at the credit worthiness or the wherewithal of the specific clients and beyond the margining in their account. And we have also engaged that nationally known consultant group to really look and review our systems and processes and procedures to make sure that they are effective and that we don't have any real pitfalls in this process.

*And I think really to conclude, Mike, I'd tell you with a lot of confidence that we don't have any other accounts with the exposure or risk associated with this account. We dropped the ball with this account*, but I don't think the rest of the book of our business is sound and adequately margined and has the financial and capital capacity to do business with them.

\*       \*       \*

*What really happened though over time was the positions got large enough and long tendered enough that we should have recognized that before it really showed up in the margin requirements. And unfortunately, we didn't do that*. Like I said, we have reviewed all of our book of business. We're making sure that not only do we look at risk in the account, along with the capital, but also length of

- 30 -

tenor and size of the position and margin requirements and capacity beyond just the margin in the account.

*     *     *

MARK LANE: Okay, so I still don't understand. This account is still open. I don't understand how does that exactly work, okay? You are in the process of liquidating this account, but there is still an active account? Do they have capital to potentially still be responsible for some of this loss? I don't understand that.

[DEFENDANT ANDERSON]: Well, at this point, basically the account – like I said, once we recognized that there was substantial risk in it, *we, along with the accountant, basically worked to mitigate or neutralize that risk or exposure. And rather than just liquidate the account, which would cost additional capital or expense, it was more effective just to let it settle off and liquidate over time and over the tenor of the position and that will happen basically over the next several months. And then you will see -- we will know basically what our effective risk is at that time, but as I said earlier, we feel comfortable that we have reserved adequately for that exposure*.

77.     On this partial disclosure of the truth, the Company's stock price fell from $6.16 to

$3.75, a one day drop of more than 39%.

78.     On November 13, 2008, the Company issued a press release entitled "FCStone

Group, Inc. Announces Fourth Quarter and Fiscal Year Results," which stated in part:

FCStone Group, Inc. (NASDAQ: FCSX), a commodity risk management firm, today announced higher year-over-year revenues for its fourth fiscal quarter ended August 31, 2008.

**Fourth Quarter Results**

Revenues, net of cost of commodities sold, a non-GAAP financial measure, were $88.3 million in the three months ended August 31, 2008, compared to $75.8 million in the same prior year quarter, an increase of 16.5%. Net income decreased to $7.4 million, or $0.25 per diluted share, for the fourth quarter, compared to $12.0 million, or $0.42 per diluted share, in the prior year quarter.

Net income from continuing operations decreased to $8.1 million, or $0.28 per diluted share for the fourth quarter, compared to $12.0 million, or $0.42 per diluted share, in the same prior year quarter.

*     *     *

**Fiscal Year Results**

- 31 -

Revenues, net of cost of commodities sold, a non-GAAP financial measure, were $336.5 million for the fiscal year 2008, compared to $257.8 million during the fiscal year 2007, an increase of 30.5%. Net income increased 21.9% to $40.6 million for the fiscal year 2008, or $1.40 per diluted share, compared to $33.3 million, or $1.33 per diluted share during fiscal year 2007.

Net income from continuing operations increased to $47.4 million, or $1.64 per diluted share for the fiscal year 2008, compared to $33.6 million, or $1.34 per diluted share during the fiscal year 2007.

79.     On November 14, 2008, FCStone filed its Form 10-K for fiscal 2008, including its full fiscal year financial results, including for the fourth fiscal quarter of 2008, which included the same financial results as previously reported. The Form 10-K also stated the following:

**Results of Operations**

***Year Ended August 31, 2008, Compared to Year Ended August 31, 2007***

\*       \*       \*

***Bad Debt Expense.*** Bad debt expense increased $0.4 million, or 22.4%, from $1.6 million in fiscal 2007, to $2.0 million in fiscal 2008. In fiscal 2008, bad debt expense reflects the increase to the allowance for doubtful accounts, net of recoveries, and direct write-offs recorded in the C&RM segment and CES segment for specific customer deficit accounts. Certain customer account deficits were related to unprecedented synthetic settlement pricing in the cotton market occurring on March 3, 2008 as the customers were unable to meet the margin calls to us in amounts as required by the exchange. In fiscal 2007, excluding FGDI's bad debt expense of $0.2 million, $1.4 million of bad debt expense was primarily a result of losses recorded for failure of a commodity pool limited partnership to meet margin requirements, of which we recovered $1.1 million during fiscal 2008.

80.     As detailed at ¶¶116-119, the disclosure and the lack of other disclosures related to the energy trading account were in violation of GAAP and resulted in the Form 10-K being materially false and misleading.

81.     The statements alleged in ¶¶74-79 were each materially false and misleading when made because:

(a)     As more fully alleged in ¶¶43-51, defendants' were aware at the time the above statements were made that the $20 million bad debt provision arising from an energy trading account was insufficient to cover the massive losses from Adams' trading account; and

(b)     As more fully alleged in ¶¶116-119, FCStone failed to record adequate bad debt losses and mislead investors as to its true loss exposure related to Adams' trading account, in violation of GAAP.

82.     On January 8, 2009, the Company issued a press release entitled "FCStone Group, Inc. Announces First Quarter Results," in a release which stated in part:

> FCStone Group, Inc. (NASDAQ: FCSX), a commodity risk management firm, today announced higher quarterly revenues for its fiscal first quarter ending November 30, 2008.
>
> **First Quarter Results**
>
> Total revenues were $85.6 million in the three months ended November 30, 2008, an increase of 16.3% compared to $73.6 million in the prior year quarter. The Company recorded a net loss for the first quarter of $3.0 million, or $0.11 per diluted share, compared to net income of $13.1 million, or $0.45 per diluted share, in the prior year quarter.
>
> *          *          *
>
> "We are pleased with our revenue growth in the first quarter of fiscal 2009, which reflects the continued successful execution of our strategic growth initiatives and the consistent performance and resiliency of our business model in the face of an uncertain market," said Pete Anderson, President and Chief Executive Officer of FCStone. "The current economic environment presents us with significantly lower interest rates, which will negatively effect our interest income, and constrained capital markets, which is having an impact on our customer's hedging and trading activities. However, FCStone continues to demonstrate steady growth in our core business segments. We believe that the Company will continue to expand in the current market environment and anticipate substantial growth prospects in our core business segments that have been the foundation of FCStone."
>
> ***Costs and expenses were higher compared to the prior year primarily due to higher volume-related costs of broker commissions, pit brokerage and clearing fees and the recognition of a $25.7 million bad debt expense primarily related to three specific customer deficit accounts. As previously announced on November 3, 2008, included in this bad debt provision is a $20.0 million pre-tax charge related to a***

- 33 -

*shortfall in a third-party energy trading account for which FCStone clears transactions*.

83. Also on January 8, 2009, the Company hosted a conference call with analysts. On

that call, defendant Anderson stated:

As previously announced, the bad debt provision for the first quarter of fiscal 2009 included the result of two accounts in the commodity risk management segment and one account in the clearing and execution segment. *The reserve established for these three accounts totals approximately $25 million pre-tax, or $15.6 million after-tax representing a loss of $0.56 per diluted share*. Also included in the first quarter fiscal 2009 results is the after-tax write-off of $711,000 of good will on the balance sheet representing value of historical acquisitions. Under GAAP, this writedown was triggered because our market value fell below our book value. Recognition of this loss negatively impacted earnings by approximately $0.03 per diluted share. Excluding the items for the three questionable accounts and the goodwill write-off, earnings for the first quarter of fiscal 2009 would have been $13.3 million, or $0.48 per diluted share, up slightly versus $0.45 in the first quarter of fiscal 2008.

*As we previously discussed, we have taken considerable steps to mitigate exposure to the three accounts that have been reserved, the two commodity risk management segment accounts have been totally liquidated with notes signed by the customers totaling $5 million. In the case of the large clearing and execution customer, FCStone is in control of the orderly liquidation of the account and has taken prudent measures to minimize the risk and provide for the orderly liquidation of the remaining positions*. FCStone also has a note in the amount of $10 million signed by the introducing broker, or IB, through which the clearing and execution customer originated. This note and earnings from the IB are expected to add to future earnings by eliminating a 50% profit share otherwise payable to the IB.

We recognize that the bad debt reserves are substantial, but we want to make it very clear that this situation is not systemic to the business in either the commodity risk management segment or the clearing and execution segment of FCStone. *FCStone has taken steps to review all segments of the Company and is making every effort to strengthen our controls, oversight and systems. The Company has taken steps to ensure that the situation that develops in this account will not occur again*. All of the commodity risk management segment and the clearing and execution segment accounts are continually being reviewed for credit worthiness, credit capacity, position limits, and volumes. FCStone has also engaged in national consulting and accounting firm to review all of the Company's procedures, processes, controls, and systems, and we recently hired a new Vice President of risk systems, whose initial focus will be leading the evaluation of all risk system design, implementation, reporting requirements, to be utilized throughout the organization.

- 34 -

84.     As detailed at ¶¶116-119, the disclosure and the lack of other disclosures related to the energy trading account were in violation of GAAP and resulted in the Form 10-K being materially false and misleading.

85.     The statements alleged in ¶¶82-83 were each materially false and misleading when made because:

(a)     As more fully alleged in ¶¶43-51, defendants' were aware at the time the above statements were made that the $20 million bad debt provision arising from an energy trading account was insufficient to cover the massive losses from Adams' trading account; and

(b)     As more fully alleged in ¶¶116-119, FCStone failed to record adequate bad debt losses and mislead investors as to its true loss exposure related to Adams' trading account, in violation of GAAP.

86.     On February 24, 2009, the last day of the Class Period, the Company finally admitted the much larger impact of the energy trading losses:

### FCStone Group, Inc. Increases Bad Debt Provision for Previously Announced Energy Trading Account

KANSAS CITY, MO., February 24, 2009 – FCStone Group, Inc. (Nasdaq:FCSX), an integrated commodity risk management firm, reported today that *it expects to incur an additional $60 million to $80 million pre-tax bad debt provision for the second quarter of fiscal 2009 in connection with previously-reported losses by a significant energy trading account for which FCStone serves as the clearing firm*. These losses, if realized, on an after-tax basis would be approximately $36 to $48 million, or $1.30 to $1.73 per share in the second quarter of fiscal 2009. *This reserve is in addition to the $25.7 million pre-tax bad debt provision that FCStone took during the first quarter of fiscal 2009 in connection with losses in this account along with two other domestic accounts for which FCStone serves as the clearing firm or counterparty*.

87.     On the disclosure that the energy bad debt had increased by approximately 300% – the Company's stock price plummeted, falling from $3.95 to $1.94, a drop of more than 49%.

## POST CLASS PERIOD DISCLOSURES

88. After the Company's February 24, 2009 disclosure, the investment community was shocked as defendants' misrepresentations about the energy account bad debt were exposed. An analyst from William Blair and Company stated:

**Reducing Rating to Market Perform; Very Troubling Credit Loss and Risk Management Breakdown**

**Downgrading FCStone to Market Perform given troubling credit loss – management has completely lost its credibility**. After the markets closed on February 24, FCStone announced it expects to incur an additional $60 million to $80 million pretax bad-debt expense in conjunction with the previously announced loss by a significant energy trading account for which FCStone serves as the clearing firm. On an after-tax basis, the loss estimate equals $36 million to $48 million, or a loss of $1.30 per share to a loss of $1.73 per share in fiscal second quarter 2009. The company will host a conference call on February 25 at 9:00 a.m. ET to discuss the increased bad-debt reserve. Management would not answer any questions before the call.

**Poor risk management or inexcusable risk assumption – either conclusion bad outcome with prospects for further credit deterioration**. FCStone first announced a loss related to this energy account on November 3, 2008, and estimated the loss at about $20 million. At that time, management stated that this account was by far its largest based on notional exposures. The $20 million loss estimate was reaffirmed on January 8, 2009, and at that time management stated that the company had implemented the appropriate measures to minimize its risk and was in the process of executing the orderly liquidation of the remaining positions. Despite volatile market conditions, the situation was handled poorly and either management assumed too much risk in liquidating the position or the hedge was poorly set. *The size of the adverse development is startling, and management never provided enough details to frame the potential size of the ultimate loss*. While this loss situation could be viewed as an isolated event and could be spun positively from this perspective, our main concern with this name is the company's ability to mitigate its credit risk during a severe economic downturn. *We now have little confidence in the company's ability to manage through this downturn, with credit only expected to get worse, and we suspect it will take significant time or significant management changes for investors to regain faith in FCStone*.

89. The Company later admitted that the bad debt was even larger, announcing its reserves increased to $110 million.

90. On March 12, 2009, an analyst from William Blair and Company stated:

**Eliminating Troubled Credit Exposure at a Cost, We Lack Confidence in the Story**

FCStone eliminates further risk of material loss to energy trading account – total loss now stands at $110 million. Before the market open on March 12, the company announced it has transferred to a third party substantially all of the positions and liability related to the previously announced loss by a significant energy trading account for which FCStone serves as the clearing firm. In doing so, the company expects to incur an additional $10 million expense, bringing the total bad-debt provision related to the account to $110 million. The company had previously announced it would liquidate the position over time through the end of fiscal 2009 (August year-end); however, transferring the position will reduce uncertainty about future losses and bring about more immediate closure to the issue, which we view positively. The board has made a business decision to eliminate any further uncertainty and give up the potential for any future economic benefits in order to protect its franchise.

FCStone first announced a loss related to this energy account on November 3, 2008, and estimated the loss at about $20 million. At that time management stated that this account was by far its largest based on notional exposures. The $20 million loss estimate was reaffirmed on January 8, 2009, and at that time management stated that the company had implemented the appropriate measures to minimize its risk and was in the process of executing the orderly liquidation of the remaining positions. On February 24, 2009, the company increased the loss estimate to $80 million to $100 million, stating that volatile market conditions led to the increased loss estimate. The total loss of $110 million announced today includes an additional payment to the transferee necessary to enable the account to be transferred immediately. While this loss situation could be viewed as an isolated event and could be spun positively from this perspective, our main concern with this name is the company's ability to mitigate its credit risk during a severe economic downturn.

## FCSTONE'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

91.     As detailed herein, FCStone's publicly issued financial statements during the Class Period[3] were materially misstated in violation of GAAP for the following reasons:

---

[3]     FCStone's Class Period Financial Statements referred to herein, include:

| Filing | Fiscal Period | End of Fiscal Period | Filed with SEC |
|--------|---------------|----------------------|----------------|
| 10-Q | 2Q2008 | February 29, 2008 | April 14, 2008 |
| 10-Q | 3Q2008 | May 31, 2008 | July 15, 2008 |
| 10-K | FY2008 | August 31, 2008 | November 14, 2008 |
| 10-Q | 1Q2009 | November 30, 2008 | January 9, 2009 |

- In its Form *10-Q for the second fiscal quarter ended February 29, 2008*, FCStone failed to disclose bad debt losses resulting from margin deficits in certain customers' cotton trading accounts, in violation of AICPA Statement on Auditing Standards No. 1, *Subsequent Events* and Statement of Financial Accounting Standards No. 5 *Accounting for Contingencies*.

- In its Form *10-Q for the third fiscal quarter ended May 31, 2008*, FCStone failed to disclose a concentration of credit risk and material loss contingencies related to the trading activity in a large customer's *energy* trading account, in violation of Statement of Financial Accounting Standards No. 107 *Disclosures about Fair Value of Financial Instruments* and Statement of Financial Accounting Standards No. 5 *Accounting for Contingencies*.

- In its Form *10-K for the 2008 fiscal year ended August 31, 2008* and Form *10-Q for the first fiscal quarter ended November 30, 2008*, FCStone failed to record adequate bad debt losses and misled investors as to its true loss exposure related to the energy trading account referred to above, in violation of Statement of Financial Accounting Standards No. 5 *Accounting for Contingencies* and AICPA Statement of Position No. 94-6 *Disclosure of Certain Risks and Uncertainties*.

92.     Generally Accepted Accounting Principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

93.     In addition to the specific GAAP requirements referred to herein, FCStone was also required under GAAP to prepare its financial statements in accordance with the following fundamental accounting principles:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34);

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of

transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period because investors and creditors often use information about the past to help in assessing the future prospects of an enterprise. (FASB Statement of Concepts No. 1, ¶42);

- The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

- The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶95).

**FC Stone's Form 10-Q for the Second Fiscal Quarter Ended
February 29, 2008 Was Materially False and Misleading**

94.     As alleged herein, at the time FCStone filed its Form 10-Q for the quarter ended February 29, 2008 with the SEC on April 14, 2008, defendants knew of material bad debt losses the Company had already incurred resulting from cotton derivative trading activity over a month earlier in early March 2008. The losses stemmed from significant volatility in the cotton derivative trading market which caused several of FCStone's customers to fail to meet their margin posting requirements- leaving FCStone to cover the margin calls and suffer the losses. The more-than $1 million bad debt loss was clearly material; when the Company finally disclosed it in the subsequent quarter, it decreased FCStone's third fiscal quarter EPS by over $0.04. Defendants later admitted that they knew about these losses prior to the Company issuing its April 14, 2008 10-Q, as detailed in ¶42.

95.     Although these losses occurred subsequent to the end of FCStone's fiscal second quarter ending on February 28, 2008, FCStone was required, under GAAP, to disclose the nature and extent of these losses to investors in its April 14, 2008 Form 10-Q.

- 39 -

96. AICPA Statement on Auditing Standards No. 1, *Subsequent Events* (SAS 1 or AU 560), requires disclosure of subsequent events, *i.e.*, events that occur between the balance sheet date and the actual date the financial statements are filed, if these events render the financial statements misleading as of the filing date. AU 560 clearly lists "Losses on receivables resulting from conditions . . . arising subsequent to the balance-sheet date," but before the financial statements are filed with the SEC, as one of the events that requires disclosure in the financial statements. Defendants were aware of this loss prior to April 14, 2008 but did not report it in the Form 10-Q of the same date despite being required to by GAAP.

97. Additionally, FASB Emerging Issues Task Force Topic D-86, citing an **SEC Staff Announcement**, states

> registrants are reminded of their responsibility to, at a minimum, disclose subsequent events . . . . A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

98. Statement of Financial Accounting Standards ("SFAS") No. 5, ¶11, *Accounting for Contingencies*, states:

> After the date of an enterprise's financial statements **but before those financial statements are issued, information may become available indicating that an asset was impaired or a liability was incurred after the date of the financial statements or that there is at least a reasonable possibility that an asset was impaired or a liability was incurred after that date. . . . Disclosure of those kinds of losses or loss contingencies may be necessary . . . to keep the financial statements from being misleading. If disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made**.

99. In July 2008, FC Stone belatedly disclosed to investors the nature and extent of the bad debt losses that defendants had known about and hidden from investors several months earlier. The disclosure of July 15, 2008 Form 10-Q included:

> For the three months ended May 31, 2008, **the Company recorded bad debt expense of $1.7 million** . . . . Certain customer account deficits related to unprecedented

- 40 -

synthetic settlement pricing in the cotton market *occurring in early March 2008*, as customers were unable to meet the margin calls to the Company in the amounts as required by the exchange.

100. FCStone's failure to disclose these known bad debt losses to investors in the second fiscal quarter Form 10-Q filed on April 14, 2008 was especially misleading in light of the bad debt disclosures that defendants actually did make at that time, including the following:

> *Bad debt expense decreased* $11,000, from $120,000 in the three months ended February 28, 2007, *to $109,000 in the three months ended February 29, 2008*.

101. Without the subsequent event disclosure as required under GAAP, investors reading the April 14, 2008 Form 10-Q were unaware that FCStone had actually already incurred material losses in the immediate subsequent quarter of an amount *equal to 10 times the losses* disclosed to investors in the prior quarter.

**FCStone's Form 10-Q for the Third Fiscal Quarter Ended**
**May 31, 2008 was materially false and misleading**

102. As alleged herein, at the time FCStone filed its Form 10-Q for the third fiscal quarter ended May 31, 2008 with the SEC on July 15, 2008, defendants knew of a significant concentration of credit risk and material loss contingencies related to a specific energy trading account that would ultimately lead to over $110 million in bad debt losses.

103. As alleged herein, according to CW 1, the energy trading positions that led to the losses first disclosed in November 2008 had been opened approximately 6 months prior – in May 2008. According to CW 1, defendants were also aware this account quickly began experiencing daily margin calls and had a $20-$30 million deficit months before defendants announced the bad debts. Further, defendant Anderson admitted in 2008, with regard to the energy trading account, that "*no other account was remotely close in size to this or anywhere close to the exposure that this has been*."

- 41 -

104.     Because of the size and loss exposure associated with this single account, FCStone was required to disclose the significant concentration of credit risk to investors. Paragraph 15A of Statement of Financial Accounting Standards No. 107 ("SFAS 107") *Disclosures about Fair Value of Financial Instruments* required FCStone to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." FC Stone was required to disclose the following:

a.      Information about the . . . activity . . . or economic characteristic that identifies the concentration

b.      The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity

c.      **The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk**, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments. . . .

105.     FCStone violated GAAP in its Form 10-Q filed on July 15, 2008 by not disclosing any information about the energy trading account, the amount of collateral it held, or the amount of loss it faced if that account "failed to perform according to the terms of the contract." It was not until November 2008 – approximately four months after the July 15, 2008 Form 10-Q was filed, when FCStone belatedly disclosed its loss exposure and the initial $20 million loss associated with the energy trading account.

106.     November 19, 2008 was also the first time FCStone (in its Form 10-K/A for the 2008 fiscal year ended August 31, 2008) made required GAAP disclosures regarding the concentrations of credit risk that exposed it to significant losses:

**We may be materially and adversely affected in the event of a significant default by our customers and counterparties**.

\*         \*         \*

- 42 -

*Credit risk is the possibility that we may suffer a loss from the failure of customers* or counterparties to meet their financial obligations. . . . As a clearing broker, we act on behalf of our customers for all trades consummated on exchanges. We must pay initial and variation margin to the exchanges before we receive the required payments from our customers. Accordingly, we are responsible for our customers' obligations with respect to these transactions, including margin payments, *which exposes us to significant credit risk*.

107.    The purpose behind the risk disclosure requirements in GAAP is to warn investors about risk concentrations that *may* result in losses – not to wait until those losses become substantial and then disclose the concentration of risk *after* the losses are already harming investors – which is exactly what happened when FCStone first told investors about the massive losses associated with the energy trading account in November 2008 – after failing to disclose anything in its Form 10-Q issued in July 2008.

108.    In addition to the required disclosures regarding the concentration of credit risk and loss exposure related to the energy trading account, FCStone was required to record a bad debt provision or, at the very least, disclose a loss contingency if the energy trading account was already in a loss position that exceeded the trading account's capital position and it was reasonably possible that the account deficit would not be funded by the customer. As alleged herein, according CW 1, the energy positions that caused the bad debt losses were entered into *six months* before the Company announcement on November 3, 2008. Moreover, according CW 1, the customer only had $10 million in his account with FCStone, but *quickly began incurring daily margin calls that exceeded this amount*. In addition, the future values of the underlying energy positions had gotten "so far from [Adams'] contracts" that there was no way that major losses could be avoided, according to CW 1. According to CW 1, Adams' position was "*flawed from the get go*" and the amount of losses for Adams' positions greatly exceeded the amount of capital that Adams had deposited with the Company. The CW stated that a series of very large margin calls created a deficit in Adams account of between $20-$30 million *months before the Company's announcement*.

- 43 -

109.     GAAP, specifically SFAS 5, *Accounting for Contingencies*, requires the accrual of a loss contingency by a charge to income, (in the case of FCStone the charge would be in the form of a bad debt provision) if, at the time the financial statements are issued, it is probable that a contingent liability or potential loss has been incurred, and the loss can be reasonably estimated.  Even in the event  FCStone couldn't determine the amount of the loss or didn't feel the loss was probable as of the time it filed its Form 10-Q on July 15, 2008, SFAS 5, ¶10 still requires that:

> **disclosure of the contingency shall be made** when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.

110.     The disclosure threshold referred to in SFAS 5, ¶10, "reasonably possibility," means the chance of the future event or events occurring is more than remote but less than likely.  As alleged herein, defendants  knew, or were reckless in not knowing, that there was more than a remote chance that the Company had incurred losses on the energy trading account as of July 15, 2008.  In accordance with SFAS 5, ¶10: "the disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made." Defendants delayed and did not make these disclosures for months.  And even when they disclosed the loss, they misled investors about the magnitude.

111.     It is clear FCStone's management, including the defendants, knew of the loss exposure associated with the energy trading account and misled investors by not disclosing the exposure until November 2008.  The Company's own stated policies and procedures  to investors in November 2008 made it clear that FCStone management knew or were reckless in not knowing about the energy trading account as of July 2008.  In its November 19, 2008 Form 19-K/A for the 2008 fiscal year ended August 31, 2008, FCStone stated:

> Although **we have procedures for reviewing credit exposures to specific customers** and counterparties to address present credit concerns, default risk **may arise from events or circumstances that are difficult to detect or foresee** including rapid changes in commodity price levels.

- 44 -

112.    However, in the case of the energy trading account, it is clear that the credit loss did **not** "arise from events or circumstances that [were] difficult to detect or foresee" but rather FCStone actually **knew** of the loss exposure because of its "procedures for reviewing credit exposures to specific customers," and also because, as stated by defendant Anderson on November 13, 2008, "all of the accounts are in our commodity in risk management and clearing and execution segments are continually being reviewed for creditworthiness, credit capacity, position limits, tenure and volumes."  Additionally, CW 1 confirmed that on daily basis "deficit sheets" which showed the exact amount of each of FCStone's customers were beyond their margin and the exposure to the Company associated with the customer's positions, were widely distributed – including to defendants Anderson and Dunaway.  In November 2008 defendant Anderson admitted that the loss exposure on the energy trading account was not a sudden surprise and that FCStone was at fault for ignoring the significant loss exposure when he stated that FCStone "dropped the ball on this account."

113.    FCStone admits to have had internal policies and procedures in place to make management fully aware of the energy trading account as of July 2008, as detailed above at ¶ 112 and its November 4, 2008 statement that "in the past six months, we have had to liquidate a number of accounts that couldn't assure us that they had the adequate credit lines or capacity to make the margin call."  However, when it came to its largest customer that actually created the most loss exposure for FCStone, defendants gladly ignored these policies and procedures and knowingly allowed the loss exposure to continue to grow until the loss exposure became true realized losses, all the while hiding what it knew about the energy trading account from investors.  CW 1 confirmed that FCStone knew of but ignored the risky positions in the energy trading account because it belonged to one of the Company's largest customers.  By doing so, FCStone hid the massive loss exposures from investors that, just months later, would be revealed to be a $110 million loss.

- 45 -

114.     FCStone's failure to disclose the significant concentration of credit risk related to a specific energy trading account to investors in the July 15, 2008 Form 10-Q was especially misleading in light of the other disclosures that were made in that same Form 10-Q.  FCStone explained the favorable growth and performance of its Clearing and Execution Services segment and even attributed the success to some of its large customers:

> We experienced strong growth in commission and clearing fee revenue and service, consulting and brokerage fee revenue, ***resulting from significant increases in exchange-traded and OTC contract trading volumes from new and existing customers.  During the period, exchange-traded contract volume increased by 12.4 million contracts, or 87.8%***, from 14.2 million in the three months ended May 31, 2007, to 26.6 million in the three months ended May 31, 2008. . . .  In the ***Clearing and Execution Services segment, we continue to show significant increases in exchange-traded contract volume stemming from the considerable amount of high-volume electronic trades from several large customers acquired during the fourth quarter of fiscal 2007***.

115.     It was materially misleading that FCStone told investors of a significant growth in revenue and trading volume in its clearing and execution business segment and even attributed the growth to "***several large customers***" but yet failed to tell investors at what cost this growth came – namely the accumulation of a significant concentration of credit risk and material loss contingencies associated with its largest customer's energy trading account.

**FCStone's Form 10-K for the Fiscal Year Ended August 31, 2008**
**and Form 10-Q for the Quarter Ended November 30, 2008**
**Were Materially False and Misleading**

116.     Despite the fact that FCStone acknowledged the losses associated with the energy trading account when it filed its Form 10-K for the fiscal year ended August 31, 2008 with the SEC on November 14, 2008 and subsequently when it filed its Form 10-Q for the quarter ended November 30, 2008 with the SEC on January 9, 2009, defendants failed to record adequate bad debt losses related to this account and misled investors as to the true loss exposure it presented.  While investors were told of $20 million in losses, FCStone, in violation of GAAP, fully assured investors

- 46 -

that the loss exposure was limited and failed to disclose the reasonable likelihood of additional bad debt losses.

117. As described above, GAAP, specifically SFAS 5, *Accounting for Contingencies,* requires the disclosure of a loss contingency, at the time the financial statements are issued, if "***there is at least a reasonable possibility that a loss . . . may have been incurred***." FAS 5 also requires the accrual of a loss contingency by a charge to income if, at the time the financial statements are issued, it is probable that a potential loss . . . may have been incurred, and the loss can be reasonably estimated. As alleged herein, defendants clearly knew, or were reckless in not knowing, that the Company would incur losses on the energy trading account in excess of the $20 million bad debt provision disclosed to investors.

118. FC Stone disclosed a $20 million loss in its 10-K filed with the SEC in fiscal 2008 and actually recorded the $20 million loss in the income statement in its Form 10-Q filed in January 2009 10-Q. However in both cases, FCStone misled investors as to the true loss exposure related to the energy trading account. The $20 million loss disclosed to investors in November 2008 and recorded in the income statement in January 2009 represented less than 20% of the $110 million loss FC Stone would disclose to investors in February 2009.

119. Defendants misled investors as to how FCStone would unwind the trading position and the extent of additional possible losses. The additional losses represented a significant uncertainty to FCStone that was required to be disclosed to investors under GAAP. AICPA Statement of Position No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6") requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. SOP 94-6 defines a "severe impact" as a "***significant financially disruptive effect on the normal functioning of the entity***." In this case, the additional losses on the

energy trading account, which ultimately reached $110 million, clearly had a severe impact on FCStone's operations. The decision and strategy on how to unwind the energy trading position was left entirely to FCStone management and as a result the individual defendants knew or were reckless in not knowing that additional losses were at least reasonably likely to be incurred. However, FCStone, in violation of GAAP, led investors to believe that there was no risk or uncertainty at all in the $20 million bad debt provision it disclosed in its financial statements issued on November 14, 2008 and January 9, 2009.

## DEFENDANTS' INSIDER TRADING

120. Defendants were motivated to engage in this course of conduct in order to sell 164,187 shares of their personally held FCStone stock and thereby reap over $7.6 million insider trading proceeds. As set forth below, defendant Anderson sold 152,187 shares of his FCStone stock between December 14, 2007 and January 14, 2008 at prices just below the Class Period high of $52.40. Likewise, defendant Dunaway dumped nearly 22% of his FCStone holdings in April and June 2008, just before defendants' disclosures regarding the Company's losses from the LIBOR Hedge and the cotton trading sent the stock price plummeting 41% on July 10, 2008. Prior to and after the Class Period, the Individual Defendants sold *no* stock. Defendants' sales are set forth below:

| FCStone Insider Sales 11/14/07-2/24/09 | | | | | | Holdings Incl. Vested | Percent Of Shares |
|---|---|---|---|---|---|---|---|
| **Last Name** | **First Name** | **Date** | **Shares** | **Price** | **Proceeds** | Options | Sold |
| ANDERSON | PAUL | 12/14/2007 | 46,652 | $45.73 | $2,133,396 | | |
| | | 12/14/2007 | 25,930 | $46.44 | $1,204,189 | | |
| | | 1/2/2008 | 6,750 | $44.59 | $300,983 | | |
| | | 1/11/2008 | 37,855 | $46.58 | $1,763,286 | | |
| | | 1/14/2008 | 35,000 | $50.42 | $1,764,700 | | |
| | | | 152,187 | | $7,166,554 | 396,215 | 27.8% |
| | | | | | | | |
| DUNAWAY | WILLIAM | 4/29/2008 | 700 | $41.22 | $28,854 | | |
| | | 4/29/2008 | 600 | $41.23 | $24,738 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 4/29/2008 | 600 | $41.25 | $24,750 | | |
| | | 4/29/2008 | 500 | $41.16 | $20,580 | | |
| | | 4/29/2008 | 500 | $41.24 | $20,620 | | |
| | | 4/29/2008 | 500 | $41.27 | $20,635 | | |
| | | 4/29/2008 | 400 | $41.18 | $16,472 | | |
| | | 4/29/2008 | 400 | $41.26 | $16,504 | | |
| | | 4/29/2008 | 300 | $41.20 | $12,360 | | |
| | | 4/29/2008 | 300 | $41.28 | $12,384 | | |
| | | 4/29/2008 | 200 | $41.15 | $8,230 | | |
| | | 4/29/2008 | 200 | $41.17 | $8,234 | | |
| | | 4/29/2008 | 200 | $41.29 | $8,258 | | |
| | | 4/29/2008 | 200 | $41.30 | $8,260 | | |
| | | 4/29/2008 | 200 | $41.47 | $8,294 | | |
| | | 4/29/2008 | 100 | $41.19 | $4,119 | | |
| | | 4/29/2008 | 100 | $41.31 | $4,131 | | |
| | | 6/16/2008 | 6,000 | $40.00 | $240,000 | | |
| | | | 12,000 | | $487,423 | 43,148 | 21.8% |
| | | | | | | | |

## LOSS CAUSATION/ECONOMIC LOSS

121. By misrepresenting its financial condition and outlook, defendants presented a misleading picture of FCStone's business and prospects. Thus, instead of truthfully disclosing during the Class Period that FCStone's business was not as healthy as represented, defendants misrepresented FCStone's condition and financial outlook, understated its exposure to falling interest rates, and did not timely and accurately account for or disclose its bad debts.

122. Defendants' claims that FCStone was hedged against falling interest rates, was protecting itself from credit risks, and its stated bad debt provisions were false and misleading. These misrepresentations caused and maintained artificial inflation in FCStone's stock price throughout the Class Period until the truth was revealed over a period of several months to the market in a series of partial disclosures of the truth.

123. Defendants' false and misleading statements had the intended effect and caused FCStone stock to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of $52.40 per share in January 2008.

- 49 -

124.     As a direct result of defendants' admissions and the public revelations regarding the truth about FCStone's lack of interest rate hedging and bad debts and the overstatement of its financial condition and its actual business prospects going forward, FCStone's stock price plummeted from the Class Period high of $52.40 per share on January 14, 2008 to $1.94 per share on February 24, 2009.  This drop removed the inflation from FCStone's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## CLASS ACTION ALLEGATIONS

125.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired FCStone common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

126.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  FCStone has 28 million shares of stock outstanding, owned by hundreds if not thousands of persons.

127.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include whether the 1934 Act was violated by defendants; whether defendants omitted and/or misrepresented material facts; whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; whether defendants knew or deliberately disregarded that their statements were false and misleading; whether the price of FCStone's common stock was artificially inflated; and the extent of damage sustained by Class members and the appropriate measure of damages.

128.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

129.    Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

130.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

131.    Plaintiffs incorporate ¶¶1-130 by reference.

132.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of FCStone common stock during the Class Period.

134.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FCStone common stock.  Plaintiffs and the Class would not have purchased FCStone common stock at the prices they paid, or at all, if they had been

- 51 -

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

135. Plaintiffs incorporate ¶¶1-130 by reference.

136. The Individual Defendants acted as controlling persons of FCStone within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of FCStone stock, the Individual Defendants had the power and authority to cause FCStone to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiffs and the members of the Class damages, including interest;

C. Awarding plaintiffs reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  September 25, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ARTHUR C. LEAHY
LUCAS F. OLTS
MATTHEW I. ALPERT


          s/ ARTHUR C. LEAHY
            ARTHUR C. LEAHY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

YONKE & POTTENGER, L.L.C.
JASON POTTENGER, No. 43354
1100 Main Street, Suite 2450
Kansas City, MO  64105
Telephone:  816/221-6000
816/221-6400 (fax)

Liaison Counsel

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, CO 80203-3507
Telephone: 303/861-1764
303/395-0393 (fax)

Additional Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 25, 2009.

s/ ARTHUR C. LEAHY
ARTHUR C. LEAHY

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: artl@csgrr.com

# Mailing Information for a Case 4:08-cv-00514-HFS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@csgrr.com

- **Sonja K Clayton-Pedersen**
  sonja.clayton-pedersen@kattenlaw.com

- **Sean William Colligan**
  scolligan@stinson.com

- **Deborah R Gross**
  debbie@bernardmgross.com

- **David H Kistenbroker**
  david.kistenbroker@kattenlaw.com

- **Arthur C. Leahy**
  aleahy@csgrr.com,ldeem@csgrr.com,e_file_sd@csgrr.com

- **Luke Olts**
  lolts@csgrr.com

- **Jason M. Pottenger**
  jpottenger@yplawfirm.com

- **Norman Eli Siegel**
  siegel@stuevesiegel.com,lynnette@stuevesiegel.com,perez@stuevesiegel.com

- **Pamela G. Smith**
  pamela.smith@kmzr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Matthew Lee Dameron
Missouri Attorney General's Office-JC
221 West High Street
4th Floor
P. O. Box 899
Jefferson City, MO 65101
```

https://ecf.mowd.uscourts.gov/cgi-bin/MailList.pl?956923018971061-L_358_0-1          9/25/2009