UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | | |
|---|---|---|
| PAUL LUMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 4:08-cv-00514-C-W-HFS (Consolidated) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| PAUL G. ANDERSON, et al., | ) ) | |
| Defendants. | ) ) ) | |

DEFENDANTS' SUGGESTIONS IN SUPPORT OF MOTION TO DISMISS

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

RELEVANT FACTS..........................................................................................................1

ARGUMENT.......................................................................................................................8

I.    Governing Standards.............................................................................................8

II.   The Complaint Fails to State a Claim Under §10(b) Based on the Energy Account Losses..................................................................................................................12

      A.    As a Matter of Law, Defendants' Forward-Looking Statements Regarding the Energy Account Are Not Actionable...............................................12

      B.    Defendants Did Not Assure Investors the Amount of the Energy Account Losses were Limited. ......................................................................15

      C.    The Company's Actions and Disclosures Fully Complied with GAAP...............17

      D.    Plaintiffs' Energy Account Claim Also Must Be Dismissed Because Their Confidential Witness Allegations Do Not Satisfy the PSLRA............................22

            1.    CW1 Did Not Hold a Position That Would Have Provided Him With Personal Knowledge of the Facts Alleged........................................22

            2.    Plaintiffs' Allegations Establish CW1Was Not in a Position to Know Information Alleged........................................................................25

      E.    CW1's Allegations Do Not Give Rise to a Strong Inference of The Defendants' Scienter with Respect to Energy Account Statements. ....................30

III.  Plaintiffs Fail to State a §10(b) Claim Based on FCStone's Cotton Trading Account Losses. ......................................................................................................35

      A.    The CAC Fails to Give Rise to Any Inference of Defendants' Scienter with Respect to the Cotton Trading Bad Debt Expense. ........................................38

IV.   The CAC's Allegations Regarding the Company's Interest Rate Hedge Also Fail to State a Claim.....................................................................................................39

V.    The CAC Must Also Be Dismissed Because Its General Scienter Allegations Give Rise to No Inference of any Defendant's Scienter..............................................41

      A.    The Competing Inferences Are More Compelling. ..............................................44

VI.   Because the CAC Fails to State a Claim Under §10(b), the Claim Under §20(a) Must also be Dismissed. ........................................................................................44

CONCLUSION...................................................................................................................45

i

# TABLE OF AUTHORITIES

FEDERAL CASES

*ABC Arbitrage Pltfs. Group v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ............................................................................. 11

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F.Supp.2d 815 (S.D.Cal. 2006) ................................................................... 20

*Bausch & Lomb, Inc. Sec. Litig.*,
  No. 06-CV-6294, 2008 WL 4911796 (W.D.N.Y. Nov. 13, 2008) ......................... 33

*Cal. Pub. Employee's Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ................................................................. 24,25, 30,31

*Cooperman v. Individual, Inc.*,
  171 F.3d 43 (1st Cir. 1999) ......................................................................... 19-20

*Cornelia I. Crowell GST Trust v. Possis Med. Inc.*,
  519 F.3d 778 (8th Cir. 2008) ........................................................................ 23-24

*Elam v. Neidorff*,
  502 F. Supp. 2d 988 (E.D. Mo. 2007), *aff'd*, 544 F.3d 921 (8th Cir. 2008) (*"Elam I"*) ......... 42

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) (*"Elam II"*) .................................................... 40, 42

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .............................................................................. 9,10

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) .............................................................................. 43

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) .............................................................................. 44

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ....................................................................... 10, 13

*Helwig v. Vencor*,
  251 F.3d 540 (6th Cir. 2001) .............................................................................. 11

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .............................................................................. 29

*Horizon Asset Mgmt. v. H&R Block*,
    580 F.3d 755 (8th Cir. 2009) ................................................................................33

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
    579 F.3d 878 (8th Cir. 2009) ("*Novastar I*") ..............................................15, 37

*In re 2007 Novastar Financial, Inc. Sec. Litig.*,
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. Jun. 4, 2008) ("*Novastar II*") .........................................................................................................20

*In re Alpharma Inc. Securities Litig.*,
    372 F.3d 137 (3d Cir. 2004) ........................................................................... 43-44

*In re Amdocs Ltd Sec. Litig.*,
    390 F.3d 542 (8th Cir. 2004) ..............................................................11, 13, 31

*In re Baker Hughes Sec. Litig.*,
    136 F. Supp. 2d 630 (S.D. Tex. 2001) ..................................................................32

*In re Best Buy Co. Inc. Sec. Litig.*,
    No. Civ. 03-6193, 2005 WL 839099 (D. Minn. 2005) ..........................................31

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ..........................................................................22, 35

*In re Capstead Mortg. Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ...................................................................9

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ...........................................................................9,10

*In re Comshare, Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999) ................................................................................40

*In re Credit Acceptance Corp. Sec. Litig.*,
    50 F.Supp.2d 662 (E.D. Mich. 1999)....................................................................21

*In re Downey Sec. Litig.*,
    No. CV08-3261-JFW, 2009 WL 2767670 (C.D.Cal. Aug. 21, 2009) ....................24

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    502 F.Supp.2d 884 (D.Minn. 2007) ("*Hutchinson I*") ..........................................18

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) ("*Hutchinson II*") ...........................................11, 45

*In re Interpool, Inc. Sec. Litig.*,
    No. Civ. 04-321(SRC), 2005 WL 2000237 (D.N.J. Aug. 17, 2005) .....................21

iii

*In re K-Tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ....................................................................................... Passim

*In re Loewen Group Inc., Sec. Litig.*,
    No. Civ.A. 98-6740, 2004 WL 1853137 (E.D.Pa. Aug. 18, 2004)..........................................20

*In re Medtronic Inc., Sec. Litig.*,
    618 F.Supp.2d 1016 (D. Minn. 2009) .....................................................................................33

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) ....................................................................................................9

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) .......................................................................31,41-42,42-43

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871 (D. Minn. 2007).................................................................................23,31

*In re Patterson Co. Inc., Sec. Litig.*,
    479 F. Supp. 2d 1014 (D. Minn. 2007) ..................................................................................30

*In re PDI Sec. Litig.*,
    No. Civ.A. 02-211(GEB), 2006 WL 3350461 (D.N.J. Nov. 16, 2006)..................................23

*In re Peritus Software Servs., Inc. Sec. Litig.*,
    52 F. Supp. 2d 211 (D. Mass. 1999) .......................................................................................43

*In re Possis Med. Inc. Sec. Litig.*,
    No. 05-CV-1084, 2007 WL 335051 (D. Minn. Feb. 1, 2007) .........................................22, 31

*In re Sec. Litig. BMC Software Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................................................32

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ..................................................................................................43

*In re St. Jude Med., Inc.*,
    629 F.Supp.2d 915 (D. Minn. 2009)......................................................................................11

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ................................................................................................33

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
    432 F.Supp.2d 571 (E.D.Va. 2006) ........................................................................................19

*Kushner v. Beverly Enter., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ..............................................................................................2, 11

iv

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)..................................................................22

*Parnes v. Gateway 2000, Inc.,*
122 F.3d 539 (8th Cir. 1997) ......................................................... Passim

*PEC Solutions Sec. Litig.,*
No. 03CV331, 2004 WL 1854202 (E.D. Va. May 24, 2001) .................................21

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,*
75 F.3d 801 (2nd Cir. 1996)..................................................................32

*Stavros v. Exelon Corp.,*
266 F. Supp. 2d 833 (N.D. Ill. 2003) ..................................................... 14-15

*Steiner v. Shawmut Nat'l Corp.,*
766 F. Supp. 1236 (D. Conn. 1991)..........................................................13,14

*Tellabs v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007)..........................................................................33

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ................................................................24

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) .............................................................. Passim

15 U.S.C. § 78u-4(b)(2) .............................................................. Passim

15 U.S.C. § 78u-4(b)(1)(B) ................................................................24

15 U.S.C. § 78u-4(b)(3)(A) ................................................................12

15 U.S.C. § 78u-5(i)(1)(A)-(D).........................................................10, 14

15 U.S.C. § 78u-5(i)(1)(D) ................................................................10

15 U.S.C. § 78u-5(c)(1) ...............................................................11, 13

15 U.S.C. § 78u-5(e)......................................................................11

Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78a, 78j, 78u.................... Passim

## RULES

Fed. R. Civ. P. 9(b) ...................................................................8,9, 31

v

## Regulations

Selective Disclosure and Insider Trading, Exchange Act Release No. 33-7882, 17 CFR 240 (Aug. 15, 2000)..............................................................................................42

## Other Authorities

Accounting for Contingencies, Statement of Financial Accounting Standards 5 (Fin. Accounting Standard Bd. 2008)....................................................................17,18,19

Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1 (Am. Inst. of Certified Pub. Accountants (1972)) ....................35, 36

Gary L. Gastineau & Mark P. Kritzman, The Dictionary of Financial Risk Management 63 (Frank J. Fabozzi Associates 1999) ............................................40

John Downes & Jordan Elliot Goodman, Dictionary of Finance and Investment Terms (Barron's Financial Guide 7th ed. 2006.  ............................................5,6

Phillip McBride Johnson & Thomas L. Hazen, Derivatives Regulation §1.02[13] (Aspen Publishers 3d ed., Vol. I 2004).........................................................3, 4, 27

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 7 of 53

Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws ("Consolidated Amended Complaint" or "CAC"), based on alleged violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") arises out of the global economic crisis and its impact on FCStone Group, Inc. ("FCStone" or the "Company"). Plaintiffs purport to represent a class of persons who purchased or acquired FCStone's shares between November 15, 2007 and February 24, 2009.

The events upon which Plaintiffs base their claims are: (i) FCStone's November 3, 2008 announcement that it expected to incur $20 million in losses on an "energy trading" account; (ii) FCStone's July 14, 2008 SEC Form 10-Q[1] disclosure that in its fiscal third quarter it incurred a $1.1 million bad debt expense on certain "cotton trading" accounts; and (iii) FCStone's statements, beginning in its 2007 SEC Form 10-K for fiscal year end August 31, 2007, that it had entered into a hedge against declining interest rates. The CAC alleges conclusorily that in connection with these adverse events, FCStone's financial statements failed to comply with Generally Accepted Accounting Principles ("GAAP") and the Defendants violated §10(b) by making false and misleading forward-looking statements, and omissions of material fact. As established herein, the CAC must be dismissed. Among the deficiencies identified below, the CAC fails to plead the "false statement" and "scienter" elements of a §10(b) claim and it fails to plead all information upon which Plaintiffs base their beliefs that Defendants violated §10(b). Defendants' financial statements did not violate GAAP. Defendants did not make any false statement or omission of material fact, and Defendants did not possess the scienter to commit

---

[1] FCStone's fiscal year begins September 1 of the year before it ends. In other words, September 1, 2007 is the beginning of the Company's 2008 fiscal year. (CAC ¶ 17 n.2.)

securities fraud.  The Court should dismiss the CAC with prejudice.

**RELEVANT FACTS**

FCStone "is an integrated commodity risk management company," which  operates one of the leading independent clearing and execution platforms for exchange-traded futures and options contracts.[2]  (CAC ¶ 17; 11/29/07 Form 10-K at 1 (attached hereto as Exhibit A.)  The Company provides "transaction execution services to commercial commodity intermediaries, end-users and producers," and assists primarily middle market customers in optimizing their profit margins and mitigating their exposure to commodity price risk.  (*Id.*)

FCStone operates through three reportable segments and through several wholly-owned subsidiaries with offices and facilities abroad and in twelve states.[3]  (Ex. A at 2.)  The Company's operating business segments are commodity and risk management services ("CR&M"), clearing and execution services ("CES"), and financial services.  (*Id.* at 2.)  Both the CR&M and CES segments clear and execute trades on behalf of FCStone's customers ("customers") through FCStone's subsidiary FCStone, LLC.  (*See id.* at 3, 5, 32.)  Additionally, FCStone LLC operates the CES segment through two separate divisions, a Wholesale division and a Professional Trading division.  (*Id.* at 6.)  FCStone LLC is a clearing firm and member of all major U.S. commodity futures exchanges, including the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade (now part of the CME), the New York Mercantile

---

[2]     FCStone merged with non-party International Assets Holding Corporation on July 2, 2009. However, all facts are stated as of the putative class period, *i.e.*, as alleged in the CAC or in public documents the CAC relies upon which were issued during the relevant time period.  The Court can consider such documents on this motion. *Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 831-832 (8th Cir. 2003) ("When deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading").

[3]     FCStone is headquartered in Kansas City, Missouri and has U.S. operational offices in Chicago, IL; New York, NY; West Des Moines, IA; St. Louis, MO; Omaha, NE; Minneapolis, MN; Bloomington,

2

Exchange (now part of the CME), the New York Board of Trade (now known as ICE Futures US), and the Kansas City Board of Trade. (*Id.* at 5; *see also* 11/14/08 Form 10-K at 5 (attached hereto as Exhibit B).)

In connection with FCStone's clearing and execution services, FCStone LLC acts as a broker for its customers who trade on margin,[4] and as a clearing firm, it is responsible for the fulfillment of its customers' accounts. (CAC ¶¶ 4, 46; *see also* Ex. B at 12.) FCStone's customers trade on futures exchanges and in the over-the-counter derivative ("OTC") markets. FCStone carries substantial open positions for its futures' customers. (Ex. B at 12.) As a clearing firm, FCStone is required by the various exchanges on which its customers trade to post and maintain margin or credit support for its customers' positions, and FCStone collects margin or other deposits from its customers.[5] (Ex. A at 18.)

Because FCStone is responsible for its customers' open positions, its business may be impeded by market volatility that leads to significant adverse price movements, causing the exchanges to require the Company's positing of additional margin on short notice. (CAC ¶¶41, 46; Ex. A at 18.) FCStone maintains borrowing facilities for this purpose and has procedures in place to collect additional margin and deposits from customers, even on a same-day basis. (Ex. A at 18.) Nevertheless, as expressly disclosed by FCStone in its 2007 Form 10-K, this service

---

IL; Buford, GA; Indianapolis, IN; Spirit Lake, IA; Bowling Green, OH; and Summit, NJ. (Ex. A at 21.)

[4] In this context, margin is the sum of money that exchanges require a purchaser or seller of a futures or option contract to deposit and maintain with his broker, e.g., FCStone, LLC, which acts as the custodian of these deposits. PHILLIP MCBRIDE JOHNSON & THOMAS L. HAZEN, DERIVATIVES REGULATION §1.02[13]] at 111 (Aspen Publishers 3d ed., Vol. I 2004) (hereinafter "DERIVATIVES REG."); *see also id.* at 116 (explaining commodity options margins are computed on the same basis as margins for futures). The level of margin is "not static and is subject to change at any time." *Id.* at 115. Additional margin may be required and the requirement for additional margin is "usually triggered by changes in the market price of the contract." *Id.*

[5] Exchange rules require the broker to make a margin call on its customer if "there are insufficient assets in a customer's account to cover the necessary margin." DERIVATIVES REG. § 1.02[13] at 114.

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 10 of 53

subjects the Company to "significant credit risk." (*Id.*)[6] This risk is realized if FCStone is required to post additional margin on a customer's behalf, and the customer cannot meet FCStone's margin call because, *e.g.,* liquidating the customers' margined positions cannot cover the deficit, the customer does not have other sufficient assets, and/or cannot obtain credit from other sources, leading to the customer defaulting on his obligations to FCStone. (*Id.* at 12-13; *see also* CAC ¶4.)

Given this risk, FCStone maintains an allowance for doubtful accounts. In its annual report on SEC Form 10-K for fiscal year 2007, FCStone disclosed its policy on doubtful accounts and stated, in relevant part:

> We maintain allowances for doubtful accounts for trade receivables and deficits on customer commodity accounts. The allowance for doubtful accounts are *significant estimates*, and are maintained at a level considered appropriate by our management based on analyses of the historical aging of our receivables, credit quality for specific accounts, historical trends of charge-offs and recoveries, and current and projected economic, market and other conditions. If we become aware of a customer's inability to meet its financial obligations, we establish a specific allowance for a potential bad expense to reduce the net recognized receivable to the amount we reasonably believe will be collected. ***Additionally, different assumptions, changes in economic circumstances or the deterioration of the financial condition of our customers could result in additional provisions to the allowances for doubtful accounts and increased bad debt expense.***

(Ex. A at 36 (emphasis added).)

In addition, like a bank, FCStone invests the funds that its customers deposit into their margin accounts, and a portion of FCStone's revenue is, therefore, derived from interest earned on these short-term investments. (Ex. A at 32; *see also* CAC ¶4.) As a result, the level of prevailing short-term interest rates affects the Company's profitability, which "generally benefits

---

(*See also* Ex. A at 18; CAC ¶46.)

[6]      "Under exchange rules, the carrying broker [FCStone, LLC] assumes responsibility for any trading losses sustained and not honored by its customers." DERIVATIVES REG. § 1.02[13] at 112.

from rising rates." (Ex. A at 32; CAC ¶ 4.) The Company's 2007 10-K filing disclosed specific

risk factors relevant to the Company's ability to generate revenue on interest income, in a section

entitled "Decreases in short-term interest rates would negatively impact our profitability," stating

in relevant part:

> Rising interest rates increase the amount of interest income earned from these customer deposits. *If short-term interest rates fall, our revenues derived from interest will decline which would negatively impact our profitability.*
>
> Short-term interest rates are highly sensitive to factors that are beyond our control, including general economic conditions and the policies of various governmental and regulatory authorities. In particular, decreases in the federal funds rate by the Board of Governors of the Federal Reserve System usually lead to decreasing interest rates in the U.S., which generally lead to a decrease in short-term interest rates.

(Ex. A at 11-12, 32 (emphasis added); *see also id.* at 11-21 (all risk factors are disclosed).)

FCStone's 2007 Form 10-K also disclosed that FCStone was hedging[7] a portion of this

investment portfolio against declining interest rates. (Ex. A at 58; *see also* CAC ¶ 53 (citing Ex.

A at 58); CAC ¶ 57 (citing 1/14/08 Form 10-Q at 29 (attached hereto as Exhibit C).) FCStone

did not disclose the specific "technique" it was using to hedge against declining interest rates

because such detail is not required and disclosure would have benefited no one but the

Company's competitors.

During the putative class period, the global economic crisis adversely impacted FCStone,

as it did nearly every other business in every industry, worldwide. First, on March 3-4, 2008, at

the beginning of FCStone's fiscal third quarter, cotton futures[8] traded higher than their price

---

[7] A "hedge" is simply a financial technique used to offset the risk of loss from price fluctuations in the market. JOHN DOWNES & JORDAN ELLIOT GOODMAN, DICTIONARY OF FINANCE AND INVESTMENT TERMS 305-306 (Barron's Financial Guide 7th ed. 2006). Hedgers employ a variety of techniques, including, but not limited to, futures contracts, options on futures, and interest rate swaps. *Id.*

[8] A futures contract is "an agreement to buy or sell a specific amount of a commodity or financial instrument at a particular price on a stipulated future date." JOHN DOWNES & JORDAN ELLIOT GOODMAN,

5

limit, and the exchange unexpectedly required additional margin on these futures contracts at unprecedented levels. (CAC ¶¶ 39-40.) FCStone met these margin calls on behalf of its customers, but the unexpected demands caused deficits in these customers' accounts. Despite FCStone's collection efforts, its customers were unable to satisfy their obligations to the Company. (*Id.*) Accordingly, one of the very risks FCStone warned its shareholders about was realized – FCStone suffered losses on these cotton trading accounts and was required to write off $1.1 million to its bad debt expense in the third quarter (hereinafter, the "Cotton Trading" account or losses).[9]

In addition, during the same quarter, an interest rate hedge FCStone had entered into, in an attempt to mitigate against the decline in short-term interest rates, was liquidated (hereinafter, the "Interest Rate Hedge"). (CAC ¶ 6, 35, 68.) Regarding its liquidation of this hedge, Mr. Dunaway stated:

> At the same time net interest rates began to decline, we began to scale on hedges on FCStone's exposure to short-term interest rates using three-month LIBOR instruments with a two-year tenor. While the instruments were intended to be hedges against interest rate declines over a two year period in order to meet GAAP accounting standards, FCStone is required to mark the infrastructures to market at the end of each quarter.

> During the current fiscal year, we recognized a 652,000 unrealized gain in our first quarter, or $0.014 per diluted share, and 4.4 million unrealized gain in our second quarter or roughly $0.10 per diluted share. The difficulty that this accounting standard presents is the fact that the hedge instrument is structured for 24 month period, but the gain is recognized at each snapshot in time.

> While the three-month LIBOR settings were virtually unchanged during the third quarter, the LIBOR curve steepened sharply with two-year LIBOR softs rising 106 basis points during the quarter. ***The entire structure was liquidated during***

---

DICTIONARY OF FINANCE AND INVESTMENT TERMS 279 (Barron's Financial Guide 7th ed. 2006).

[9]      In FCStone's financials, "bad debt expense consists of both amounts written off based on known defaults of customers and brokers, as well as an allowance for accounts that we believe may become uncollectible through our review of the historical aging of our receivables and our monitoring of the financial strength of our customers, brokers and counterparties." (Ex. A at 35.)

6

*our fiscal third quarter with substantially no gain, which had the effect of reversing all the previously recognized unrealized gains, reducing the Company's income for the third quarter by $0.11 per diluted share.*

(July 10, 2008 Conf. Call Tr. at 6 (attached hereto as Exhibit D) (emphasis added); *see also* CAC ¶ 67 (selectively quoting this transcript).) In other words, due to GAAP standards, FCStone's *reported* income was increased by the required recognition of *unrealized*, "paper" gains in the first and second quarters, and this paper income was eliminated, as required, from FCStone's financial statements when it liquidated the hedge in the third quarter. No actual material gain or loss was ever realized. Nevertheless, the hedge strategy failed to mitigate FCStone's exposure to declining interest rates, which were already low and continuing to decline. (CAC ¶¶ 5-6, 9, 25-38.) The market could, therefore, reasonably expect the Company's future profitability to be adversely impacted – just as FCStone had disclosed in its 2007 10-K risk disclosure.

Finally, on November 3, 2008, the Company announced that it expected to record a bad debt expense of up to $25 million pre-tax during the quarter, based on losses incurred on three domestic accounts. (CAC ¶ 73; ¶ 74 (quoting 11/4/08 Form 8K, Nov. 3, 2008 Press Release at Exh. 99.1 (attached hereto as Exhibit E); ¶ 76 (quoting Nov. 4, 2008 Conf. Tr. at 3-4, 5, 6, 12 (attached hereto as Ex. F); ¶ 83 (quoting Jan. 8, 2009 Conf. Call Tr. at 2 (attached hereto as Ex. G).) The losses related primarily to a significant energy trading account (hereinafter the "Energy Account"). (CAC ¶¶ 9, 43-51, 72-72, 112, 118.) FCStone's estimate of the Energy Account's losses was repeated in its fourth quarter Form 10-Q filed on January 9, 2009, at which time FCStone further warned investors that it intended to liquidate the account. (1/9/09 Form 10-Q at 32 (attached hereto as Exhibit H).) FCStone also warned that because the Energy Account included a large number of contracts, and due to "market conditions and the position's long-tenured settlement dates extending over the next few quarters, *there can be no assurances that we will not have to make significant adjustments to the estimate in future periods.*" (*Id.*

(emphasis added).)  This very risk was realized.  On February 24, 2009, FCStone announced that it expected to incur an additional $60 to $80 million in bad debt on the Energy Account.  (CAC ¶ 44; Form 8K, Feb. 24, 2009 Press Release at Exh. 99.1 (attached hereto as Exhibit I).)  On March 12, 2009, FCStone announced that it had liquidated the Energy Account, thereby eliminating any continuing future risk.  However, the liquidation came at a price, which fixed the amount of FCStone's actual total bad debt loss on the Energy Account at $110 million.  (CAC ¶ 44.)

A<span style="font-variant:small-caps">RGUMENT</span>

Because the CAC alleges three distinct violations of §10(b), based on statements made about three distinct events described above, each of which occurred at different times during the putative class period, Defendants discuss each of Plaintiffs' claims by event and demonstrate that none allege a violation of §10(b).

## I.  GOVERNING STANDARDS

To state a claim under §10(b) of the Exchange Act, a plaintiff must allege that each defendant (i) misrepresented or omitted a material fact, (ii) in connection with the purchase or sale of securities, (iii) with *scienter*, (iv) upon which the plaintiff justifiably relied, and (v) which proximately caused the plaintiff's injury.  *See In re K-Tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 888 (8th Cir. 2002).  To survive a motion to dismiss, the allegations of each of these required elements must satisfy the pleading requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)") and the more stringent requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78a, 78j, 78u, (the "PSLRA" or "Reform Act").  *See K-Tel*, 300 F.3d at 889 (Reform Act "embodies" and strengthens Rule 9(b) pleading requirements).

Rule 9(b) requires a plaintiff to specify "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir.

1997) (quotations and citations omitted) (holding, Rule 9(b) should be applied strictly to securities fraud complaints). In other words, compliance with Rule 9(b) requires Plaintiff to specifically plead the "'who, what, when, where, and how: the first paragraph of any newspaper story'" of an alleged fraud. *Id.* at 549-50 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Additionally, "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Id.* at 549; *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (catch-all allegations should be disregarded); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 546 (N.D. Tex. 2003) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal.") (quotation and citation omitted).

The PSLRA intentionally increased the pleading requirements of a securities fraud complaint in several significant respects. First, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading…." 15 U.S.C. § 78u-4(b)(1); *see also In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997) (affirming dismissal because Plaintiffs failed to plead "specific facts" demonstrating what was "'false or misleading about a statement and why it was false'").

Second, with respect to "*each*" alleged act or omission, the PSLRA requires plaintiff to "state with particularity facts giving rise to a *strong inference* that [each] defendant acted with the required state of mind," *i.e.*, scienter. 15 U.S.C. § 78u-4(b)(1)-(2) (emphasis added); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008) ("Under the [PSLRA], it is not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter.") (internal quotation omitted); *K-Tel*, 300 F.3d at 889; *see also Green Tree*, 270 F.3d at 660 ("inferences of scienter survive a motion to dismiss only if they are both reasonable and

9

'strong' inferences"). Moreover, the "inference 'must be more than merely plausible or reasonable – it must be cogent and *at least as compelling as any opposing inference* of nonfraudulent intent.'" *Ceridian,* 542 F.3d at 244 (quoting *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007) (emphasis added)). Under well-settled law, the scienter required for §10(b) claims based on false statements or omissions of material *fact* is "severe recklessness." *Green Tree*, 270 F.3d at 653-54. Severe recklessness is "'highly unreasonable omissions or misrepresentations that ... present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it.'" *Ceridian*, 542 F.3d at 244 (quoting *Green Tree*, 270 F.3d at 654).

Third, the PSLRA established a safe harbor which renders inactionable any qualifying oral or written statement that is forward looking. 15 U.S.C. § 78u-5(c)(1). A forward looking statement is one "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and includes assumptions underlying or relating to any such statements. 15 U.S.C. § 78u-5(i)(1)(A)-(D).[10] Under the PSLRA's safe harbor, a complaint seeking to state a §10(b) claim based on a forward-looking statement fails, as a matter of law, if the statement was accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) ("[I]f a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."); *see also id.* ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making

_____

[10] Under the safe harbor, a statement qualifies as forward-looking even if it incorporates statements of existing conditions or historical fact if these factors are "assumptions underlying or relating to" future performance. 15 U.S.C. § 78u-5(i)(1)(D).

the statement." (citing H.R. Rep. No. 104-369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730)). *Helwig v. Vencor,* 251 F.3d 540, 547-48 (6th Cir. 2001) (same); *see also In re Amdocs Ltd Sec. Litig.,* 390 F.3d 542, 548 (8th Cir. 2004) (court did not conduct scienter analysis before affirming dismissal of forward-looking statements which were accompanied by sufficient cautionary language, holding such statements were immaterial as a matter of law); *In re St. Jude Med., Inc*., 629 F.Supp.2d 915, 922 (D. Minn. 2009) (same). Cautionary statements that are not subject to material dispute must be considered by the Court on a motion to dismiss. 15 U.S.C. § 78u-5(e) ("On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.")

Furthermore, even forward-looking statements that are *not* accompanied by meaningful cautionary language are *not* actionable unless the plaintiff alleges particularized facts showing: (1) the statements were material, and (2) defendants had actual knowledge that the statements were false or misleading when made. *Id.* at § 78u-5(c)(1)*; See Kushner*, 317 F.3d at 831.

Fourth, the PSLRA requires that a §10(b) complaint which is based on "information and belief," must "state with particularity *all facts* upon which [the] belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added).[11] At a minimum, "all facts" include "the source of the information and the reasons for the belief." *Parnes*, 122 F.3d at 550; *see also In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 958 (8th Cir. 2008) (*"Hutchinson II")* ("if an allegation regarding the statement or omission is made on information and belief, the complaint shall state

---

[11]     Plaintiffs cannot escape this requirement by failing to expressly plead that their claims are based on "information and belief" because allegations that are not based on a plaintiff's personal knowledge are necessarily pleaded on "information and belief." *ABC Arbitrage Pltfs. Group v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002).

with particularity all facts on which that belief is formed").

Finally, the PSLRA's pleading requirements are not optional; if a complaint fails to meet any one of the standards, it must be dismissed. *See* 15 U.S.C. § 78u-4(b)(3)(A) ("[T]he court *shall*, on the motion of any defendant, dismiss the complaint if the [pleading] requirements ... are not met.") (emphasis added). As established below, the CAC fails to satisfy any of the PSLRA's pleading requirements, and the deficiencies are so glaring and numerous, the Court should dismiss the CAC with prejudice.

## II. THE COMPLAINT FAILS TO STATE A CLAIM UNDER §10(B) BASED ON THE ENERGY ACCOUNT LOSSES.

The most significant §10(b) violation Plaintiffs assert is based on the losses FCStone suffered on the Energy Account (the "Energy Account Claim"). Based on these losses, Plaintiffs allege: (i) Defendants' estimates of the amount of future losses were false when made; (ii) Defendants falsely assured investors that losses on the Energy Account were limited in its financial statements issued on November 14, 2008 and January 9, 2009; and (iii) Defendants knew the true scope of the Energy Account losses as early as June 2008, which gave rise to a duty to disclose the existence and scope of these losses in the Company's third quarter financial statements under GAAP. But Defendants concealed the information instead. Thus, Plaintiffs attempt to plead the first element of their Energy Account Claim based on forward-looking statements, false assurances, and omissions of material facts. (CAC ¶¶ 52-62.) Plaintiffs' attempt fails.

### A. AS A MATTER OF LAW, DEFENDANTS' FORWARD-LOOKING STATEMENTS REGARDING THE ENERGY ACCOUNT ARE NOT ACTIONABLE.

Plaintiffs claim that statements Defendants made on November 4, 2008, January 8-9, 2009, and February 24, 2009, estimating the amount of future bad debt on the Energy Account

12

violated §10(b) because these statements were all false when made.[12]  ((See CAC ¶¶ 9, 10, 43, 74-76, 79, 82-83; *see also id.* ¶¶ 44, 108.)  Contrary to Plaintiffs' assumption, because these statements were estimates of FCStone's future bad debt on the Energy Account and they were accompanied by meaningful cautionary language, none of the statements are actionable under the PSLRA's safe harbor.  15 U.S.C § 78u-5(c)(1); *Amdocs*, 390 F.3d at 548-49 (affirming dismissal, company's forward-looking statements were "immaterial as a matter of law because they were accompanied by cautionary statements that bespoke caution"); *Harris*, 182 F.3d at 804-07 (affirming dismissal, challenged statements were forward-looking statements accompanied by sufficient cautionary language).

First, reserves for, or estimates of, future bad debt are forward-looking because they predict a company's future financial liabilities.  Estimates of losses, by their nature, cannot be validated until future events are realized.  *Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 1236, 1245 (D. Conn. 1991) (explaining that "reserves [a]re estimates or predictions of the likely collection or liquidation experience of the [company] in the future").  Simply reading Defendants' challenged statements confirms their forward-looking nature.  For example, in FCStone's November 3, 2008 press release, the Company stated that it "*expect[ed]* to incur up to a $25 million pre-tax bad debt provision *for the first quarter* of fiscal year 2009," which would

---

[12]       These statements include comments by the Individual Defendants during the conference calls following these earnings press releases.  (CAC ¶¶ 9-10, 43, 74-76, 83.)  As demonstrated in the transcripts of those calls, however, each began with Mr. Dunaway warning against reliance on forward-looking statements and providing meaningful cautionary language.  (Nov. 15, 2007 Conf. Call Tr. at 3 (attached hereto as Exhibit J) ("It is important to note that such statements about [FCStone's] anticipated future results, prospects, or other non historical facts or forward-looking statements can reflect FCStone's current prospective of existing trends and information as of today's date…."); Jan. 14, 2008 Conf. Call Tr. at 2 (attached hereto as Exhibit K) (same); Ex. D at 2 (same); Ex. G at 1 (same).)  During these conference calls, additional meaningful cautionary language was also offered.  (*See, e.g.,* Ex. F at 2 ("The recent upheaval of the credit and financial risk in the highly volatile commodities markets have increased our exposure to credit risk"); Feb. 25, 2009 Conf. Call Tr. at 2 (attached hereto as Exhibit L) ("changes in

13

not end until November 30, 2008.  (Ex. E (emphasis added).)  FCStone further explained that "[t]his *estimated* bad debt provision is based upon currently available information . . ."  (*Id.* (emphasis added).)  The Company's January 8, 2009 press release and January 9, 2009 fourth quarter 10-Q simply included the estimated amounts in FCStone's reserve.  (1/8/09 Form 8-K, Jan. 8, 2009 Press Release at Exh. 99.1 (attached hereto as Exhibit M); Ex. H at 8, 35.)  On February 24, 2009, FCStone announced that it expected to incur an additional $60 to $80 million in losses on the account for the second quarter of fiscal 2009 (ending February 28, 2009).  Because these statements were estimates of future bad debt, these statements qualify as forward-looking under the PSLRA.  15 U.S.C. § 78u-5(i)(I)(A)-(D); *see, e.g., Steiner,* 766 F. Supp. at 1245 (explaining that "reserves [a]re estimates or predictions of the likely collection or liquidation experience of the [company] in the future").

These forward-looking statements were also accompanied by meaningful cautionary language.  For example, the November 3rd press release stated that the basis of FCStone's estimate was "currently available information, market conditions and account positions, ***which could change before the end of the first quarter.***"  (Ex. E (emphasis added).)  FCStone further stated ***"no assurances can be given that additional losses on this account will not be recognized***."  (*Id.*)  FCStone's fourth quarter 10-Q filed on January 9, 2009 similarly provided specific warnings regarding the risks related to the Energy Account, that ***no assurances*** could be given regarding the amount of the losses, and it incorporated by reference all specific risk disclosures contained in FCStone's 2007 10-K filing.[13]  The February 24, 2009 press release, disclosing FCStone's increase to the estimated bad debt, disclosed the factors that caused the

_____

market conditions could cause our loss [on the Energy Account] to be lower or higher than the reserve.")) 
[13] "[D]irect incorporation of SEC filings by reference is permissible and further supports considering the

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 21 of 53

increase and that these factors were continuing:   "Since the prior announcement, the extraordinary global economic turmoil has continued, with credit markets in gridlock, interest rates falling, a significant collapse and de-leveraging of the commodity markets and a wide range of settlement valuations in the commodities market. "   (Ex. I at 1.)     In short, Defendants' forward-looking statements were accompanied by meaningful cautionary language.

Because the Company's cautions were specific and meaningful, none of the Defendants' forward-looking statements regarding the Energy Account are actionable, and to the extent Plaintiffs base their §10(b) claim on these statements, they fail to state a claim.   The Court should, at a minimum, strike them from the CAC.   (*See* CAC ¶¶ 9, 10, 43, 74-76, 79, 82-83.)

### B.   DEFENDANTS DID NOT ASSURE INVESTORS THE AMOUNT OF THE ENERGY ACCOUNT LOSSES WERE LIMITED.

Plaintiffs also allege that Defendants violated §10(b) by falsely assuring investors that the Company's "exposure" on the Energy Account was "limited" in the Company's financial statements issued on November 14, 2008 and January 9, 2009.   (CAC ¶¶ 116, 118-119.)   First, these allegations are conclusory – the CAC fails to specify the content of any statement or in either SEC filing.   (*See id.*)   Here, Plaintiffs' failure to identify the "what" with precision is inexcusable because the statements were made in public filings (which Plaintiffs liberally quote selectively throughout their CAC).   *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 -883 (8th Cir. 2009) (*"Novastar I"*) (failure to specifically identify "what" statements were allegedly false or misleading" does not satisfy the PSLRA's pleading requirements); *K-Tel*, 300 F.3d at 890 (allegations must be stated with particularity, including "contents of false representations").   Second, a reading of FCStone's 2008 10-K, filed on November 14, 2008,

_____

warnings contained in [such] filings.  *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 (N.D. Ill. 2003).

and its fourth quarter 10-Q, filed on January 9, 2009, prove they contained no such assurance.

The Company's 2008 fiscal year 10-K, filed on November 14, 2008, reported the loss estimates as a subsequent event and stated: "We **believe** this range of bad debt provision properly reflects all shortfall for which we are currently responsible as it relates to this third-party account." (Ex. B at 53 (emphasis added).) However, the very first paragraph of this 10-K identified this statement of "belief" as forward-looking and was accompanied by meaningful cautionary statements. Indeed, the Company warned investors that:

> This report includes forward-looking statements . . . .These statements involve known and unknown risks, assumptions, uncertainties and other factors that may cause our actual results . . . to be materially different from any future results, . . . performance, . . . anticipated, estimated or projected results or achievements expressed or implied by these forward-looking statements. These factors include, among other things, customer/counterparty credit and liquidity risk . . .. You should consider the risks described in the "Risk Factors" section . . . in evaluating any forward-looking statements included in this report.

> In some cases, you can identify forward-looking statements by use of words such as "will be," "intend," "continue," **"believe,"** "may," "expect," "hope," "anticipate," "goal," "forecast," or other comparable terms, or by discussions of strategy, plans or intentions.

> ***There is no assurance the events discussed or incorporated by reference in this report or circumstances reflected in the forward-looking statements will occur and actual results, performance or achievements could differ materially from those anticipated or implied in the forward-looking statements. Given these uncertainties, you should not place undue reliance on these forward-looking statements***.

(Ex. B at 1 (emphasis added); *see also id.* at 9, 10-11, 12, 16, 29 (specifically identifying risks applicable to Energy Account).) In short, Plaintiffs not only fail to plead a false assurance was stated in the 2008 10-K, a reading of the 10-K demonstrates Plaintiffs are wrong.

Plaintiffs' second claim, based on "false assurances" in FCStone's fourth quarter 10-Q for the period ending November 30, 2008, is frivolous. This 10-Q expressly **disclaimed** any assurances, including the precise one Plaintiffs claim was made. With respect to FCStone's bad

16

debt provision on the Energy Account, the 10-Q stated in relevant part:

> We believe the pre-tax debt provision provides a reasonable estimate of the shortfall for which we are currently responsible as it related to this third party account. . . . .
>
> In the case of the energy trading account, we are in control of the orderly liquidation of the account and have taken specific steps intended to reduce the market risk associated with the trading position of the energy account. Although this liquidation process may take several months, we believe this approach will permit us to maximize the remaining value of the account. To determine the bad debt provision for this energy account, we have estimated the ultimate shortfall of the account utilizing our internal experts and the assistance of a third party consulting and accounting firm. ***However, because of the large number of contracts included in the energy account, market conditions and the position's long-tenured settlement dates extending over the next few quarters, there can be no assurances that we will not have to make significant adjustments to the estimate in future periods. . . . While we plan to liquidate the energy account over the next several months, there can be no assurances given that any additional reduction in the value of the account will not necessitate an accelerated liquidation which could result in further significant losses.***

(Ex. H at 32 (emphasis added).)

In sum, to the extent Plaintiffs' §10(b) claim is based on false assurances, it fails as a matter of law. At a minimum, the Court should strike paragraphs 116, and 118-119 of the CAC.

### C. THE COMPANY'S ACTIONS AND DISCLOSURES FULLY COMPLIED WITH GAAP.

Plaintiffs also attempt to plead the first element of their Energy Account Claim based on alleged omissions of material "fact." This allegedly material "fact" was that the Energy Account would ultimately lead to a $110 million bad debt expense which Plaintiffs believe should have been disclosed in FCStone's third quarter 10-Q, filed on July 14, 2008. (CAC ¶¶ 10, 44, 91, 103.) This claim is premised on Plaintiffs' erroneous beliefs (i) that the GAAP standards discussed below required disclosure, and (ii) that Defendants "knew" the full scope of the losses in June, which is based on "information" offered by a former low-level FCStone employee, who was not in a position to know any of the information he provided Plaintiffs (*infra* at 22-30).

Plaintiffs allege that GAAP, specifically the Statement of Financial Accounting

Standards No. 5 ("SFAS 5"), required FCStone to increase its allowance for doubtful accounts in its third quarter, Form 10-Q filed on July 15, 2008 (for the period ending May 31, 2008), because "defendants knew at least as early as June 2008 the true scope of the risk associated with the customers' trades" (CAC ¶ 10), and "there was more than a remote chance that the Company had incurred losses on the energy trading account" (CAC ¶ 110). On the contrary, SFAS 5, ¶ 8, does not require any charge to income based on "remote" chances. The standard is:

> An estimated loss from a loss contingency[14] shall be accrued by a charge to income[15] if both of the following conditions are met: (a) information available prior to issuance of the financial statements indicates that it is **probable**[16] that an asset has been impaired or a liability has been incurred at the date of the financial statements [and] (b) the amount of loss can be **reasonably estimated**.

Accounting for Contingencies, SFAS 5, ¶ 8 (Fin. Accounting Standard Bd. 2008) (emphasis added); *see also In re Hutchinson Tech., Inc. Sec. Litig.*, 502 F.Supp.2d 884, 894 (D.Minn. 2007) ("*Hutchinson I*"). Thus, to plead the omission of a material fact based on SFAS 5, ¶8, Plaintiffs were required to plead particularized facts showing FCStone identified a "probable" loss on the Energy Account and that FCStone "reasonably estimated" the amount of the loss before filing its third quarter 10-Q on July 14, 2008. As established *infra* at 30-35, Plaintiffs' attempt to meet this standard based on information provided by their confidential witness fails.

Plaintiffs also allege that "even if" the Energy Account losses were not probable by July 14, 2008, SFAS 5, ¶ 10 required FCStone to disclose (not charge to income)[17] that there existed

---

[14]     Insofar as is relevant to this action, SFAS 5 defines "contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss," which includes expenses and losses, "(hereinafter a 'loss contingency') to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur." (SFAS 5 ¶ 1; *id.* n.1.) Furthermore, resolution of the uncertainty is confirmation of "the loss or impairment of an asset or the incurrence of a liability." (*Id.*)

[15]     FCStone's allowance for doubtful accounts is a "charge to income." (*See, e.g.* Ex. B at 32.)

[16]     SFAS 5 defines "probable" as "[t]he future event or events are likely to occur." (SFAS 5, ¶ 3(a).)

[17]     Appendix C, ¶59 of SFAS 5 explains that ¶8 requires "the loss be reasonably estimable" in order

"at least a *reasonable possibility* that a loss . . . [on the Energy Account] may have been incurred." (SFAS 5, ¶ 10.) "Reasonably possible" is defined in SFAS 5, ¶ 3(b) as "the chance of the future event or events occurring is more than remote but less than likely." (SFAS 5, ¶ 3(b); CAC ¶ 109-10.)

Plaintiffs fail to state a violation of §10(b) based on these GAAP provisions. In addition to the date on which they claim a reserve should have been established, Plaintiffs were required to allege the amount. *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,* 432 F.Supp.2d 571, 588 (E.D.Va. 2006) (no actionable omission where plaintiff failed to allege the amount that should have been reserved for and the time the reserve should have been taken during the Class Period). Plaintiffs do not allege any facts specifying the amount of Energy Account losses that should have been disclosed in FCStone's third quarter 10-Q. (CAC ¶¶ 91, 102-115.) At most, they allege conclusorily that the "full scope" of the loss was known as early as June. (CAC ¶10.)

Plaintiffs do not allege who knew that the future loss was $110 million, who predicted this amount with such precision, or how that magically perfect prediction was reached – particularly given that the amount of future loss FCStone would suffer on the account was not certain, until the account was liquidated nine months later. The "full scope" of the actual $110 million bad debt expense could not have been determined until the Energy Account was sold in March 2009. 15 U.S.C. § 78u-4(b)(1); *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47-48 (1st Cir. 1999) (affirming dismissal and explaining that "it is only when ... conclusions are logically compelled, or at least supported, by the stated facts . . . that 'conclusions' become 'facts' for

to "prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements. The Board has concluded that *disclosure* is preferable to accrual when a reasonable estimate of loss cannot be made." (SFAS 5, Appendix C, ¶59 (1972) (emphasis added).)

19

pleading purposes").

Despite their burden and the CAC's length – 136 paragraphs – Plaintiffs' "belief" is supported by no information and not a single particularized fact. *See Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 823 (S.D.Cal. 2006) ("Bare allegation that bad debt reserves were inadequate is insufficient because even reasonable predictions turn out to be wrong.") (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994)); *In re Loewen Group Inc., Sec. Litig.*, No. Civ.A. 98-6740, 2004 WL 1853137, at *1 (E.D.Pa. Aug. 18, 2004) (securities fraud claim based on understated reserves must allege the amount of the increase that should have been made to the allowance for doubtful accounts and why the company's allowance was unreasonable in light of its bad debt experience). The absence of these facts is fatal. *See Parnes*, 122 F.3d at 549.

Because the CAC is devoid of particularized facts showing FCStone's actual loss was known to be $110 million in June 2008, or any specific lesser amount was reasonably estimable, or that any of the Company's subsequent disclosures were false when made, Plaintiffs' Energy Account Claim fails. Plaintiffs' belief can be based only on their hindsight speculation that because FCStone increased its bad debt estimates substantially, their estimates "must have been" false when made and not accounted for properly. This is not enough. *K-Tel*, 300 F.3d at 889. (PSLRA's pleading standards are an "attempt to restrain securities litigation abuses such as the pleading of fraud by hindsight"). Plaintiffs illogical and conclusory allegations fails to state a claim. As this very Court ruled last year, "[t]he Company may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made." *In re 2007 Novastar Financial, Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367 at *3 (W.D. Mo. Jun. 4, 2008) (*"Novastar II"*).

20

The Court should also note that Plaintiffs do not, because they cannot, allege that FCStone's independent auditors (i) disagreed with the Company's bad debt estimates on the Energy Account, or (ii) disagreed with the timing of the Company's statements, or (iii) required a restatement of prior financial results. FCStone's independent auditors opined that FCStone's financial statements for fiscal year 2008, ending August 31, 2008, were prepared in accordance with GAAP and provided a fair picture of FCStone's financial position. (Ex. B at F-2-F-3.). Those statements were included in FCStone's 2008 10-K, filed on November 14, 2008 – less than two weeks after FCStone's first disclosure on the Energy Account losses. (*See id.*) Plaintiffs' CAC does not challenge this opinion, and "[a] failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP." *PEC Solutions Sec. Litig.,* No. 03CV331, 2004 WL 1854202, at *12 (E.D. Va. May 24, 2001).

Furthermore, a material understatement of a company's bad debt requires an accounting restatement on Form 10-K/A or 10-Q/A. A company may not correct the error simply by writing off or increasing its bad debt expense in a subsequent quarter. *In re Interpool, Inc. Sec. Litig.*, No. Civ. 04-321(SRC), 2005 WL 2000237, at *5 (D.N.J. Aug. 17, 2005) (GAAP requires restatement where "previously provided financial statements are both inaccurate and material"); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F.Supp.2d 662, 680 (E.D. Mich. 1999) (GAAP would have required restatement of financial statements issued during class period if reserve was found to have been materially misstated). Plaintiffs do not allege and cannot allege that the Company ever restated prior financials.

Given that the allegedly false forward-looking statements are not actionable under the PSLRA's safe harbor, Defendants offered no false assurances of their estimates, and the CAC fails to specify the amount of bad debt which should have been disclosed in FCStone's third

21

quarter 10-Q, Plaintiffs fail to state a §10(b) violation against the defendants based on the Energy Account. The Court need go no further in its analysis – this claim should be dismissed.

### D. PLAINTIFFS' ENERGY ACCOUNT CLAIM ALSO MUST BE DISMISSED BECAUSE THEIR CONFIDENTIAL WITNESS ALLEGATIONS DO NOT SATISFY THE PSLRA.

Although unnecessary, even if the Court is inclined to consider the "information" Plaintiffs' confidential witness, CW1, allegedly provided to them, it will conclude that CW1 was not in a position to know any of the information. Therefore, all allegations based on CW1 must be disregarded, and the Energy Account Claim dismissed on this independent ground. 15 U.S.C. §78u-4(b)(2). Under the PSLRA, a court must dismiss any §10(b) claim based on a confidential witness, unless the witness is described with "sufficient particularity to support the probability that a person in *the position occupied by the source* would possess the information alleged." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000) (emphasis added); *In re Possis Med. Inc. Sec. Litig.,* No. 05-CV-1084, 2007 WL 335051, at*4 (D. Minn. Feb. 1, 2007). The CAC fails to meet this standard and dismissal is mandatory. 15 U.S.C. §78u-4(b)(2). Moreover, allegations based on a confidential witness must be corroborated by other facts. *See In re Cabletron Sys., Inc.,* 311 F.3d 11, 31 (1st Cir. 2002) (holding confidential source allegations sufficient only after concluding that they were "specific, provided by sources with personal knowledge, and the sources' accounts *were corroborated by other sources.*") (emphasis added.) The CAC fails to satisfy these standards.

### 1. CW1 DID NOT HOLD A POSITION THAT WOULD HAVE PROVIDED HIM WITH PERSONAL KNOWLEDGE OF THE FACTS ALLEGED.

The CAC describes CW1 as a former employee who worked in a "trade support role" clearing customers trades with various clearinghouse exchanges throughout the class period up until the end of January, 2009 ..." (CAC  ¶45.) CW1 is Plaintiffs' supposed source for their belief that Defendants violated §10(b) by failing to disclose $110 million of bad debt on the

–29–

Energy Account in FCStone's July 14, 2008 10Q, and by allegedly falsely stating the amount of the Energy Account estimated loss in every subsequent public statement until its March 2009 disclosure. CW1 also supposedly informed Plaintiffs that:

- FCStone knew of energy trading losses approximately six months before they announced them. (CAC ¶¶ 44, 108.)

- the Individual Defendants were made aware of the losses because they were provided daily reports which showed the "exact amount" of customers' margin account deficits. (CAC ¶¶ 10, 50, 112.)

- the Individual Defendants "lied about the extent of their losses" in public disclosures. (CAC ¶¶44, 99-100, 119.)

- "FCStone knew of but ignored risky positions in the energy trading account because it belonged to one of the Company's largest customers" and they "hid the massive loss exposures from investors that, just months later, would be revealed to be a $110 million loss." (CAC ¶¶ 10, 49, 102, 110-115.)

The CAC not only fails to allege facts showing CW1 was in a position to know this information, the CAC affirmatively demonstrates CW1 was not in such a position.

Plaintiffs do not allege CW1's title, to whom he reported, what his specific responsibilities were in his "trade support" role, what type of information an employee who clears customer trades received or provided, let alone to whom or from whom. These deficiencies alone are sufficient to warrant the Court's rejection of all information allegedly provided by CW1 and, therefore, dismiss the Energy Account Claim. *See In re NVE Corp. Sec. Litig.,* 551 F. Supp. 2d 871, 882 (D. Minn. 2007) (rejecting confidential witness allegations in part because complaint did not allege the witness' job title, to whom he reported and the basis for his knowledge); *see also In re PDI Sec. Litig*., No. Civ.A. 02-211(GEB), 2006 WL 3350461, at *5 (D.N.J. Nov. 16, 2006) (where plaintiff fails to describe a confidential source's job title, job description, responsibilities or duties the source is rendered "irrelevant for the purposes of plaintiff's allegations"); *see also Cornelia I. Crowell GST Trust v. Possis Med. Inc*., 519 F.3d

778, 783 (8th Cir. 2008) (information from a confidential source was not compelling or reliable because complaint failed to allege the confidential source's basis of knowledge).

Moreover, Plaintiffs do not allege any facts that directly connect CW1's employment with the Energy Account. The state, operating segment or subdivision in which CW1 worked is not alleged.[18] While the CAC alleges that CW1 cleared customer trades with "various clearinghouse exchanges" (CAC ¶ 45), Plaintiffs carefully avoid alleging that CW1 actually cleared or executed any Energy Account trade or had any other responsibilities for that account. (*See* CAC ¶¶ 45-51.) Indeed, the CAC does not even allege the exchanges on which the Energy Account traded or that CW1 cleared any trades for any customer who traded on the same exchange. These deficiencies eviscerate the reliability of CW1, require the Court to disregard the "information" he provided, and mandate dismissal of the Energy Account Claim. 15 U.S.C. § 78u-4(b)(1)(B); *see also Cal. Pub. Employee's Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149-150 (3d Cir. 2004) (confidential source allegations fail to meet particularity requirements when they omit when and how the witness obtained the information they allegedly possess, and whether their supposed knowledge is first or second hand); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (rejecting confidential witness allegations where complaint "fail[ed] to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged"); *In re Downey Sec. Litig.,* No. CV08-3261-JFW, 2009 WL 2767670, at *10 (C.D.Cal. Aug. 21, 2009) (statements of confidential witness disregarded where plaintiff provided "insufficient facts demonstrating that CW1 possessed personal knowledge regarding [plaintiff's allegations] during the Class Period or at any time.").

Because the CAC fails to allege when and how CW1 learned of the information he provided and failed to identify whether any of his information was based on personal, first-hand knowledge, the Court need not consider any other information CW1 provided or Plaintiffs' conclusory scienter allegations.

## 2. PLAINTIFFS' ALLEGATIONS ESTABLISH CW1 WAS NOT IN A POSITION TO KNOW INFORMATION ALLEGED.

Although the CAC's deficiencies in describing CW1 alone are enough to disregard his "information," if the Court chooses to further consider the information he provided, any lingering doubt that may exist will be removed. For example, CW1 allegedly stated that FCStone had a "Margin Department" [19] which was "responsible for *determining if* and **when** it *might* be necessary to liquidate a position at a loss so as to avoid incurring potentially even greater losses because the position was simply unlikely to turn around and recover." (CAC ¶ 47 (emphasis added).) CW1 is not alleged to have worked in the Margin Department at any time during the putative class period. (CAC ¶ 45.) Even assuming a Margin Department existed and CW1's brief description of it is accurate, the CAC contains no facts showing an employment link between CW1 and the Margin Department, or any other facts showing that CW1's trade support role required his knowledge of the amount of any customer's margin account deposits with FCStone, let alone if and when the account was in a deficit position. *See Chubb,* 394 F.3d at 152 ("[I]t is not sufficiently probable that an employee working in personal lines would possess information regarding commercial lines policies and their impact on the rate initiative"). Moreover, there are no facts alleged showing CW1 was in a position to know the amount of

---

[18]     *See supra* at 23.

[19]     Defendants assume, without conceding, for purposes of this motion only, that the "Margin Department" exists and that its duties are correctly alleged.

Case 4:08-cv-00514-HFS   Document 30    Filed 11/25/09   Page 32 of 53

funds or other collateral in the Energy Account, when the account was in a deficit position, the amount of such a deficit, or the identity of the account holder,[20] let alone whether FCStone's margin calls on that Customer were met by him immediately and, if not, the dates and amounts of deficits FCStone was unable to collect.

The folly of relying on CW1 is further evidenced by his illogical and demonstrably false claim that the "Margin Department was *obligated* to liquidate money-losing positions 'no matter how big' they were." (CAC ¶ 47.) FCStone's unchallenged public disclosures, incorporated by Plaintiffs in their CAC, plainly contradict CW1. FCStone's 2008 10-K states:

> *Generally*, if a customer is unable to meet its margin call, we promptly liquidate the customer's account. However, there can be no assurance that in each case the liquidation of the account will not result in a loss to us *or that a liquidation will be feasible,* given market conditions, size of the account and tenor of the positions.

(Ex. B at 10-11 (emphasis added).) Moreover, on November 4, 2008, FCStone expressly disclosed that it was not liquidating the Energy Account immediately because it was not in the Company's best interests to do so:

> rather than an immediate liquidation, it is really more effective to just let [the energy account] settle off as we go forward" and "rather than just liquidate the account, **which would have cost additional capital or expense**, it was more effective just to let it settle off and liquidate over time and over the tenor of the position ..."

(Ex. F at 4 (emphasis added).)

Plaintiffs and their CW1 are also apparently confused about the most elementary aspects of the type of trades FCStone allegedly executed on this Customer's behalf. The CAC alleges

---

[20] Although the CAC purports to allege the identity of the Energy Account holder, as demonstrated herein, the CAC fails to allege facts sufficient to demonstrate CW1 was in a position to know this information. Therefore, Defendants' refer to this customer as the "Customer."

these trades were of futures[21] (CAC ¶¶ 17, 23, 45-46), and the Customer "entered into the energy positions that caused bad debt more than 6 months before" FCStone's November 3, 2008 announcement. (CAC ¶¶ 44, 48, 103, 108.) Apparently, Plaintiffs assume that mere entry into these positions caused FCStone's losses. Not only is this assumption inaccurate, it defies logic and undermines CW1's credibility as a source for any accurate information about the nature and mechanics of the Energy Account or its positions.

Whether the Customer's futures contracts would result in losses on the agreed *future* date of sale could not have been known at the time the Customer entered into these positions. Losses or gains on futures depend upon the difference between the price of the commodity specified in the contract and the market price of the commodity on the future date of sale. Thus, if on June 1, 2008, Mr. Jones agreed to buy 100 widgets for $10 each on December 1, 2008, his actual profit or loss is not known until December 1, 2008.[22] If on December 1, 2008, widgets are selling for $30 each, Mr. Jones buys at $10, sells at $30, and makes a $2000 profit. Moreover, the exchanges frequently change the level of margin they require in a customer's account to "reflect variations in market conditions and other factors. In highly volatile markets, for example, margins are commonly set at higher levels." DERIVATIVES REG. § 1.02[13] at 115. Thus, the margin required in a customer's account fluctuates often, with a margin call one day and a surplus in the account, the next.[23]

---

[21]    The CAC fails to allege CW1 was in a position to know the type of contracts this Customer traded, and Defendants need not accept as true such conclusory allegations on this motion. Nevertheless, the type of trading conducted by this Customer is confidential. Therefore, for purposes of this motion only, Defendants assume CW1's characterization of the Customer's positions as "futures" is correct. See *supra* at n.8 for futures contract definition.

[22]    However, there is no prohibition against the customer selling that futures contract while it is still open, *i.e.*, in this example, before December 1, 2008.

[23]    Indeed, the global economic crisis did cause turmoil which caused volatility and adversely impacted the Energy Account severely. (*See* Ex. L at 2 (describing factors leading to increased estimate

27

Because margin requirements on open futures fluctuate often, CW1's claim that the Customer "only had $10 million in his account with FCStone" (CAC ¶40) inherently lacks credibility. The CAC alleges no facts specifying the date this amount was allegedly in the Customer's account, let alone whether the $10 million was a deficit or surplus on that day. (CAC ¶ 40.) Moreover, this unsupported and vague statement by an employee in a "trade support" role, who did not work in the "Margin Department," is also contradicted by Mr. Anderson's unchallenged statement that the Energy Account had available capital which "varied over time" and ranged from a "low of $20 million to a high of $50 million" during the relevant period. (Ex. L at 16.) Given the foregoing, Plaintiffs' claim that the bad debt was known because CW1 claims the Customer had entered into futures positions six months before November, cannot be credited.

This claim is also ludicrous due to the complexity involved in predicting possible losses on this Customer's account. Identifying the possibility and amount of the Energy Account losses would necessarily require consideration of the Customer's history, his knowledge of the energy market and experience trading commodities derivatives, his past payment history, his assets, his current and future access to other lines of credit, the future duration of the credit crisis, the current and future volatility of the market, the future duration of depressed energy prices, the direction of the global economy, among others, not the least of which would be the specific terms of the Customer's open positions.[24] Yet, the CAC is devoid of any allegations regarding

of bad debt on Energy Account).

[24] The Company warned its investors about the impact tightening credit markets might have on its performance. (Ex. B at 12); *see also* (Ex. F at 12 (liquidation of the energy account will occur over time "[a]nd then you will see – we will know basically what our effective risk is at that time."); Ex. L at 2 ("the extraordinary global economic turmoil has continued with credit markets and gridlocked interest rates falling, a significant collapse and leveraging of the commodities markets, and a wide range of settlement valuations in the commodities markets. Because of these factors, the energy trading account experienced

28

these factors, let alone what Defendants knew about them, who knew and when, or how the factors were allegedly analyzed to determine the existence and amount of estimated future losses by June 2008, the time at which Plaintiffs speculate the full scope of the Energy Account losses were known. In contrast to the vacuum of specifics alleged to demonstrate how the losses were known in June, Mr. Anderson explained that:

> I think really once we recognized there was a substantial risk, we went ***through the process of really analyzing that risk and trying to quantify what our exposure or potential loss was***, as well as, like I said, we engaged a consulting firm to help us really determine or give us an estimate or [probably] validate, verify what our analysis showed us and as I said, ***we just got that completed*** and made the determination that ***now was the time with the visibility we had to make that determination*** to reserve for the potential bad debt. And we think that what we have reserved is sufficient to cover that specific risk.

(CAC ¶ 76 (quoting Ex. F at 4) (emphasis added).) As demonstrated by Mr. Anderson's comments, FCStone made its initial disclosures of the Energy Account losses immediately after it had conducted a careful analysis, which was validated by an independent consultant. In other words, FCStone did exactly what it should have done. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention.... Taking the time necessary to get things right is both proper and lawful."). The CAC alleges no facts to contradict the truth of this disclosure or any facts to support a conclusion that CW1 was in a position to know that the actual $110 million loss was known in June. In short, CW1's allegations must be rejected and the Energy Account Claim dismissed.

---

additional losses and increased volatility."); Ex. A at 36 ("different assumptions, changes in economic circumstances or the deterioration of the financial condition of our customers could result in additional provisions to the allowance of doubtful accounts and increased bad debt expense.") *See also supra* at 3-4.

29

**E.      CW1'S ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE OF THE DEFENDANTS' SCIENTER WITH RESPECT TO ENERGY ACCOUNT STATEMENTS.**

Although the deficiencies of Plaintiffs' allegations regarding the Energy Account claim demonstrated above are overwhelming, if the Court decides to consider the CAC's scienter allegations, it will find only additional deficiencies further justifying dismissal.  Indeed, the CAC relies exclusively on bald assertions unsupported by fact, derived entirely from statements made by CW1, to plead Defendants' scienter with respect to statements made about the Energy Account.

First, even if Defendants' forward-looking statements were not accompanied by meaningful cautionary language, *supra* at 11, they are not actionable unless the CAC pleads particularized facts giving rise to a strong inference of Defendants' actual knowledge that their estimates were false when made and that probable losses were known but not disclosed in the Company's third quarter 10-Q.  *See In re Patterson Co. Inc., Sec. Litig.,* 479 F. Supp. 2d 1014, 1032 (D. Minn. 2007) ("to the extent a complaint is based on forward-looking statements and opinions, the requisite state of mind is actual knowledge.")[25] (CAC ¶¶ 43-51, 72-74, 85, 102.) As demonstrated below, the CAC demonstrates that CW1 was not in a position to know anything regarding Defendants' actual knowledge of Energy Account losses at any time during the putative class period.  This failure is fatal.  *See Chubb,* 394 F.3d at 154.  (rejecting "the conclusory assertion" by a confidential witness that the defendants had access to negative financial results "far in advance of when they were announced" as "patently insufficient.") Second, the CAC's scienter allegations are so shallow, they would not give rise to an inference of the Defendants' scienter even if the lesser, "severe recklessness" standard were applied.

---

[25]      As established *supra* at 13-15, Defendants' estimates of future bad debt on the Energy Account were forward-looking statements protected by the safe harbor.

For example, Plaintiffs allege conclusorily that: (1) the Customer "quickly began incurring daily margin calls that exceeded [the $10 million in his account]"; (2) "there was no way that major losses could be avoided"; (3) the Customer's "position was flawed from the get go," and (4) Messrs. Anderson and Dunaway knew all of this. (CAC ¶¶ 48, 50, 108, 112.) As an initial matter, the CAC fails to allege how CW1 learned of this information, when he learned it, how it was communicated to the Defendants, by whom, and when, and the dates or even an approximate time frame during the putative class period when these conditions on the Energy Account existed. In short, these allegations fail to meet any of the pleading requirements embodied in Rule 9(b) and the PSLRA. These allegations therefore give rise to no inference of Defendants' scienter and the Court should disregard them. *See In re Best Buy Co. Inc. Sec. Litig.,* No. Civ. 03-6193, 2005 WL 839099, at *7 (D. Minn. 2005) ("The who, what, when, where and how are missing from these statements which would allow a strong inference to be made that Defendants acted recklessly, or with actual knowledge that their statements were misleading." (quoting *K-Tel,* 300 F.3d at 891)); *See Amdocs,* 390 F.3d at 549-50 (holding that general impressions shared by lower-level employees and contractors are not enough to show that the defendants' representations were false); *In re NVE,* 551 F. Supp. 2d at 884 (rejecting the assertion of an opinion by a confidential witness where the witness offered no details to support the basis of their opinions.); *Possis,* 2007 WL 335051, at *5 (rejecting allegations because "there is no way to know whether the information from this anonymous source is based on first-hand knowledge or unsupported rumor" or is mere "scuttlebutt").[26]

---

[26] Similarly, there is no basis alleged for Plaintiffs' opinion that Defendants were motivated to ignore mounting margin losses because this Customer was one of FCStone's biggest and oldest clients. Such baseless allegations must be rejected. *See Chubb,* 394 F.3d at 155 (3d Cir. 2004) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. §78u-4(b)(1).")

31

Although bald conclusions abound,[27] the only specific fact Plaintiffs offer to support the scienter element of their §10(b) Energy Account Claim is CW1's claim that daily deficit sheets, allegedly provided to the Defendants, "showed the exact amount" that "FCStone's customers were beyond their margin and the exposure to the company." (CAC ¶ 112). But again, these allegations fail to satisfy the PSLRA's stringent pleading standards. "Pleading conscious misbehavior is a stringent standard which requires strong circumstantial evidence." *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 647 (S.D. Tex. 2001) (citation omitted). Thus, when a plaintiff alleges actual knowledge of internal reports or numbers contradicting reported numbers, he must detail who prepared the figures, when they were prepared, how firm they were and which officers reviewed them. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812-13 (2nd Cir. 1996); *In re Sec. Litig. BMC Software Inc.*, 183 F. Supp. 2d 860, 887 (S.D. Tex. 2001).

Plaintiffs studiously ignore this standard. The CAC fails to allege facts showing that CW1 prepared these reports or that his low-level position required him to receive these reports, let alone that he knew, or how he knew, what information was contained in them. The CAC does not allege who was responsible for preparing these sheets, who received them, what specific information was contained in them, whether they included all accounts of the Company, or a segment, or a division of a segment, or by customer account, or by exchange. No allegations exist to demonstrate how CW1 would know if these sheets were delivered to Mr. Anderson or Mr. Dunaway. (CAC ¶¶ 10, 112.) No allegations exist to determine how these sheets were used, what action, if any, was taken based on these sheets, and who was responsible for taking action,

---

[27] *See e.g.* CAC ¶50 ("Losses of the size [the Customer] was incurring were a subject of major concern within the Company and were, in fact, communicated to defendants Anderson and Dunaway").

if any.  Even assuming these sheets were generated and even delivered to Messrs. Anderson and Dunaway, this is not enough to give rise to any inference of their actual knowledge that FCStone's estimates of bad debt on the Energy Account were wrong.  *In re Medtronic Inc., Sec. Litig.*, 618 F.Supp.2d 1016, 1032 (D. Minn. 2009) ("[A]n allegation of data monitoring is not sufficiently specific to support a strong inference of scienter." (citing *In re Apple Computer, Inc. Sec. Litig.*, 243 F.Supp.2d 1012, 1026 (N.D.Cal.2002))).[28]

Furthermore, the Supreme Court's decision in *Tellabs Inc. v. Makor*, requires this Court to consider competing inferences of non-fraudulent intent.  *Tellabs*, 551 U.S. at 309 (in determining whether the pleaded facts give rise to a strong inference of scienter, **"the court must take into account plausible opposing inferences."**)  Here, the inference of non-fraudulent intent is the only plausible inference to be drawn from the alleged deficit sheet allegation and it is by far the more compelling one.  Thus, while Plaintiffs attribute the Defendants' actual knowledge of the full scope of Energy Account losses to receipt of daily deficit sheets, this belief sophomorically equates the amount of a customer's margin account deficit on any given day with the amount of FCStone's bad debt on the Energy Account.  This is equivalent to assuming that a banking customer's checking account overdraft immediately causes the bank to incur a bad debt, and that assumption is patently wrong.  At most, a deficit sheet might provide FCStone with a starting point for its collection efforts; perhaps assist it in beginning to analyze if an account

---

[28]      *See also Horizon Asset Mgmt. v. H&R Block*, 580 F.3d 755, 764 (8th Cir. 2009) (allegations asserted by a CW1 are not "strong and compelling" where they fail to provide the sources' basis of knowledge and demonstrate whether the knowledge is first or second-hand); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002) (holding allegations that defendants read various negative financial reports insufficient to demonstrate knowledge in part because plaintiffs "failed to include corroborating details of the internal reports such as dates or contents of reports."); *Bausch & Lomb, Inc. Sec. Litig.*, No. 06-CV-6294, 2008 WL 4911796, at *13 (W.D.N.Y. Nov. 13, 2008) (holding that confidential source allegations do not establish scienter where they did not show that defendants had access to or had reviewed information that would actually contradict their public statements.).

33

poses a bad debt risk.  Based on the label "deficit sheet," which is all Plaintiffs offer (CAC ¶ 112), it is more plausible to infer that the sheet discloses only the amount of money FCStone needs to *request* from a customer to cover the margin deficit.  Assessing the customer's ability to cover is, in turn, dependent upon a slew of other factors.  *See supra* at 4, 28-29.[29]  Like the banking analogy, only the most remote possibility of bad debt arises if the customer has other funds or lines of credit he can transfer to his account to cover the deficit.  In fact, as Plaintiffs have pointed out, GAAP only requires a charge to income based on bad debt if and when a company *determines* that a loss is probable and reasonably estimable.  (CAC ¶ 109-117.)

In addition, based on CW1's description of the Margin Department, it is more likely that these deficit sheets were used by that department to identify the customers on whom a margin demand needed to be made, and, perhaps if necessary, *begin* collection efforts, which would include determining if it would be better to liquidate a customer's open positions to cover the margin call, or if and "*when*" a "position was simply unlikely to turn around and recover." (CAC. ¶47.)  This conclusion is supported by Mr. Anderson's statement that FCStone's analysis of the reasonably estimable amount of losses on the Energy Account took FCStone six weeks to conduct and was not completed until November 3, 2008, the day before the initial announcement regarding the bad debt provision.  (Ex. F at 3.)

In sum, even if severe recklessness were the scienter standard, the CAC is utterly devoid of particularized facts giving rise to any inference that in June 2008, Defendants consciously disregarded facts showing the Energy Account's losses would be $110 million, let alone that

---

[29]     See also (Ex. A at 36)  ("If we become aware of a customer's inability to meet its financial obligations, we establish a specific allowance for a potential bad expense . . . .  Additionally, different assumptions, changes in economic circumstances or the deterioration of the financial condition of our customers could result in additional provisions to the allowance of doubtful accounts and increased bad debt expense."

they possessed actual knowledge of this amount, or that their subsequent stated estimates were false when made. The Energy Account Claim should therefore be dismissed.[30]

## III. PLAINTIFFS FAIL TO STATE A §10(B) CLAIM BASED ON FCSTONE'S COTTON TRADING ACCOUNT LOSSES.

Plaintiffs also attempt to state a §10(b) claim against Defendants based on FCStone's $1.1 million bad debt write off which arose from the Cotton Trading losses. Plaintiffs again attempt to allege the first element of this §10(b) claim based on an alleged omission of material fact, *i.e.*, FCStone's failure to disclose this bad debt in its second quarter 10-Q as a "subsequent event," contrary to GAAP. Again, Plaintiffs' attempt to state a §10(b) claim fails.

On July 10, 2008, FCStone announced its third fiscal quarter 2008 financial results (for period March 1 – May 31, 2008) which included a $1.1 million bad debt write off which resulted from the unexpected events in the cotton trading market on March 3-4, 2008, at the beginning of the Company's *third* quarter. (CAC ¶¶ 41-42.) While Plaintiffs concede that these unexpected events, which eventually led to FCStone's losses, occurred in the third quarter, they allege that under GAAP, this was a material "subsequent event" that should have been disclosed in the Company's second quarter 10-Q filing because it was known before those results were filed on April 14, 2008. (CAC ¶ 42.) Plaintiffs are mistaken.

Plaintiffs claim GAAP provision AU 560 "requires" the disclosure of "subsequent" events in financial statements. (CAC ¶ 96.) Under AU 560, "subsequent events" are defined as "events or transactions" which "occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements," and "that have a material effect on the financial statements." (CODIFICATION OF ACCOUNTING STANDARDS AND PROCEDURES, Statement on

---

[30] The CAC is also deficient in failing to offer any corroborating facts. *Cabletron,* 311 F.3d at 31 (holding, confidential witness allegations sufficient because facts showed witnesses possessed personal

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 42 of 53

Auditing Standards No. 1, § 560.01 (Am. Inst. of Certified Pub. Accountants (1972)); CAC ¶ 96.)

Plaintiffs, however, ignore that AU 560 expressly states that not all subsequent events require adjustment or disclosure in the statements. (*Id.*) The type of subsequent event that should be disclosed is one that provides "additional evidence with respect to ***conditions that existed at the date of the balance sheet*** and affect the estimates inherent in the process of preparing financial statements." (*Id.* at § 560.03.) (emphasis added.) An example of this type of event is "a loss on an uncollectible trade account receivable" which results from "a customer's deteriorating financial condition leading to bankruptcy" filed after the balance-sheet date because this event would evidence "***conditions existing at the balance-sheet date***." (*Id.* at § 560.04.) (emphasis added). In contrast, an exemplar of a subsequent event that would ***not*** require disclosure is a "similar loss resulting from a customer's major casualty such as a fire" suffered ***after the balance-sheet date*** because this event "***would not***" ***evidence*** "conditions existing at the balance-sheet date." *Id.* (emphasis added).[31] Plaintiffs offer no facts or allegations to support their conclusion that the cotton trading losses were the type of subsequent event that should have been disclosed under AU 560. Because these losses were realized in the third quarter as a result of an unprecedented decision by the exchanges in the third quarter, these losses did not evidence any conditions existing at the balance-sheet date for the second quarter, *i.e.*, February 28, 2008. Therefore, even if the bad debt had been known by July 14, 2008, disclosure was not required

---

knowledge, information was specific, and was corroborated).

[31] This GAAP provision expressly recognizes that any type of subsequent event requires "consideration by management and evaluation of by the independent auditor," as well as the "exercise of judgment and knowledge of the facts and circumstances." (CODIFICATION OF ACCOUNTING STANDARDS AND PROCEDURES, Statement on Auditing Standards No. 1, § 560.03-560.04 (Am. Inst. of Certified Pub. Accountants (1972)).

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 43 of 53

under GAAP.

Even if, however, Plaintiffs' interpretation of GAAP were correct, the Company's failure to disclose the $1.1 million bad debt on April 14, 2008, would not constitute the omission of a material fact, let alone a knowing one. (CAC ¶ 41.) While Plaintiff's claim assumes that a customer's account deficit, caused by the exchanges' unexpected demand for additional margin, either constituted a "bad debt" or instantaneously created a bad debt expense for FCStone, Plaintiffs' assumption is neither logical nor supported by facts alleged in the CAC. (*See* CAC ¶ 41 (alleging, "[t]hese events in the cotton trading market caused several of FCStone's customers to fail to meet their margin posting requirements, ***requiring FCStone to cover the margin calls and suffer bad debt losses totaling $1.1 million"***) (emphasis added).) This assumption simply ignores the way the commodities markets work as well as FCStone's explicit disclosures about its business operations.[32]

FCStone has policies and procedures in place to "collect additional margin or credit support" from its customers, and the CAC provides no basis for concluding that FCStone did not attempt to collect additional funds from these customers. (CAC ¶¶ 23, 39-42, 66.) The CAC alleges no facts disputing that FCStone followed these policies and procedures in attempting to recover from its customers the account deficits created on March 3-4, 2008. It alleges no facts describing the size of the account deficits, how many customers were involved, FCStone's attempts, let alone over what time period the collection attempts were made, and whether any customers cured their customer deficits or any portion of those deficits during FCStone's third quarter. The absence of these facts is fatal to Plaintiffs' claim. *Novastar I*, 579 F.3d at 882.

In short, the CAC is devoid of a single fact supporting Plaintiffs' claim that these account

37

deficits resulted in a bad debt expense to the Company by April 14, 2008. Furthermore, the CAC includes facts supporting the conclusion that under GAAP, these cotton trading losses were the type of subsequent event that should ***not*** be disclosed under AU 560.04. The CAC's facts show that the events leading to the losses caused by the "unprecedented" volatility in cotton prices occurred in the third quarter, and did not reflect the customers' financial condition as of the second quarter's February 28, 2008 balance sheet date.

Indeed, Plaintiffs even cite to an August 13, 2008 investigative report in *The Wall Street Journal* which described the cotton price spike as "extraordinary," the decision by the exchange to commence all-electronic trading on March 3, 2008 as "end[ing] a 138-year old tradition of floor trading in the cotton pit," and that when the options market closed in mid-afternoon on March 4, 2009, the exchange "jolted traders" with the price announcement which led to 'huge' margin calls." (CAC ¶ 40.) By virtue of Plaintiffs' specific and factual allegations, the CAC demonstrates that Cotton Trading losses were not related to any conditions existing as of FCStone's February 28, 2008 balance-sheet date for either FCStone or its cotton trading customers. Accordingly, under AU 560.04, even if the account deficits of FCStone's cotton trading customers created an instantaneous bad debt for the Company, GAAP did not require these losses to be disclosed as a subsequent event on April 14, 2008. In short, Plaintiffs' §10(b) claim based on the timing of FCStone's Cotton Trading bad debt disclosure fails to allege even a false statement of fact or omission.

A.    THE CAC FAILS TO GIVE RISE TO ANY INFERENCE OF DEFENDANTS' SCIENTER WITH RESPECT TO THE COTTON TRADING BAD DEBT EXPENSE.

The CAC also should be dismissed because it alleges no facts, let alone particularized

---

[32]    *See also supra* at 3-4, 28-29.

facts, giving rise to any inference of the Defendants' scienter. Instead, Plaintiffs rely exclusively on Anderson's alleged "admission" in July 2008, that in "early March" the exchanges left traders "unprepared or unable to meet the margin call," and that as "a result of the situation, FCStone experienced bad debt write-offs . . . for the quarter." (CAC ¶ 41.) This statement gives rise to no inference that Anderson actually knew, stated or implied that the customers' inability to meet these margin calls immediately created "bad debt" for FCStone or that the bad debt was known by July 14, 2008. Because Plaintiffs' scienter allegations are based on the same erroneous assumptions as their allegations regarding account receivable practices, to the extent their Section 10(b) claim is premised on the Cotton Trading bad debt, it also fails for lack of any scienter allegations.

## IV. THE CAC'S ALLEGATIONS REGARDING THE COMPANY'S INTEREST RATE HEDGE ALSO FAIL TO STATE A CLAIM.

Plaintiffs also claim that Defendants falsely stated FCStone had hedged a portion of its portfolio against declining short-term interest rates. (CAC ¶¶ 53, 55.) Plaintiffs claim that FCStone did not actually enter into a hedge, but rather made a "risky bet" on the spread between the Federal Funds rate and the LIBOR rate. (*Id.* at ¶ 62(a).) The CAC, however, is devoid of even a single fact to support Plaintiffs' characterization.

Plaintiffs' characterization is not based on any of FCStone's public disclosures. Indeed, Defendants refused to publicly disclose the details of its confidential investment strategies. (Ex. C at 3, 6, 12-13; CAC ¶¶ 5, 27, 55.) In response to a direct question seeking this confidential information, Mr. Anderson stated: "I don't think we would want to disclose our position or when we put those [hedges] on, but its pretty typical or common, I think positions utilizing

Case 4:08-cv-00514-HFS   Document 30   Filed 11/25/09   Page 46 of 53

swaps and collars ...."  (*Id.*)[33]  The CAC is devoid of any facts contradicting Mr. Anderson's statement.  Plaintiffs do not allege this statement was false when made, and they do not allege the source of any information upon which Plaintiffs base their belief that FCStone had not entered into an interest rate hedge, let alone that the vehicle FCStone used was a "risky bet" on the spread between the Federal Funds rate and LIBOR rate.  This violation of the PSLRA's requirements, to plead "all information" upon which Plaintiffs' belief is based, requires dismissal.  15 U.S.C. §§78u-4(b)(1), 78u-4(b)(2).

Moreover, there are *many* types of hedging techniques a company can use,[34] and Plaintiffs fail to plead even the type FCStone utilized.  Other than characterizing the actual vehicle used as a bet on the spread between the Federal Funds and LIBOR rates, Plaintiffs do not allege any relevant terms.  The CAC does not specify the Federal Funds rate, the LIBOR rate, if the vehicle was a collar, the amount of the floor and the cap, when and if the rates reset, the maturity dates, or who the counterparty was.  These deficiencies also require dismissal of Plaintiffs' §10(b) claim based on the Interest Rate Hedge.  *Elam v. Neidorff*, 544 F.3d 921, 929-30 (8th Cir. 2008) (*"Elam II"*) (affirming dismissal because plaintiffs allegations regarding false statements were not sufficient to plead with particularity, as required by PSLRA); *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir. 1999) ("claims of securities fraud cannot rest on speculation").

While the Company's termination of the hedge could lead an investor to conclude that the hedge had not effectively mitigated the Company's risk exposure to declining interest rates, an

---

[33]     A collar is "a feature of a debt contract or a separate agreement that puts both a cap (ceiling) and a floor (minimum) on the interest rate.  Also called Min Max."  GARY L. GASTINEAU & MARK P. KRITZMAN, The Dictionary of Financial Risk Management 63 (Frank J. Fabozzi Associates 1999).

[34]     *See supra* at n.7.

40

ineffective strategy does not give rise to a fraud claim. *K-Tel,* 300 F.3d at 891 (bad decisions do not constitute securities fraud). Nor does investors' understandable disappointment that FCStone would be less profitable as a result of declining interest rates. This was a risk the Company specifically disclosed. (*See, e.g.*, Ex. A. at 11, 32, 58.) Moreover, Plaintiffs allege no facts that would give rise to any inference of Defendants' scienter in connection with these statements. In short, as a matter of law, Plaintiffs' conclusory allegations, unsupported by a single fact, fail to state a claim that Defendants violated §10(b) in connection with the interest rate hedge statements.

## V. THE CAC MUST ALSO BE DISMISSED BECAUSE ITS GENERAL SCIENTER ALLEGATIONS GIVE RISE TO NO INFERENCE OF ANY DEFENDANT'S SCIENTER.

Other than insufficient allegations based on CW1, Plaintiffs offer little, and nothing that is sufficient, to adequately plead the scienter element of their § 10(b) claims. Plaintiffs allege only that: (i) by virtue of their positions with the Company, Mr. Anderson, the Company's CEO, and Mr. Dunaway, the Company's CFO, knew material non-public information about the Company (CAC ¶ 20); (ii) Mr. Anderson sold 27.8% of his holdings in FCStone's stock during the putative class period (*id.* ¶¶ 18, 120); and (iii) Mr. Dunaway sold 21.8% of his holdings in FCStone's stock during the putative class period (CAC ¶¶ 19, 120). As demonstrated below, these additional allegations, viewed in isolation and combined with the other insufficient allegations of scienter, give rise to no inference of any Defendant's scienter.

Messrs. Anderson and Dunaway sold FCStone stock during the class period. Insider stock sales are not, however, "inherently suspicious." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002) (internal quotation omitted). Plaintiffs "must allege more than that the defendant benefited from trading because of a false statement or misleading omission; the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the

41

portion of stockholdings sold, the number of insiders involved," or prior trading history of sales. *Elam v. Neidorff*, 502 F. Supp. 2d 988, 994 (E.D. Mo. 2007), *aff'd*, 544 F.3d 921 (8th Cir. 2008) (*"Elam I"*) (citing *Navarre*, 299 F.2d at 747); *K-tel*, 300 F.3d at 896.

The CAC alleges that neither Mr. Anderson nor Mr. Dunaway sold any stock before or after the putative class period, but both sold small percentages of their FCStone stock holdings during the putative class period. (CAC ¶ 120.) However, these stock sales were made pursuant to Rule 10(b)5-1 plans, the approval of which was announced by the Company during the November 15, 2007 Conference Call. (Ex. J at 6; *see also* CAC ¶¶ 5, 52.) A Rule 10b5-1 trading plan is "an agreement which allows corporate insiders to set a schedule by which to sell shares over time." *Elam II*, 544 F.3d at 928 n.3 (citation omitted). By pre-scheduling future stock sales, these trading plans protect corporate insiders from hindsight allegations of illegal insider trading, "even if [the insiders] later become aware of material nonpublic information." (Selective Disclosure and Insider Trading, Exchange Act Release No. 33-7882, 17 CFR 240 (Aug. 15, 2000).) Moreover, on this motion, this Court can and should consider that Messrs. Anderson's and Dunaway's stock sales were made pursuant to Rule 10(b)5-1 plans. *Elam II*, 544 F.3d at 928. More importantly, this Court should conclude that because "the sales were prescheduled" they are "not suspicious." *Id.*

Furthermore, as a matter of law, the sale of a small percentage of an insider's total holdings is not unusual or suspicious and does not give rise to a strong inference of scienter. According to Plaintiffs, Mr. Anderson sold only 27.8% of his holdings between December 14, 2007 and January 14, 2008 (months before any of the adverse events are alleged to have occurred) and Mr. Dunaway sold 21.8% of his holdings in April and June 2008. The sales of these small percentages fail to give rise to a strong inference of scienter. *Navarre*, 299 F.3d at

42

747 (holding, "the sale of ten percent or even thirty-two percent of an individual's stock interest during a class period fails to substantiate a strong inference of scienter"); *see also In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 987 (9th Cir. 1999) (sales of 43.6% and 65% of insiders' respective holdings held insufficient to give rise to a strong inference of deliberate recklessness). Moreover, the retention by Messrs. Anderson and Dunaway of well over half of their shares also undermines any inference of scienter. *See K-Tel,* 300 F.3d at 896; *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999) (retention of 94%, 62% and 75% of defendants' holdings suggested sales "were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values"). Finally the timing of these pre-scheduled sales also undermine any inference of scienter. Mr. Anderson's shares were sold before any of the adverse events or allegedly false statements were made, (CAC ¶ 120.) Although Plaintiffs claim the Energy Account losses were known in "June" and Mr. Dunaway sold a few thousand shares on June 16, 2008, Plaintiffs do not even attempt to allege conclusorily that these stock sales were made before the Energy Account losses were allegedly known.

Even if these stock sales gave rise to some suspicion, the only other scienter allegations the CAC pleads are, that by virtue of their corporate positions, Messrs. Anderson and Dunaway must have known. (CAC ¶20.) All allegations like this one have been uniformly rejected by all Courts as insufficient under the PSLRA. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 211-212 (5th Cir. 2009) ("[P]leading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." (quoting *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008))); *In re Alpharma Inc. Securities Litig.*, 372 F.3d 137, 149-150 (3d Cir. 2004) ("'[G]eneralized imputations of knowledge' do not satisfy the scienter

requirement 'regardless of the defendants' positions within the company"); *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) (even "...'[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient' to create a strong inference of scienter").

### A. THE COMPETING INFERENCES ARE MORE COMPELLING.

Although a Defendant's motive and opportunity to commit fraud are not a component of actual knowledge, when a complaint fails to demonstrate a Defendant's motive or opportunity, "other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard." *K-Tel*, 300 F.3d at 894. The CAC alleges no motive for the alleged misstatements and given the significant stock holdings retained by Messrs. Anderson and Dunaway, no rational reason for committing fraud can be inferred. Moreover, given the absence of any facts pled in the CAC to demonstrate any inference of their recklessness, let alone actual knowledge of false statements, no scienter inference exists. The only plausible inference is that FCStone, like many businesses and individuals, was adversely effected by the global economic crisis, and the market reacted by readjusting its expectations of the Company's near-term profitability, which caused its stock price to decline.

### VI. BECAUSE THE CAC FAILS TO STATE A CLAIM UNDER §10(B), THE CLAIM UNDER §20(A) MUST ALSO BE DISMISSED.

Plaintiffs' failure to state a claim under §10(b) is fatal to their §20(a) claim. Plaintiffs' §20(a) allegations conclude that the "Individual Defendants acted as controlling persons of FCStone within the meaning of §20(a) of the 1934 Act" and thereby "caused FCStone to engage in the wrongful conduct" alleged. (CAC ¶134.) However, to plead a §20(a) claim, Plaintiffs must allege facts sufficient to plead (1) a predicate violation of the 1934 Act or any rule or

44

regulation promulgated thereunder, here § 10(b) and Rule 10(b)-5, and (2) that the alleged control person possessed the power to determine the specific acts or omissions upon which the underlying violation is predicated. *Hutchinson II,* 536 F.3d at 961 (quoting *Deviries v. Prudential-Bache Sec., Inc.,* 805 F.2d 326, 329 (8th Cir. 1986) (affirming dismissal of plaintiff's §20(a) claims where § 78j (b) and Rule 10(b)-5 claims were also dismissed).

Where, as here, Plaintiffs fail to establish an actionable claim for violation of §10(b) and/or Rule 10(b)-5, their §20(a) claim must also be dismissed. *Hutchinson II,* 536 F.3d at 961 ("[D]ismissal of [plaintiff's] other 1934 Act claims was fatal to his Section 20 claim." (quoting *Deviries,* 805 F.2d at 329)); *Parnes*, 122 F.3d at 550 n.12 (affirming dismissal of Plaintiffs' §20(a) claims where "Plaintiffs presented no actionable claim for violation of . . . Section 10(b), or Rule 10(b)-5"). Accordingly, the Court should also dismiss Plaintiffs §20(a) claim.

CONCLUSION

For all of the foregoing reasons, Defendants FCStone Group, Inc., Paul G. Anderson and William J. Dunaway respectfully request this Court grant their motion and dismiss this case with prejudice.

Dated: November 24, 2009                    Respectfully Submitted,


                                            FCSTONE GROUP, INC., PAUL G. ANDERSON, AND
                                            WILLIAM J. DUNAWAY


                                            By: s/ Pamela G. Smith
                                            One of Their Attorneys

                                            David H. Kistenbroker
                                            Pamela G. Smith
                                            Katten Muchin Rosenman LLP
                                            525 West Monroe Street
                                            Suite 1900
                                            Chicago, Illinois 60661
                                            (312) 902-5200

45

(312) 902-1061 (fax)
David.Kistenbroker@kattenlaw.com
Pamela.Smith@kattenlaw.com

-and-

Sean W. Colligan
Stinson Morrison Hecker LLP
1201 Walnut Street
Suite 2900
Kansas City, Missouri 64106
(816) 842-8600
(816) 691-3495 (fax)

Counsel for Defendants

46