UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | |
|---|---|
| PAUL LUMAN, Individually and On Behalf of All Others Similarly Situated, ) | No. 4:08-cv-00514-C-W-HFS (Consolidated) |
| ) | |
| Plaintiff, ) | CLASS ACTION |
| ) | |
| vs. ) | |
| ) | |
| PAUL G. ANDERSON, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**LEAD PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................ 1

II.   Factual Background ...................................................................................... 3

    A.    Defendants Misrepresent the "LIBOR Hedge" and FCStone's Hedging
        Against Falling Interest Rates .............................................................. 3

    B.    Defendants Did Not Disclose or Properly Account for Cotton Bad Debt
        Losses ................................................................................................ 5

    C.    Defendants Failed to Disclose Loss Exposure and Record Bad Debt
        Provisions Related to the Energy Account ........................................... 7

III.  Argument ................................................................................................... 10

    A.    Standard On Motion to Dismiss......................................................... 10

    B.    The Complaint Alleges Actionable False and Misleading Statements ........ 12

        1.    Defendants' Made Material Misstatements and Failed To Disclose
            All Material Facts Regarding the Energy Account ......................... 12

            a.    Defendants' Failure to Disclose The Scope of Risk From
                the Energy Account Violated GAAP ............................... 15

            b.    The PSLRA "Safe Harbor" Does Not Shield Defendants
                from Liability .............................................................. 18

                (1)    The PSLRA Safe Harbor Does Not Immunize
                      Defendants For Their False and Misleading
                      Statements and Omissions ................................. 19

                (2)    Defendants' Boilerplate Cautionary Language Does
                      Not Satisfy the PSLRA ..................................... 20

        2.    Defendants' Failure To Disclose $1.1 Million In Cotton Trading
            Losses Violated GAAP ............................................................. 22

        3.    Defendants Falsely Represented the LIBOR Hedge................................. 27

    C.    The Complaint Alleges a Strong Inference of Scienter ......................... 33

        1.    Pleading Standard ................................................................... 33

        2.    The Complaint Alleges Strong Circumstantial Evidence of
            Conscious Misbehavior or Recklessness .................................... 34

3.    The Complaint's CW Supports a Strong Inference of Scienter ................37

4.    Defendants' Failure To Disclose The Cotton Trading Losses
Supports A Strong Inference Of Scienter ...................................................40

5.    Defendants' GAAP Violations Support a Strong Inference of
Scienter .......................................................................................................41

6.    Defendants' Insider Trading Supports a Strong Inference of
Scienter .......................................................................................................42

IV.    Conclusion ....................................................................................................................44

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008)........................................................................................35

*Albert v. Alex. Brown Mgmt. Servs.*,
    No. 04C-05-250 PLA, 2004 Del. Super. LEXIS 303
    (Del. Super. Ct. Sept. 15, 2004)...............................................................................31

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)........................................................................................18

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004)................................................................................20, 21

*Berson v. Applied Signal Tech, Inc.*,
    527 F.3d 982 (9th Cir. 2008)....................................................................................38

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d. Cir 2002)......................................................................................12

*Cornelia I. Crowell GST Trust v. Possis Med., Inc.*,
    519 F.3d 778 (8th Cir. 2008) ...................................................................................40

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
    No. 99 CIV 12046 WHP, 2001 WL 300733
    (S.D.N.Y. Mar. 28, 2001) ........................................................................................20

*Day v. U. S.*,
    734 F.2d 375 (8th Cir. 1984) ...................................................................................30

*Dutton v. D&K Healthcare Res.*,
    No. 4:04CV147SNL, 2006 WL 1778884
    (E.D. Mo. June 23, 2006)....................................................................................19, 42

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ........................................................................... *passim*

*Hardeman v. United States*,
    No. 4:09CV00312 SWW, 2010 U.S. Dist. LEXIS 2224
    (E.D. Ark. Jan 11, 2010).........................................................................................11

*In re Ashanti Goldfields Sec. Litig.*
    184 F. Supp. 2d 247 (E.D.N.Y. 2002) ...........................................................29, 30, 31, 34

Case 4:08-cv-00514-HFS   Document 36   Filed 01/22/10   Page 4 of 56

*In re Ashanti Goldfields Sec. Litig.*
No. CV-00-0717 (DGT), 2004 U.S. Dist. LEXIS 5165
(E.D.N.Y. Mar. 30, 2004) ..........................................................................36

*In re Cabletron Sys. Inc.*,
311 F.3d 11 (1st Cir. 2002) .......................................................................38

*In re Computer Assocs. Class Action Sec. Litig.*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...........................................................27

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .....................................................33

*In re Digit Int'l Inc. Sec. Litig.*,
6 F. Supp. 2d 1089 (D. Minn. 1998),
*aff'd*, 14 Fed. Appx. 714 (8th Cir. 2001) ..................................................42

*In re Donna Karan Int'l. Sec. Litig.*,
No. 97 Div. 2011, 1998 U.S. Dist. LEXIS 22435
(E.D.N.Y. Aug. 14, 2008) ..........................................................................33

*In re Eng'g Animation Sec. Litig.*,
110 F. Supp. 2d 1183 (S.D. Iowa 2000) ....................................................42

*In re Evci Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006).........................................................40

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007) .....................................................33

*In re Giant Interactive Group, Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009)........................................................22

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................23

*In re Indep. Energy Holdings PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001)........................................................33

*In re K-Tel Int'l Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ................................................................12, 32

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
626 F. Supp. 2d 947 (D. Minn. 2009)................................................ *passim*

- iv -

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007) ..................................................... *passim*

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ...............................................................27, 29, 43

*In re Novastar Fin. Sec. Litig.*,
    No. 04-0330-CV-W-ODS, 2005 U.S. Dist. LEXIS 19946
    (W.D. Mo. May 12, 2005) ...................................................................43, 44

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871 (D. Minn. 2007) ..................................................39, 40

*In re Olympic Fin. Ltd. Sec. Litig.*,
    No. 97-496 (MJD/AJB), 1998 U.S. Dist. LEXIS 14789
    (D. Minn. Sept. 10, 1998) ..........................................................................36

*In re Oxford Health Plans Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..........................................................22, 44

*In re PDI Sec. Litig.*,
    No. 02-211 (GEB), 2006 U.S. Dist. LEXIS 80142
    (D.N.J. Nov. 2, 2006)..................................................................................40

*In re St. Paul Travelers Sec. Litig. II*,
    No. 04-4697 (JRT/FLN), 2006 U.S. Dist. LEXIS 70261
    (D. Minn. Sept. 25, 2006) ..........................................................................34

*In re Stellent, Inc. Sec. Litig.*,
    326 F. Supp. 2d 975 (D. Minn. 2004) ..................................................26, 28

*In re Synovis Life Techs., Inc. Sec. Litig.*,
    No. 04-3008ADMAJB, 2005 WL 2063870
    (D. Minn. Aug. 25, 2005) ...........................................................................35

*In re Transcrypt Int'l Sec. Litig.*,
    No. 4:98CV3099, 1999 U.S. Dist. LEXIS 17540
    (D. Neb. Nov. 4, 1999) ...............................................................................42

*In re UTC Starcom Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................43

*In re Veeco Instruments, Inc., Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................20

Case 4:08-cv-00514-HFS   Document 36   Filed 01/22/10   Page 6 of 56

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1206 (N.D. Okla. 2003) ...........................................................18, 30, 32

*Jade Trading, LLC v. U.S.*,
80 Fed. Cl. 11 (Fed. Cl. 2007) ..........................................................................................31

*Kushner v. Beverly Enters.*,
317 F.3d 820 (8th Cir. 2003) ............................................................................................34

*Lane v. Page*,
581 F. Supp. 2d 1094 (D.N.M. 2008) ..............................................................................33

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
173 F. Supp. 2d 129 (S.D.N.Y. 2001) ..............................................................................30

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ......................................................................................37, 44

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007) ..............................................................................44

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996) ................................................................................44

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .......................................................................................20, 38

*Parnes v. Gateway 2000*,
122 F.3d 539 (8th Cir. 1997) ......................................................................................21, 23

*Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*,
42 F. Supp. 2d 423 (D. Del. 1999) ...................................................................................27

*S. Ferry LP #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................................................38

*SEC v. Shanahan*,
No. 4:07CV270 JCH, 2008 U.S. Dist. LEXIS 100641
(E.D. Mo. Dec. 12, 2008) ..................................................................................................11

*Steiner v. Shawmut Nat'l Corp.*,
766 F. Supp 1236 (D. Conn. 1991) ...................................................................................21

*Stevens v. Spegal*,
    No. 4:09CV1394 MLM, 2010 U.S. Dist. LEXIS 861
    ( E.D. Mo. Jan. 6, 2010) ......................................................................................11

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ..................................................................44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .........................................................................10, 12, 34, 35

*Tower Bank & Trust Co. v. Bank One, N.A.*,
    No. 1:06-CV-00156, 2006 U.S. Dist. LEXIS 51660
    (N.D. Ind. July 26, 2006) ....................................................................................31

*Tricontinental Indus. v. Anixter*,
    215 F. Supp. 2d 942 (N.D. Ill. 2002) ..................................................................27

*Tsirekidze v. Syntax-Brillian Corp.*,
    No. CV-07-02204-PHX-FJM, 2009 U.S. Dist. LEXIS 8464
    (D. Ariz. Jan. 30, 2009) ......................................................................................40

*W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*,
    No. 4:08CV00120 ERW, 2009 U.S. Dist. LEXIS 103460
    (E.D. Mo. Nov. 6, 2009) .....................................................................................19

*Yellen v. Hake*,
    437 F. Supp. 2d 941 (S.D. Iowa 2006) ...............................................................11

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77z-2(a) .............................................................................................................19
    §77z-2(c)1 ...........................................................................................................19
    §772-2(c)(i) .........................................................................................................21

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................................................27
    Rule 12(b)(6) ................................................................................................11, 21

15 U.S.C.
    §78j(b) .....................................................................................................12, 44, 45
    §78t(a) .................................................................................................................45

117 C.F.R.
    §240.10b5-1(c)(1)(i) ...................................................................................44
    §240.10b5-1(c)(1)(ii) ..................................................................................44

## I.    Introduction

Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint is a fallacious effort to blame the "global economic crisis" for defendants' own fraudulent misrepresentations. Throughout the Class Period defendants repeatedly lied to investors about the amount of losses FCStone Group, Inc. ("FCStone" or "the Company") was sustaining from its customers' trading accounts, the Company's ability to cover those losses, and its risky speculation on interest rates. In an effort to cover up these lies, defendants simply delayed telling investors the truth, hoping the market would rebound and cover their tracks. It did not, and defendants' fraud has now come to light.

Defendants' primary argument is that the Complaint is vague and lacks detail, yet their motion ignores many of plaintiffs' most damaging allegations.[1] For example, defendants spend several pages claiming they fully warned investors that the Company could face additional losses from the trading account of its largest customer (the "Energy Account"), but their motion *does not mention* the fact that, once defendants admitted the losses would be *$80 million* more than they initially disclosed, financial analysts claimed to have been misled by defendants' repeated and unequivocal assurances that the account had been "effectively neutralized", declaring that FCStone's management "*has completely lost its credibility*," and noting that "[*t*]*he size of the adverse development is startling, and management never provided enough details to frame the potential size of the ultimate loss*." ¶¶76, 88.[2]

---

[1]    Defendants do not dispute that the Complaint sufficiently pleads materiality, reliance, and loss causation for all of plaintiffs' allegations. Defendants' Suggestions in Support of Motion to Dismiss Consolidated Complaint for Violation of the Securities Laws ("Defs' Mot") at 1.

[2]    All "¶__" or "¶¶__" references are to the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"). Additionally, here as elsewhere, emphasis has been added and citations omitted, unless otherwise noted.

- 1 -

Defendants also wholly ignore many of the Complaint's allegations regarding defendants' failure to comply with Generally Accepted Account Principles ("GAAP"). Defendants' motion does not address an array of accounting regulations that required them to disclose $1.1 million in bad debt arising out of cotton trading prior to the filing of the Company's April 14, 2008 10-Q, nor does it mention multiple other accounting regulations that plaintiffs allege were violated by defendants' failure to disclose the risks and losses stemming from the Energy Account losses.

Even the arguments defendants do set forth fail to raise any legal basis for dismissal. Defendants contend, for instance, that their statements regarding the Energy Account are protected by the Private Securities Litigation Reform Act of 1995's ("PSLRA") "safe-harbor" provision because they are forward-looking and protected by "meaningful" cautionary language. Defs' Mot at 16. A review of defendants' statements, however, reveals the safe harbor is totally inapplicable as it does not apply to defendants' statements of current or historical fact. Moreover, regardless whether the statements were forward-looking, defendants' purported cautionary language was not "meaningful" as required by the PSLRA. The passage cited at length in defendants' motion from the Company's November 14, 2008 10-K (which defendants' claim warned investors of the dangers of the Energy Account) is inadequate boilerplate, having appeared *verbatim* in the Company's 2007 10-K, filed a year before investors had ever heard of the Energy Account.

Defendants also argue that the Complaint fails to allege with particularity that they misrepresented that the Company was hedged against interest rate declines. Defs' Mot at 39. Defendants' explicit statements during the Class Period that the Company was "direct[ly] hedging . . . interest rates" and "we are doing what we to in order to protect ourselves" (¶55), however, were later directly contradicted by defendants' admission that the "hedge" was, in fact, nothing more than a risky bet on the spread between the LIBOR and the Federal Funds Rate. As a result, when that

- 2 -

spread increased, the Company was forced to take a $3.1 million loss. As the Complaint alleges, with particularity, why these statements were false and misleading, the allegations should be upheld.

Finally, plaintiffs have alleged detailed, reliable, and particularized facts from a former company insider that set forth exactly how the fraud occurred and that defendants had direct knowledge that their statements were false. Viewed holistically with defendants' sales of more than 20% of their Company stock at all-time high prices, the Complaint more than adequately alleges defendants' scienter.

In the end, defendants' motion does little more than argue that the Complaint is too vague and not particularized enough. These arguments cannot succeed in the face of plaintiffs' detailed, well-pled and straight forward allegations, especially when defendants must ignore whole sections of the Complaint to make their arguments. Defendants' motion should be denied.

## II.     Factual Background

Defendant FCStone is a commodity risk management company providing risk management consulting and transaction execution services to commercial commodity traders, end-users, and producers. ¶¶22. The Company works with professional traders to provide clearing and execution of commodities (*e.g.*, cotton, energy, natural gas and oil) futures and options sales. ¶23. As a clearing broker acting on behalf of its customers for trades consummated on commodities exchanges, FCStone is responsible for guarantying those customers' positions with the exchanges. ¶24. To mitigate the risk of a customer over-extending their credit, the Company represented that it required its customers to place security deposits as collateral for their trades. *Id.* FCStone generates a large percentage of its earnings by holding these deposits in interest-bearing accounts. *Id.*

### A.     Defendants Misrepresent the "LIBOR Hedge" and FCStone's Hedging Against Falling Interest Rates

In fiscal 2007, 80% of FCStone's pretax income resulted from interest earned on these deposits. ¶4. Because interest was FCStone's main source of income, any decline in interest rates

had the potential to significantly affect the Company's financial results. *Id.* In September 2007, short-term interest rates began to decline. The Federal Funds rate dropped from 5.25% to 4.50% by November and declined throughout 2008, finally hitting 0% in January 2009. ¶5. Investors and analysts were understandably concerned about this decline and, during the Class Period, grilled defendants at length about FCStone's strategy to protect itself from the declining rates. ¶¶55, 59, 67.

To quell market concern regarding the Company's interest rate risk, defendants repeatedly reassured investors that, in 2007, it had entered into the "LIBOR Hedge" position: "Interest rates have softened recently, but that weakness should be offset by . . . direct hedging of interest rates." ¶¶52, 55 (April 10, 2008: "we started [the hedges] right at about the end of last fiscal year" and "we've gone out about two years with the hedges."); s*ee also* ¶¶6, 53, 55, 57. Defendants assured investors that although "short-term interest rates are a concern, [] we are doing what we need to in order to protect ourselves." ¶55. More specifically, defendants expressly represented that they had utilized a collar to "really lock[] in a floor," on interest rate declines, thereby protecting the Company from continued downward movement. *Id.* Defendants also specifically represented that the collar was tied to the LIBOR rate. ¶59 (April 10, 2008: "[analyst:] what is the collar tied to, treasury rates? [defendant Dunaway:] It's a LIBOR hedge."). Dunaway emphasized that "if there's no change in LIBOR between the beginning and end of the quarter" the "hedge" would be "virtually flat," *i.e.*, there would be no gain or loss. *Id.*

After fraudulently inflating FCStone's stock price by misleadingly reassuring investors concerning the Company's exposure to declining interest rates, between December 14, 2007 and January 14, 2008, defendant Anderson sold approximately 28% of his holdings in the Company for proceeds of over $7.1 million. ¶120. In fact, Anderson sold on the very day that defendants falsely assured investors that "we are doing what we need to in order to protect ourselves." ¶27. Anderson sold for prices as high as $50.42, only slightly below the Class Period high of $52.40. ¶120. Prior to

- 4 -

these sales, Anderson had sold no FCStone stock, nor did he sell any after. *Id*. When defendants finally revealed the truth regarding FCStone's exposure to declining interest rates, the stock plummeted 41% to $17.64. ¶70.

The truth was that, unbeknownst to investors, the LIBOR Hedge was really not a hedge at all. ¶¶6, 67. Instead, defendants were actively betting that the spread between the LIBOR and the Fed Funds rate would not fluctuate. ¶¶6, 67. Defendants later admitted as much: "there became really a *disconnect between fed funds rate and LIBOR*, *which is what the hedge position was in or the collar was in*." ¶67 ("as the disconnect became more dramatic, . . . we had to make a determination that is there value in keeping that position on . . . ."). While this risky bet on the spread between the rates allowed defendants to report mark-to-market gains of $653,000 and $4.4 million in fiscal 1Q08 and 2Q08, respectively, it provided no hedging protection, or "floor" against declines in interest rates, as defendants had represented. ¶¶32-33. Instead, even though the LIBOR did not change dramatically in 3Q08 (in which case, defendants had represented that the "hedge" would be "virtually flat"), defendants were forced to take a $3.1 million loss as the spread widened. ¶¶34-36. Defendants were also forced to liquidate the position, erasing the over $5 million in gains. *Id*. Upon the disclosure of this information (along with increases in bad debt reserves, discussed below) on July 10, 2008, FCStone's stock plummeted 41%. ¶70.

## B. Defendants Did Not Disclose or Properly Account for Cotton Bad Debt Losses

In FCStone's 2Q08 Form 10-Q, filed April 14, 2008, defendants reported that the Company's bad debt expense had decreased $11,000 (from $120,000 to $109,000), year-over-year. ¶100. Defendants, however, knew nearly two months earlier (on March 4), that FCStone had already incurred bad debt losses for the subsequent quarter of $1.1 million – ten times the losses reported – yet failed to disclose that in violation of GAAP. ¶111. These losses stemmed from the artificial

- 5 -

settlement of cotton prices by the Intercontinental Exchange ("ICE") after a sudden 31% jump in prices over a two day period on March 3rd and 4th, 2008. ¶¶39-40.

As a result of the unprecedented price increase, on March 4, traders had "only hours to obtain giant new loans or have their trading positions closed out." ¶40. And, according to defendants, on that day, "[p]roviding capital to make those margin calls got confusing enough that it got to the point where basically lenders just stopped making loans for margin requirements." ¶67. As a result, "a handful" of FCStone's customers failed to meet their margin posting requirements. ¶¶41, 67. FCStone "ha[d] procedures in place to collect additional margin and deposits from customers, even on a same-day basis." Defs' Mot at 3. But, according to defendants, that "handful of accounts" "just didn't have the leverage or the capital to adequately margin the account." ¶67. Defendants Anderson and Dunaway, who were provided, on a daily basis, with "Deficit Sheets" identifying traders whose losses exceeded their capital accounts and by exactly how much, were informed of the amount of losses. ¶50. Yet, over a month later, on April 14, 2008, when defendants filed FCStone's 2Q08 10-Q, they failed to disclose the $1.1 million in resulting bad debt losses. ¶111. Instead, defendants misleadingly represented to the market, without qualification, that FCStone's bad debt had *decreased*. ¶100.

While in possession of this (and other) material, non-public information, between April 29 and June 16, 2008, defendant Dunaway liquidated 22% of his FCStone holdings for prices between $40 and $41.47. ¶120. Prior to these sales, defendant Dunaway had sold no FCStone stock, nor has he sold since. *Id*. A month later, on July 10, the Company finally disclosed the bad debt (and "hedge") losses, sending FCStone's stock plummeting 41% to $17.64. ¶38. On a conference call that day, defendants admitted that they knew about the bad debt losses prior to the issuance of the April 14, 2008 10-Q: "In early March the Exchange settled a cotton contract synthetically, leaving the commercial industry and market participants unprepared or unable to meet the margin call. As a

- 6 -

result of the situation, FCStone experienced bad debt write-offs of $1.1 million, or $0.03 per diluted share for the quarter." ¶41. Defendants' failure to disclose these material losses, incurred over a month prior to the April 14, 2008 10-Q filing, violated GAAP. ¶¶91-98.

### C. Defendants Failed to Disclose Loss Exposure and Record Bad Debt Provisions Related to the Energy Account

Throughout the Class Period, defendants represented to investors that because the Company acted as a clearing broker and was therefore "responsible for our customers' obligations" for "all trades consummated on exchanges," the Company "mitigated [its] credit risk *by requiring sufficient margining or security deposits*" from customers to cover potential liabilities arising from trading accounts. ¶¶61, 71. These statements were false and misleading because the Company did not, in fact, require sufficient margining or security deposits from its customers. ¶¶74-86.

On November 3, 2008, the Company issued a press release disclosing for the first time that it would be forced to take a staggering $25 million bad debt provision stemming from losses in three customer accounts for which the Company was responsible and did not have sufficient credit protections. ¶74. Twenty million of the $25 million in losses stemmed from the Company's largest customer's "Energy Account". ¶¶74-75. Defendants further admitted that the Company's "credit risk management procedures" had been drastically insufficient to monitor customer credit risk and that they had recently engaged an "external consultant to review all of the company's credit risk procedures, processes and systems" and that "[t]he company believes that it has made appropriate adjustments to its monitoring system designed to substantially reduce the risk of failures of these types in the future." ¶74. Defendant Anderson conceded that "*we dropped the ball on this account . . . the positions got large enough and long tendered enough that we should have recognized that before it really showed up in the margin requirements. And unfortunately, we didn't do that.*" ¶76. On this partial disclosure of the truth concerning the Energy Account, the Company's stock price fell from $6.16 to $3.75, a one day drop of more than 39%. ¶77.

- 7 -

But defendants did not completely come clean on these revelations – defendants did not disclose the Company's full exposure to the Energy Account or the true, much higher risk associated with that account in its November 3, 2008 disclosure (and subsequent November 14, 2008 4Q08 and January 8, 2009 1Q09 earnings releases). ¶¶79-85. The November 3, 2008 press release stated that the Company would incur "up to" a $20 million bad debt provision for the Energy Account and that "FCStone has taken and is taking appropriate actions to mitigate these exposures." ¶74. On a November 4, 2008 conference call with analysts, defendant Anderson assured analysts that the $25 million reserve was sufficient to cover all the risks from the Energy Account and others, saying, "[b]ased on our internal analysis . . . it was appropriate to basically reserve . . . up to $25 million of potential bad debt . . . ." ¶76. Anderson detailed the Company's supposed thorough analysis of the potential risks and careful calculation of the reserve, stating:

> I think really once we recognized there was a substantial risk, we went through the process of really analyzing that risk and trying to quantify what our exposure or potential loss was, as well as, like I said, we engaged a consulting firm to help us really determine or give us an estimate or [probably] validate, verify what our analysis showed us and as I said, we just got that completed and made the determination that now was the time with the visibility we had to make that determination to reserve for the potential bad debt. ***And we think that what we have reserved is sufficient to cover that specific risk***.

¶76.

When pressed by analysts for more disclosure on the Energy Account, Anderson stated, "***I am not going to get into specific positions with the account, but as I said, we think we have got it effectively neutralized and/or the risks mitigated to a large extent*** . . . ." ¶76.[3]

---

[3] On November 14, 2008 and January 8, 2009, the Company reaffirmed that the losses from the Energy Account would not exceed $20 million. ¶¶78-79, 82-83. On the January 8, 2009 conference call, defendant Anderson again reiterated to investors that "FCStone has taken steps to review all segments of the Company and is making every effort to strengthen out controls, oversight and systems. The Company has taken steps to ensure that the situation that develops in this account will not occur again." ¶83.

Defendants' assurances, however, were false. According to a high-ranking former FCStone employee ("CW1") who worked clearing trades for the Company, the losses in the Energy Account came from trades made by Scott Adams ("Adams"), an energy trader associated with FCStone's Geldermann subsidiary. ¶45.[4] According to CW1, defendants were aware that Adams had entered into the energy positions that caused the Company's huge losses more than *six months before* the Company's announcement on November 3, 2008. ¶48. Moreover, Adams' trades were deeply flawed from their inception. *Id*. The future values of the underlying natural gas products quickly got so far from Adams' contract prices that there was no way that major losses could be avoided. *Id*. According to CW1, Adams' position was "flawed from the get go" and, dangerously for FCStone, the amount of losses for Adams' positions greatly exceeded the amount of capital that Adams had deposited with the Company. Although Adams only had $10 million in his account with FCStone, he quickly began incurring daily margin calls that exceeded this amount. Id. In fact, a series of very large margin calls created a deficit in Adams account of between $20-$30 million *four months before* the Company's November 3, 2008 announcement. *Id*. These losses alone were enough to require the Margin Department to liquidate his positions, but it did not. *Id*. Defendants permitted Adams to simply "do what he pleased" despite his huge losses and regardless of the continuing risk

---

[4]     Adams worked as a independent trader who utilized Geldermann to enter into futures positions on several natural gas products which had suffered huge losses. *Id*. Traders like Adams were supposed to deposit capital with FCStone as collateral to trade on margin in commodities futures. *Id*. These trades had margin calls that had to be settled on a daily basis with the clearinghouse exchanges, and FCStone was responsible for ensuring that those exchanges received the cash necessary to satisfy any margin calls. *Id*. As the broker, FCStone was responsible to make sure the clearinghouse was paid if the trader could not cover his margin. *Id*. During the Class Period, FCStone's "Margin Department," was responsible for monitoring the positions taken by its clients and determining if and when it might be necessary to liquidate a position at a loss so as to avoid incurring potentially even greater losses because the position was simply unlikely to turn around and recover. ¶47.

that Adams' activities imposed on FCStone because Adams was FCStone's biggest and one of its oldest clients. ¶49.

Losses of the size Adams was incurring were a subject of major concern within the Company and were communicated to defendants Anderson and Dunaway early on – defendants were aware of the losses as early as July 2008. ¶¶48-50. Defendants Anderson and Dunaway were aware of the losses because they were provided with "Deficit Sheets" that the Company generated on a daily basis. ¶50. These Deficit Sheets were generated using the Company's software system, known as SCAN or RISK. *Id*. The daily Deficit Sheets identified traders whose losses exceeded their capital accounts and by exactly how much. *Id*.

Then, after knowingly and falsely representing that the losses from the Energy Account would not exceed $20 million, the Company shocked investors by later disclosing the true, much larger magnitude of the losses – the Company expected to incur an additional ***$60 to $80 million*** bad debt provision on these same energy trades. ¶86. This news sent shockwaves through the market, causing the Company's stock price to plummet from $3.95 to $1.94. ¶87. Analysts clamored that FCStone's management "has completely lost its credibility" and that the additional loss was the result of "[p]oor risk management or inexcusable risk assumption." ¶88.[5]

## III. Argument

### A. Standard On Motion to Dismiss

In considering a Rule 12(b)(6) motion, this Court must accept plaintiffs' factual allegations as true and construe those allegations in the light most favorable to the plaintiffs. *Tellabs, Inc. v.*

---

[5] Even this additional $80 million was not enough to cover the Company's losses. ¶89. On March 12, 2009, the Company finally announced that it had "eliminated" the Energy Account and would incur an additional $90 million loss on top of the $20 million announced on November 3, 2008, for a staggering total loss of $110 million. ¶90.

*Makor Issues & Rights, Ltd.* ("*Tellabs I*"), 551 U.S. 308, 322 (2007); *SEC v. Shanahan*, No. 4:07CV270 JCH, 2008 U.S. Dist. LEXIS 100641, at *10 (E.D. Mo. Dec. 12, 2008). On a motion to dismiss, "[t]he issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims, irrespective of a judge's disbelief of a complaint's factual allegations or a judge's belief that the plaintiff cannot prove what the complaint asserts." *Hardeman v. United States*, No. 4:09CV00312 SWW, 2010 U.S. Dist. LEXIS 2224, at *5 (E.D. Ark. Jan 11, 2010); *Stevens v. Spegal*, No. 4:09CV1394 MLM, 2010 U.S. Dist. LEXIS 861, at *3 ( E.D. Mo. Jan. 6, 2010) ("'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable'").

Moreover, when reviewing whether a complaint properly states a securities fraud claim under the PSLRA, the court must consider "'whether *the total of plaintiffs' allegations*, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'" *Yellen v. Hake*, 437 F. Supp. 2d 941, 958 (S.D. Iowa 2006). Thus, the Court should "consider the complaint in its entirety . . . [and] not . . . scrutinize each allegation in isolation but . . . assess all allegations *holistically*." *Tellabs I*, 551 U.S. at 322. Additionally, any issues involving factual disputes are inappropriate for resolution on a motion to dismiss, and are best left for a jury. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001).

To state a claim under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) purchase or sale in reliance on the misrepresentation or omission; (4) economic loss; and (5) loss causation. *See In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 969 (D. Minn. 2009). Plaintiffs satisfy these standards.

## B. The Complaint Alleges Actionable False and Misleading Statements

### 1. Defendants' Made Material Misstatements and Failed To Disclose All Material Facts Regarding the Energy Account

Defendants' series of materially false and misleading statements regarding the Company's massive losses from the Energy Account violated Section 10(b) by: (1) misrepresenting the Company's internal credit management procedures; (2) omitting material facts from investors regarding the future risks associated with the Energy Account; and (3) misrepresenting that $20 million bad debt reserve was adequate to cover all of the losses from that account.

By choosing to discuss the Energy Account with investors, defendants were required to speak truthfully and disclose all known material facts about its risks. *MoneyGram*, 626 F. Supp. 2d at 973 ("a company that makes material representations 'assumes a duty to speak fully and truthfully on those subjects'"); *In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (a duty to disclose "'arises . . . if there have been inaccurate, incomplete, or misleading disclosures'"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d. Cir 2002) ("upon choosing to speak, one must speak truthfully about material issues").

Defendants argue that the Complaint "fails to specify the content of *any statement* or in either (sic) SEC filing" that defendants falsely misrepresented or omitted regarding the Company's exposure to the Energy Account, and thus must be dismissed as a matter of law. Defs' Mot at 15. This argument simply ignores the Complaint's allegations.

Defendants represented to investors throughout the Class Period that they were "mitigate[ing] our credit risk by *requiring sufficient margining or security deposits*" from customers to cover potential liabilities arising from customer's trading accounts. ¶¶61, 71. Defendants admitted on November 3 and 4, 2008, that, contrary to the foregoing representations, FCStone *had not* required sufficient margins or security deposits from three of its customers, and due to the massive trading losses in those accounts the Company would have to incur "*up to $25*

- 12 -

*million* in pre-tax bad debt provision(s)" ¶74. In addition, defendant Anderson admitted that "*we dropped the ball on this account . . . the positions got large enough and long tendered enough that we should have recognized that before it really showed up in the margin requirements. And unfortunately, we didn't do that*." ¶76.

Even after disclosing the existence of these losses, however, defendants continued to misrepresent to investors the true magnitude of the risk from the Energy Account. In the November 2, 2008 announcement, defendants stated that the magnitude of the loss was $20 million while assuring investors that "FCStone *has taken and is taking appropriate actions to mitigate these exposures*. . . . The Company has taken specific steps intended to reduce the market risk associated with the trading position of the energy account . . . ." ¶¶9, 34, 74. Defendant Anderson also repeatedly assured analysts that the Company had fully investigated all potential losses stemming from the Energy Account by "*really analyzing that risk and trying to quantify what our exposure or potential loss was*" and hiring a consulting firm "to help us really determine" the potential losses, and that by doing so "we think that what we have reserved is sufficient to cover that specific risk." ¶76.

These statements were all untrue. First, contrary to their representations, defendants did not require sufficient margining or security deposits from customers and had not "*effectively neutralized*" the risks from the Energy Account, as investors found out on February 24, 2009 when the Company admitted that "it expects to incur an *additional $60 million to $80 million pre-tax bad debt*" sending the Company's stock plummeting 49% in a single day. ¶¶86-87. Analysts were shocked and outraged by this news as they felt they had been misled by defendants, stating

- 13 -

FCStone's "***management has completely lost its credibility***" and noting that "[*t*]***he size of the adverse development is startling*** . . . ." ¶88.[6]

Instead of disclosing the details of the Energy Account, defendants purposely choose to keep investors in the dark. When ***specifically asked*** by analysts about whether the Energy Account was closed out (and whether the Company could suffer additional losses), defendant Anderson stated, "***I am not going to get into specific positions with the account***, but as I said, we think we have got it effectively neutralized and/or the risks mitigated to a large extent . . . ." ¶76. Moreover, defendants repeatedly and specifically told investors that they had conducted a thorough investigation into the potential risks associated with Adams' account, and "***we think that what we have reserved is sufficient to cover that specific risk***." ¶76. Despite these assurances, defendants failed to tell investors that (1) the positions in Adams' account exposed the Company to ***four times more the liability*** defendants had disclosed, (2) the Company ***had not taken a sufficient reserve*** for these potential losses; and (3) that the Company had ***not adequately reduced the risk*** of the trading positions. ¶¶44-51, 81-87. Defendants' failure to disclose these facts graphically illustrates the falsity of their statements and renders their statements actionable. *MoneyGram*, 626 F. Supp. 2d at 979 ("By expressly commenting on the strategic review and the Portfolio's valuation, [defendant] had a duty to disclose all related material information.").

---

[6] Defendants' demand that the Court strike the allegations in ¶¶116 and 118-119 because those allegations have been pled without particularity is meritless. As demonstrated above, the Complaint details each statement made by defendants (¶¶52-90), provides the date and the context in which the statement was made (*id.*) and explains why the statement was false (¶¶62, 68-69, 72, 80-81, 84-85). Unsurprisingly, defendants fail to cite a single authority for their misguided request to have plaintiffs' allegations stricken. The Court should dismiss the request.

- 14 -

### a. Defendants' Failure to Disclose The Scope of Risk From the Energy Account Violated GAAP

Defendants' sole argument that their accounting for the Energy Account did not violate GAAP appears to be that FCStone was not required to take a charge to income (in this case, a bad debt provision) or reserve because plaintiffs have not alleged that defendants knew with certainty during the Class Period that the amount of loss would be $110 million. *See* Defs' Mot at 19. Defendants, however, ignore the relevant law and the majority of plaintiffs' allegations concerning GAAP violations. Under SFAS 5, ¶10, even if a charge to income was not mandated, defendants were required to disclose the risk of a loss to investors "when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. ¶109. A "reasonable possibility" means the chance of the future events occurring is more than remote but less than likely." *Id*. In other words, even if the risk of a loss was less than likely, defendants were still required to disclose that risk to investors. *Id*. Here, the Complaint painstakingly alleges that defendants were ***aware*** of the risk and its true magnitude ***months before*** they disclosed anything to the investing public. ¶¶48-50. Thus defendants ***knew***, at the very least, that there was "a reasonable possibility" of a loss well before they ever informed investors. ¶¶43-51.

Moreover, contrary to defendants' argument, SFAS 5, ¶10 mandates disclosure ***regardless of whether the exact amount*** of the possible loss is certain. ¶110. SFAS 5, ¶10 states, "the disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss ***or state that such an estimate cannot be made***." *Id*. In other words, even when an "estimate" of the "range of loss" cannot be made, much less a "magically perfect prediction," defendants are still required to disclose the risk to investors. *Id*. *See also* Defs' Mot at 18-19, n.17 ("'The Board has concluded that disclosure is preferable to accrual when a reasonable estimate of loss cannot be made.' (SFAS 5, Appendix C, ¶59 (1972)"). Regardless of whether defendants could predict the precise amount of the losses stemming from the Energy Account, investors were entitled to know

- 15 -

(and GAAP mandated the disclosure) of the risks associated with this account. Defendants failure to disclose these risks to investors violated GAAP. In any event, defendants were aware, according to CW1, many months before disclosure that the losses in Adam's account were between $20 and $30 million. ¶48. Therefore, defendants should have disclosed this range of loss, at the very least.

Additionally, defendants do not address or challenge plaintiffs' allegations that defendants' failure to disclose the risks associated with the Energy Account violated Statement of Financial Accounting Standards No. 107 ("SFAS 107") Disclosures about Fair Value of Financial Instruments.[7] ¶104. The Complaint concisely alleges defendants' knowledge of the risks stemming from the Energy Account early in the Class Period. ¶48. Defendants admitted that the Energy Account represented a significant concentration of credit risk: "no other account was remotely close in size to this or anywhere close to the exposure that this has been." ¶¶102-103. Therefore, FCStone was required under GAAP to disclose the significant concentration of credit risk to investors, which it did not. ¶¶102-103.

Moreover, under GAAP, defendants were required to disclose the "maximum amount of the loss" that could stem from these risks. ¶104. The positions at issue had been opened in May 2008. ¶103. And defendants admitted that "we have procedures for reviewing credit exposures to specific customers" and that "all of the accounts in our commodity in risk management and clearing and execution segments are constantly being reviewed for creditworthiness, credit capacity, position limits, tenure, and volumes." ¶112. Yet, defendants failed to make any disclosure that the "maximum amount of the loss" was over $100 million – until many months after they became aware

---

[7]     Paragraph 15A of SFAS 107 requires defendants to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." ¶104. SFAS 107 required defendants to disclose, for example, "the maximum amount of loss" and the "entity's policy requiring collateral or other security to support financial instruments subject to credit risk." *Id.*

- 16 -

of it.[8] The purpose behind the risk disclosure requirements in GAAP is to warn investors about risk concentrations that may result in losses – it is not designed to allow defendants (as they did here) to wait until those losses became substantial and then disclose the concentration of risk after the losses are already harming investors. ¶107.

Defendants also ignore the allegations that their failure to disclose the risk violated GAAP Standard AICPA Statement of Position No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6").[9]¶119. Here, defendants clearly knew or were reckless in not knowing that FCStone was exposed to the "risk[]" or "uncertaint[y]" of a $110 million loss. *Id.* In fiscal 2008, by contrast, FCStone had net income of $40.6 million. *See* Defs' Mot, Ex. B at 24. This $110 million risk clearly had a "significantly financially disruptive effect" on the normal functioning of FCStone and led analysts to conclude that "management has completely lost its credibility." ¶¶88, 119. Defendants' failure to address or respond to these allegations mandates the denial of their motion.

In addition, plaintiffs have adequately alleged that defendants' failure to take a charge to income violated GAAP. SFAS 5, Accounting for Contingencies, requires the accrual of a loss contingency by a charge to income (here, a bad debt provision) if, at the time the financial statements are issued, it is probable that a contingent liability of potential loss has been incurred, and the loss can be reasonable estimated. Plaintiffs allege that in FCStone's 3Q08 10-Q and 2008 10-K, filed November 14, 2008 and January 9, 2009, respectively, defendants failed to record adequate bad debt

---

[8]     As discussed above, defendants also violated GAAP by failing to disclose that their "policy requiring collateral" was woefully inadequate given the maximum loss at issue. Specifically, defendants knew that the maximum loss from the Energy Account exceeded $100 million and that Adams had just $10 million in deposits to cover this loss. ¶48.

[9]     SOP 94-6 requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. ¶119. SOP 94-6 defines a "severe impact" as a "significantly financially disruptive effect on the normal functioning of an entity." *Id.*

losses related to the Energy Account and continued to mislead investors as to the magnitude of risk that it presented. ¶116. Moreover, the Complaint alleges that defendants were aware of the true magnitude of the risks emanating from this account as early as May 2008, that it had already incurred losses far exceeding its capital account, and that there was no way major losses could be avoided. ¶¶45-51.

Defendants argue that they should face no liability because there was no restatement of FCStone's financial statements and plaintiffs have not alleged that the Company's independent auditors disagreed with the bad debt reserves. Defs' Mot at 21. But a restatement or disagreement with auditors need not be alleged to plead actionable violations of GAAP. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 n.4 (N.D. Okla. 2003) ("[T]he fact that WCG's financial results were not restated does not mean that the financial results disseminated during the Class Period were accurate."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (rejecting defendants' argument that because the company "never restated any of its financials" and "because its financial statements were audited by an independent accounting firm . . . no inference of scienter can be drawn").

### b. The PSLRA "Safe Harbor" Does Not Shield Defendants from Liability

Defendants claim that they should be immune from liability for their material misrepresentations regarding the Energy Account "[b]ecause these statements were estimates of FCStone's future bad debt," and therefore should "qualify as forward-looking under the PSLRA." Defs' Mot at 13-14. This argument ignores well established law and the facts of this case, and should be rejected.

In order to gain the protection of the PSLRA's "safe-harbor" provision for forward looking statements, defendants must: (1) identify each statement as a forward-looking statement; and (2) accompany each forward looking statement with "meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §77z-2(a), (c)1; *Dutton v. D&K Healthcare Res.*, No. 4:04CV147SNL, 2006 WL 1778884, at *8 (E.D. Mo. June 23, 2006).

### (1) The PSLRA Safe Harbor Does Not Immunize Defendants For Their False and Misleading Statements and Omissions

The PSLRA safe harbor does not apply to false statements of present or current fact, or to omissions. *Id.* ("The 'safe harbor' provision 'does not insulate statements [like these] that misrepresent historical/hard or current facts.'"); *W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*, No. 4:08CV00120 ERW, 2009 U.S. Dist. LEXIS 103460, at *6-*7 (E.D. Mo. Nov. 6, 2009). Here, defendants assured investors the Company **was currently and had already** mitigated against additional risk from Adams' trading losses. *See e.g.*, ¶74 ("FCStone **has taken and is taking** appropriate actions to mitigate these exposures. **The company has taken specific steps** intended to reduce the market risk associated with the trading position of the energy account."); ¶75 ("we **took measures to really mitigate or neutralize the positions** as effectively as we could and we believe **we have done that to a large extent**"). These statements speak only to what had or was currently happening, or was being observed at the present, and could in no way be construed as projections concerning the future. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that defendants did more than offer rosy projections; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

In addition, defendants' safe-harbor argument relies on the misguided claim that "reserves for, or estimates of, future bad debt are forward-looking" and therefore cannot be actionable under the securities laws. Defs' Mot at 13. Because defendants here claimed that they had **already reserved a sufficient amount** to cover the losses from the Energy Account, the safe-harbor is

inapplicable. *See Green Tree*, 270 F.3d at 666 ("Whether defendants could have believed during the class period that reserves were an adequate response is a question of fact that cannot render the complaints inadequate, lest the heightened pleading requirements of the Reform Act replace the function of a trial."); *see also In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) ("affirmative representations about the current or historical performance" are not considered forward-looking); *see also Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 CIV 12046 WHP, 2001 WL 300733, at *8-*9 (S.D.N.Y. Mar. 28, 2001) (warnings of specific risks are insufficient to shelter a defendant from liability where they fail to disclose specific facts necessary to appreciate the magnitude of the risk); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("[plaintiffs allege] that the projections were too rosy, and that [defendant] knew it. That charges the defendants with stupidity as much as with knavery, for the truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones.").[10]

### (2) Defendants' Boilerplate Cautionary Language Does Not Satisfy the PSLRA

Even assuming *arguendo* that defendants' statements were forward-looking – which they were not – the purported "cautionary" language cited by defendants is woefully deficient, and therefore the PSLRA's safe-harbor provision does not protect them from liability. Generally, the sufficiency of a cautionary statement involves a factual analysis, which is improper at the pleading stage. *Asher*, 377 F.3d at 735. Moreover, "dismissal of a securities fraud complaint under Rule 12(b)(6) should be granted . . . only where 'the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not

---

[10]     Defendants' **only** cited support for the notion that the PSLRA safe harbor should protect their statements, *Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp 1236, 1245 (D. Conn. 1991), is from five years **before** the PSLRA was enacted into law, and thus is uninformative to the discussion here.

disagree that the challenged statements were not misleading.'" *Parnes v. Gateway 2000*, 122 F.3d 539, 548 (8th Cir. 1997) (emphasis added and in original).

Here, defendants claim that their statements in the November 14, 2008 10-K, the November 30, 2008 10-Q, and the January 9, 2009 10-Q were accompanied by meaningful cautionary language. Defs' Mot at 14, 16-17.[11] This argument lacks any validity. Defendants point to language such as "[w]e **believe** this range of bad debt provision properly reflects all shortfall for which we are currently responsible . . . (from the November 14, 2008 10-K) and that "no assurances can be given" (from the November 30, 2008 10-Q and January 9, 2009 10-Q) as evidence of their disclosure. Defs' Mot at 14, 16. Simply stating "we believe" at the beginning of a sentence, however, does not render the speaker immune to the securities laws, especially when, as here, the defendants knew the statement was false. As the court in *Giant Interactive Group* held:

> Defendants cannot, as a matter of law, be absolved of liability pursuant to the 'bespeaks caution' where they failed to disclose the existence of facts known for many months that would negatively affect [the defendant company's] business **but only warned that these facts 'could' negatively affect their business**.

*In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009); *see also In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("[I]f Defendants knew that . . . their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected by the safe harbor."). Here, because defendants knew their statements were false at the time they made them, no cautionary language short of a confession they knew their statements were false is sufficient. *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999); *Nash*, 502

---

[11]    Defendants' claim that "cautionary language" in the November 3, 2008 and February 24, 2009 press releases shields them from liability to is patently deficient, as neither press release identifies ***any language*** in the documents as "forward looking", and therefore cannot be protected by the safe-harbor. 15 U.S.C. §772-2(c)(i); Defs' Mot at 14-15 (citing Exs. E and I).

F. Supp. 2d at 873 ("[C]autionary language can not be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false."); *Nortel*, 238 F. Supp. 2d at 629 (where defendants did not disclose "that certain risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions").

Likewise, any supposed forward-looking statements made by defendants do not qualify for safe-harbor protection because the cautionary language contained therein was not meaningful. For example, defendants point to language contained in the Company's November 14, 2008 10-K, which made the false statement that "[w]e believe this [$20 million] bad debt provision properly reflects all shortfall for which we are currently responsible as it relates to this [Energy Account]." Defs' Mot at 14. The only "meaningful cautionary language" in that 10-K, however, appeared more than 50 pages prior to the statement (on the very first page of the filing), and made no mention of the Energy Account, the Company's losses, or even bad debt reserves in general. *Id.*

In fact, the same purported "meaningful" cautionary language cited in defendants' motion was used in the Company's previous 10-K, filed on November 29, 2007 – *a full year before investors had ever heard of the Energy Account*. *See* Defs' Mot. at 4, 16; Exhibit 1, attached hereto. As such, this language totally fails to immunize defendants' false and misleading statements, as "[t]he cautionary language must 'relate directly to that by which plaintiffs claim to have been misled.'" *Parnes*, 122 F.3d at 548; *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) ("[T]he cautionary statement must discredit the alleged misrepresentations to such an exent that 'the risk of real deception drops to nil.'").

### 2. Defendants' Failure To Disclose $1.1 Million In Cotton Trading Losses Violated GAAP

In FCStone's 2Q08 Form 10-Q, filed April 14, 2008, defendants reported that FCStone's bad debt expense had decreased $11,000 (to $109,000), year-over-year. ¶100. Meanwhile, defendants

- 22 -

knew that by March 4, 2008, FCStone had already incurred bad debt losses for the subsequent quarter of $1.1 million – *ten times higher*. ¶111. Defendants' failure to disclose these material losses, incurred over a month earlier, violated GAAP provisions that require the disclosure of "subsequent events." ¶¶91-98.

Defendants' main defense seems to be that they had no duty, under "GAAP provision AU 560," to disclose the $1.1 million in bad debt losses. Defs' Mot at 35-36. This is because, according to defendants, the only "type of subsequent event that should be disclosed is one that provides 'additional evidence with respect to conditions that existed at the date of the balance sheet . . . .'" *Id.* at 36. Defendants misstate the law.

AU 560 governs the disclosure of "subsequent events," or "events or transactions [that] occur subsequent to the balance-sheet date, *but prior to the issuance of financial statements*, which have a material effect on the financial statements and therefore require adjustment or disclosure in the statements." §560.01. The rule unequivocally states that there are "*Two types of subsequent events*" that require disclosure. §560.02. Defendants are correct that the first type of event "consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet . . . ." §560.03. Defendants, however, ignore that AU 560 also mandates disclosure of a second type of subsequent event.

AU 560 plainly states that "[t]he second type consists of those events that provide evidence with respect to conditions *that did not exist at the date of the balance sheet being reported on but arose subsequent to that date*." §560.04. Under AU 560, defendants were required to disclose this second type of event if it was "of such a nature that disclosure of them is required to keep the financial statements from being misleading." §560.05; ¶96. Further, as detailed in the Complaint, "AU 560 clearly lists 'Losses on receivables resulting from conditions . . . arising subsequent to the

- 23 -

balance sheet date,' but before the financial statements are filed with the SEC, as one of the events that requires disclosure in the financial statements." ¶96.

At the same time defendants were reassuring the market that FCStone's bad debt was decreasing, they knew that the Company had already incurred "[l]osses on receivables" of over ten times the amount reported. ¶¶110-111. GAAP required defendants to disclose that FCStone's bad debt had already increased tenfold to keep the 10-Q from misleading investors, particularly in light of their statements that bad debt was decreasing.

Moreover, defendants fail to respond to plaintiffs' allegations that various other accounting rules mandated the disclosure of the $1.1 million losses. For example, defendants make no mention of FASB Emerging Issues Task Force Topic D-86 (citing an SEC Staff Announcement), which states that "registrants are reminded of their responsibility to, at a minimum, disclose subsequent events . . . . A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events." ¶97. Nor do defendants address Statement of Financial Accounting Standards ("SFAS") No. 5 ¶11, Accounting for Contingencies, which states, "After the date of an enterprise's financial statements but before those financial statements are issued, information may become available indicating that an asset was impaired or a liability was incurred after the date of the financial statements or that there is at least a reasonable possibility that an asset was impaired or a liability was incurred after that date. . . . Disclosure of those kinds of losses or loss contingencies may be necessary . . . to keep the financial statements from being misleading." ¶98. Defendants' knowing failure to disclose the bad debt losses was a clear violation of GAAP.

Defendants also suggest that disclosure was not required because they could not have known the precise volume of "bad debt" by April 14 as a result of policies and procedures that were in place to collect additional margin from its customers. Defs' Mot at 37. According to defendants,

plaintiffs' purported failure to plead how many customers were involved and the collection efforts that defendants made is fatal to plaintiffs' allegations. This argument fails for many reasons.

First, defendants' motion admits that FCStone "ha[d] procedures in place to collect additional margin and deposits from customers, *even on a same-day basis*." Defs' Mot at 3. Given that the Company's collection procedures were "same-day," it is difficult to credit defendants' suggestion that, by April 14, more than a month after the March 3-4 events at issue, they were still unable to quantify or estimate the amount of bad debt.[12] And contrary to defendants' claim that plaintiffs have failed to specify the number of accounts involved, defendants have admitted (and the Complaint clearly alleges) that "it really only amounted to *a handful of accounts* that it affected." ¶67. Additionally, according to defendants, that "handful of accounts" "just didn't have the leverage or the capital to adequately margin the account." *Id*.

Further, the Complaint alleges that given the inherent risk that a margin call might exceed the amount of deposited capital, FCStone had a "Margin Department" responsible for monitoring the positions taken by its traders. ¶47. The Complaint also alleges that, on a daily basis, defendants Anderson and Dunaway were provided with "Deficit Sheets" (generated using the Company's SCAN or RISK software system) identifying traders whose losses exceeded their capital accounts and by exactly how much. ¶50. Therefore, the Complaint clearly alleges that by March 4, defendants had quantified the exact amount by which the "handful" of cotton traders' losses exceeded their margin accounts. At the pleading stage, any argument that a different version of events should be adopted does little more than "kick up dust." *In re Stellent, Inc. Sec. Litig*., 326 F.

---

[12]    Defendants were also promptly informed that lenders would not step in to provide the capital necessary to cover the margin calls. The Complaint alleges that on March 4, traders had "***only hours*** to obtain giant new loans or have their trading positions closed out." ¶40. And defendants have admitted that, on that day, "[p]roviding capital to make those margin calls got confusing enough that it got to the point where *basically lenders just stopped making loans* for margin requirements." ¶67.

Supp. 2d. 975, 975 n.1 (D. Minn. 2004); *Green Tree*, 270 F.3d at 666 ("The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.").

Even more importantly, GAAP required defendants to make a disclosure even if they could not estimate the size of the bad debt loss. SFAS No. 5 ¶11 states that if there is "at least a reasonable possibility that an asset was impaired or a liability was incurred," "the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss *or state that such an estimate cannot be made*." ¶98. Defendants did not do this.

Defendants also demand a level of detail that neither the PSLRA nor Fed. R. Civ. P. 9(b) require.[13] *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002) (Plaintiffs "need not describe in detail a single specific transaction or shipment carried out under [the] alleged scheme."); *Tricontinental Indus. v. Anixter*, 215 F. Supp. 2d 942, 947-48 (N.D. Ill. 2002); *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del. 1999) ("[T]he requirement of particularity [in pleading fraud] does not require 'an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff[s] ha[ve] investigated . . . the alleged fraud and reasonably believe[] that a wrong has occurred.'"); *In re Computer Assocs. Class Action Sec. Litig.*,

---

[13] Defendants' citation to *In re 2007 Novastar Fin. Inc.* ("*Novastar I*"), 579 F.3d 878 (8th Cir. 2009) does not support their argument that plaintiffs were required to specify defendants' precise collection efforts. Defs' Mot at 37. *Novastar* stands for the unremarkable proposition that plaintiff is required to '"plead the "who, what, when, where, and how" *of the misleading statement or omissions*."' 579 F.3d at 882. In other words, plaintiff need only specify what the misleading statement was, when and where it was made, who made it, and how it was misleading. *Id.* Indeed, in *Novastar*, the plaintiff's complaint was dismissed because "it [did] not identify 'what' statements were allegedly false or misleading." *Id.* at 883. "Absent an indication of precisely *what* statements Lester alleges to be misleading, it is difficult, if not impossible, to determine whether the complaint adequately specified *why* each statement was misleading." *Id.* (emphasis in original). Here, by contrast, plaintiffs have clearly specified the information that defendants improperly omitted, namely the $1.1 million in bad debt losses, how and why that omission was misleading, and the where, when and who of the statements that the omission caused to be misleading. No more is required.

75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) ("Unknown specifics, such as the exact amount the earnings have been overstated, are not fatal . . . .").

### 3. Defendants Falsely Represented the LIBOR Hedge

As detailed above, because a high percentage of FCStone's pre-tax income (80%) came from interest, the decline in short-term interest rates that began in September 2007 concerned investors. ¶¶4-5.  To quell concern, defendants reassured investors that, in September 2007, FCStone had entered into a two-year hedged position, utilizing a LIBOR collar (the "LIBOR Hedge"), to "really lock[] in a floor" on interest rate declines.  ¶¶6, 52-53, 55, 57, 59.  Defendants assured investors that interest rate "weakness should be offset by . . . direct hedging of interest rates" and "we are doing what we need to in order to protect ourselves."  ¶¶5, 55.

Unbeknownst to investors, however, defendants were not hedging interest rate risk but, instead, were increasing risk by speculatively betting on the spread between the LIBOR and the Fed Funds rate.  ¶¶6, 67 ("there became *really a disconnect between fed funds rate and LIBOR, which is what the hedge position was in or the collar was in*").  As a result, on July 14, 2008, defendants announced they had to take a $3.1 million loss and the danger in carrying the risky bet forward had caused them to liquidate the position, reversing over $5 million in previously recorded gains. ¶¶34-36, 67.  Upon this disclosure, FCStone's stock plummeted 41%.  ¶38.

Defendants argue that plaintiffs have not alleged their claims with sufficient particularity. But the Complaint alleges, in great detail, defendants' false and misleading statements and omissions regarding interest rate risk, where and when each statement was made, who made each statement, and why each statement or omission was false and/or misleading.  Nothing more is required. *Stellent*, 326 F. Supp. 2d at 980 ("'[P]laintiff must specify each allegedly false statement – *i.e.*, state the date, location and maker of the statement – and why each statement was false.'").

- 27 -

Defendants argue that plaintiffs have not pled details regarding the LIBOR Hedge, including whether it was tied to the federal funds rate or the LIBOR rate, the maturity date, the amount of the floor and cap. Yet, just a page earlier, defendants boasted that they "refused to publicly disclose the details of [FCStone's] confidential investment strategies." Defs' Mot at 39. A plaintiff "need not plead . . . precise details . . . where the subject matter of the fraud is uniquely within defendants' knowledge or control." *Navarre*, 299 F.3d at 744.[14]

Moreover, the Complaint pleads many of the details that defendants claim are missing. For example, the Complaint alleges the term – two years (¶59) ("we've gone out about two years with the hedges"), and when it was put in place – at the beginning of FCStone's fiscal 2008 (¶59) (April 10, 2008: "We started right at about the end of last fiscal year."). Plaintiffs have also pled that defendants represented that the hedge was a collar that was tied to the LIBOR rate, when in fact it was not. ¶59. ("[defendant Dunaway:] I don't think you'll see a sizable gain going forward from this collar . . . [analyst:] what is the collar tied to, treasury rates? [defendant Dunaway:] It's a LIBOR hedge."). The Complaint details that the purported "hedge" was in actuality, a risky bet on the spread between the Fed Funds rate and the LIBOR rate and not a hedge on declining rates. ¶67 ("there became really a disconnect between fed funds rate and LIBOR, which is what . . . the collar was in").

---

[14] *See also Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.,* 523 F.3d 75, 90 (1st Cir. 2008) ("'[I]n determining the adequacy of a complaint [a court] cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'"); *In re UnitedHealth Group PSLRA Litig.,* No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623, at *5-*6 (D. Minn. June 4, 2007) (In the securities context, a "[c]omplaint should not be dismissed for failure to state a claim where there is a 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support plaintiffs' claims.") (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 559 (2007)); *In re Am. Italian Pasta Co. Sec. Litig.,* No. 05-0725-CV-W-ODS, 2006 U.S. Dist. LEXIS 40548, at *22-*23 (W.D. Mo. June 19, 2006) (the pleading stage "is not the time to put Plaintiffs to their proof").

Similarly, in *In re Ashanti Goldfields Sec. Litig.* ("*Ashanti I*"), 184 F. Supp. 2d 247, 254-55 (E.D.N.Y. 2002), the plaintiff alleged that defendants had misrepresented to the market that the defendant corporation was hedged against risk when, in reality, it was making risky speculations.[15] The court rejected defendants' argument that plaintiffs were required to plead the details of defendant's hedge book, noting that the hedge book was in defendant's control. *Id.* at 258-59. The court reasoned that "These heightened pleading requirements often put plaintiffs in a Catch-22 in securities fraud cases. Many plaintiffs do not have access to internal documents of the entities against which they wish to file claims, but those documents are the best way to demonstrate the alleged fraud. In effect, the heightened pleading requirement in many cases prevents plaintiffs from conducting the discovery they need to meet the requirement." *Id.* (citing *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137-38 (S.D.N.Y. 2001) ("courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery")). Further, because plaintiffs did not base their allegations on the details of defendants' hedge book, but rather on the general nature of the instruments at issue (*i.e.*, whether they were "hedges" or "speculation"), there was no requirement that they plead the details of the hedge book. *Id. See also Williams*, 339 F. Supp. 2d at 1254-55 (omission of nature of interest rate and credit risk of company's energy marketing and trading was actionable).

Here, as in *Ashanti I*, plaintiffs are alleging that defendants misrepresented the very nature and purpose of their strategy (*i.e.*, whether it was hedging or speculation), not the minute details of the hedge book. As a result, there is no requirement that plaintiffs plead the details of the hedge

---

[15] The court held that a determination of whether defendant was hedging or making speculative bets was an "issue[] that can be better resolved with expert evidence and following appropriate discovery." *Id.* at 260. This is because "courts have held that the determination of whether futures activity is hedging or speculation is a factual issue, not a legal one. *Id.* (citing *Day v. U. S.*, 734 F.2d 375, 376 (8th Cir. 1984)).

book.  *See Ashanti I*, 184 F. Supp. 2d at 258-59.  This makes sense.  Had plaintiffs pled, for example, that defendants misrepresented to the market that the floor on its hedge was 100, it would be logical to require plaintiffs to allege the details of the floor that was actually in place.  Here, plaintiffs need only allege the reason why defendants' statements that they were properly hedged were false or misleading.  In addition to the many reasons why defendants' statements were false, detailed above, plaintiffs have also pled that defendants' unexpected disclosure of a large loss from "hedging" activities show that they were engaged in speculation, not hedging.  Because large losses are inconsistent with a hedged position, nothing more is required.  *Id.* at 256-57 ("the allegation that [defendant] suffered large losses on its 'hedge book' following [a price movement] alone is reason why [defendant's] statements that it was engaged in hedging and not speculation were fraudulent").

Further, the Complaint alleges that defendants liquidated the LIBOR Hedge during FCStone's fiscal 3Q08, explaining that "there was far more risk in carrying it forward." ¶¶34-36, 67.  Defendants' explanation, however, is entirely inconsistent with their representations that their position was a LIBOR collar that "really locked in a floor" on the interest rate.  In an interest rate collar, a party uses a combination of call and put options to create a ceiling and a floor on an interest rate.  In other words, the party will not be affected, either positively or negatively, by interest rate movements either above the ceiling or below the floor.  *Albert v. Alex. Brown Mgmt. Servs.*, No. 04C-05-250 PLA, 2004 Del. Super. LEXIS 303 (Del. Super. Ct. Sept. 15, 2004) ("A common way to hedge stock is to 'collar' it . . . thereby locking the risk between . . . two prices.").[16]  If defendants had actually implemented an interest rate collar, as they had represented to the market, FCStone

---

[16]     *See also Jade Trading, LLC v. U.S.*, 80 Fed. Cl. 11, 17 (Fed. Cl. 2007) (collars have the effect of "limiting potential losses while . . . capping potential profit"); *Tower Bank & Trust Co. v. Bank One, N.A.*, No. 1:06-CV-00156, 2006 U.S. Dist. LEXIS 51660, at *3 n.3 (N.D. Ind. July 26, 2006) ("a 'collar' . . . effectively limit[s] potential declines and increases in the market price of the securities").

would have been protected against interest rate decreases beyond the "locked in . . . floor." ¶55. There could never have been "far more risk carrying it forward" than in keeping the collar on. ¶67. In fact, liquidating the position could only have exposed FCStone to more risk, because there would no longer be a floor on the effect of interest rate declines.

Defendants argue that plaintiffs' allegations amount to "speculation" and fraud-by-hindsight and that they should not be held liable for failing to predict changes in interest rates.[17] Had defendants disclosed that FCStone was engaging in risky speculation instead of hedging interest rate risk, their argument might have some appeal. Had proper disclosure been made, investors would have been able to assess FCStone's risk exposure and properly value the price of FCStone's stock. *Williams*, 339 F. Supp. 2d at 1222 n.4 ("These allegations do not constitute fraud-by-hindsight because the Complaint alleges with specificity the facts then-existing during the Class Period that called for a write-down of these assets."). *See also Boston Scientific*, 523 F.3d at 90 ("'In cutting off the case on the pleadings by citing hindsight, the court is essentially making a prediction that the discovery process will yield only evidence that requires the benefit of hindsight bias to seem adequate [to support the allegations].'"). The 41% price decline in FCStone's stock price following the disclosure of the true nature of the LIBOR Hedge and that it caused a $3.1 million loss (and reversal of over $5 million in gains) demonstrates that investors were unaware of and unwittingly shouldered these risks. ¶¶32-36, 70.

_____

[17] This is not a situation, like in *K-Tel Int'l*, cited by defendants, where "there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentations." 300 F.3d at 891. Here, the positions at issue were put into place on or around September 2007 and were to continue for two years. Defendants undoubtedly knew (or were reckless in ignoring), at the time they entered into this transaction in September 2007 and subsequently while they were making misrepresentations that the positions were bets on the spread between LIBOR and Fed Funds rate, and did not protect the Company from interest rate declines.

Defendants also suggest that they had no duty to disclose the risk to investors because these practices reflected instances of mismanagement or "ineffective strategy" which are not actionable under the securities laws. Defs' Mot at 40-41. Defendants misstate their disclosure obligations and the allegations in the Complaint. The Complaint alleges a case of misrepresentation and intentional concealment of known risks concerning the LIBOR Hedge – not mismanagement. *See In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) ("the Individual Defendants are not alleged to be simply poor managers – they are alleged to be dishonest ones"). Further, even if defendants' conduct could be deemed mismanagement, this "will not preclude a claim under the federal securities laws if the[y] . . . failed to disclose a specific material fact resulting from that mismanagement." *In re Donna Karan Int'l. Sec. Litig.*, No. 97 Div. 2011, 1998 U.S. Dist. LEXIS 22435, at *28 (E.D.N.Y. Aug. 14, 2008); *see also Lane v. Page*, 581 F. Supp. 2d 1094, 1113 (D.N.M. 2008); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 n.14 (S.D.N.Y. 2001) (rejecting mismanagement argument where the "basis of plaintiffs' claim is not that they disagree with the Company's business choices, but rather, that the Prospectus failed to disclose known objective facts" existing at the time of the offering). Hence, defendants' failure to disclose accurately and fully the nature of the LIBOR Hedge and their knowing mischaracterization of it rendered their statements touting their protection from declining interest rates materially false, misleading and actionable under the securities laws.[18]

---

[18]    Also, FCStone's loss was not caused merely by "declining interest rates," "changed economic conditions," or "the global economic crisis." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) ("The Court will not be distracted by… macroeconomic arguments."). In fact, defendants have admitted that, during the period at issue, they expected interest rates to decline – "all indications were that the fed funds rate were going to continue to decline." ¶67. And had defendants been hedged against interest rate declines, as they had represented to the market, the declining rates would not have put the Company at risk.

Nor are defendants immunized from liability by their general statements that declining interest rates could lead to lower revenues. Defendants knew, starting in the fall of 2007, that investors were concerned about the effect of declining interest rates on FCStone. For that reason, they specifically misrepresented that in September 2007 they began to protect themselves from the declining rates by hedging. Defendants' false statements regarding their purported hedges misled investors and caused the market to view FCStone as less risky than it was. *Ashanti I*, 184 F. Supp. 2d at 260-61 (statements that a price decline could negatively affect the Company cannot "be read to properly disclose any risks related to the hedge book").

### C. The Complaint Alleges a Strong Inference of Scienter

#### 1. Pleading Standard

Plaintiffs allege a "strong inference" of scienter: "'(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud, (2) from conduct which rises to the level of severe recklessness, or (3) from allegations of motive and opportunity.'" *MoneyGram*, 626 F. Supp. 2d at 980-87; *Nash*, 502 F. Supp. 2d at 881. This Circuit has developed non-exhaustive "badges of fraud" to demonstrate scienter, including whether defendants: (1) "engaged in deliberately illegal behavior," (2) "knew facts or had access to information suggesting that their public statements were not accurate," or (3) "failed to check information they had a duty to monitor." *In re St. Paul Travelers Sec. Litig. II*, No. 04-4697 (JRT/FLN), 2006 U.S. Dist. LEXIS 70261, at *11 (D. Minn. Sept. 25, 2006) (citing *Kushner v. Beverly Enters.*, 317 F.3d 820, 827 (8th Cir. 2003)).

Under *Tellabs I*, the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." 551 U.S. at 323. The inference that defendants acted with scienter "need not be irrefutable" (*i.e.*, of the "'smoking-gun'" genre), nor even "the most plausible of competing inferences." *Id.* at 324. A complaint will survive "if a reasonable person would deem the

- 33 -

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Accordingly, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *accord MoneyGram*, 626 F. Supp. 2d at 983.

Finally, pleading requirements for scienter "do[] not license [courts] to resolve disputed facts at this stage of the case." *Green Tree*, 270 F.3d at 666; *Am. Italian Pasta*, 2006 U.S. Dist. LEXIS 40548, at *22-*23 (the pleading stage "is not the time to put Plaintiffs to their proof").

### 2. The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they ***knew facts*** or ***had access to information*** suggesting that their public statements were materially inaccurate." *Green Tree*, 270 F.3d at 665. Officers are deemed to know "facts reasonably available to them, particularly when the facts are critical to a business' core operation or an important transaction." *In re Synovis Life Techs., Inc. Sec. Litig.*, No. 04-3008ADMAJB, 2005 WL 2063870, at *15 (D. Minn. Aug. 25, 2005); *Boston Scientific*, 523 F.3d at 90-91.[19] Here, defendants had actual knowledge or access to information that showed each of their statements were false and misleading. *Green Tree*, 270 F.3d at 655. For example, defendants have ***admitted*** that they had direct knowledge of the risks associated with the Energy Account, and that they conducted a detailed review of the positions and that "***what we have reserved is sufficient to cover that specific risk***." ¶76. Likewise, the Complaint details how defendants were provided detailed daily information on Adam's Energy Account trades through "Deficit Sheets" which

---

[19]     Knowledge, however, is not required. *In re Xcel Energy Sec. Litig.*, 286 F. Supp. 2d 1047, 1057 (D. Minn. 2003) ("Plaintiffs may raise a strong inference of scienter by alleging facts indicating defendant's conduct was highly unreasonable and reckless.").

demonstrated the enormous losses and the fact that Adams was unable to cover those loses, and that the trades were the subject of major concern with defendants for six months before they were disclosed to investors. ¶¶48-51. CW1 has stated that defendants were well aware of the losses from these trades early in the Class Period but never disclosed them until near the end of the Class Period. ¶¶47-50.

Plaintiffs have also adequately pled defendants had actual knowledge that their statements regarding the LIBOR hedge were false and misleading. *See also In re Olympic Fin. Ltd. Sec. Litig.*, No. 97-496 (MJD/AJB) 1998 U.S. Dist. LEXIS 14789, at *6 (D. Minn. Sept. 10, 1998) (A complaint demonstrates a statement's false or misleading nature by identifying inconsistent contemporaneous information available to defendants.). As discussed above, plaintiffs have alleged particularized facts showing that while defendants were representing to the market that they had entered into a LIBOR collar to "lock[ ] in a floor" and protect against interest rate declines, they knew that the instruments that they had in place were a risky bet on the spread between two interest rates which offered no protection against rate declines. ¶¶6, 25-38, 52-67.

Defendants' statements representing that the hedges would protect FCStone from interest rate declines also suggest that they were aware of the true nature of the hedges and lead to a strong inference of scienter. *In re Ashanti Goldfields Sec. Litig.* ("*Ashanti II*"), No. CV-00-0717 (DGT), 2004 U.S. Dist. LEXIS 5165,*13-*14 (E.D.N.Y. Mar. 30, 2004) ("[Defendant's] statements regarding the hedge book's ability to withstands a price rise shows that [they] were aware of the nature of the transactions in the hedge book" and, as a result, plaintiff's allegations "'lead to a strong

- 35 -

inference that [defendant] knew that its characterizations of its futures activity as hedging and not speculation were false.'").[20]

Moreover, because of the magnitude and importance of both the LIBOR Hedge and Energy Account to FCStone's overall business, knowledge regarding the true facts of these core operations is attributed to defendants. Interest income made up 80% of FCStone's 2007 pre-tax income, and the interest rate decline and FCStone's hedge was a constant topic of discussion in all of FCStone's SEC filings and analyst conference calls during 2007. ¶¶25-38. Likewise, CW1 stated that Adams was FCStone's **largest customer**, a fact confirmed by defendant Anderson, who stated that the Energy Account "was one of our largest customers *and no other account is remotely close in size* to this or anywhere close to the exposure that this has been." ¶75.

Courts routinely impute to directors and officers knowledge concerning developments affecting a company's core business. As Judge Posner put it, "[t]hat no members of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's flagship products] knew that they were false is very hard to credit." *Makor Issues & Rights, Ltd. v. Tellabs Inc*. ("*Tellabs II*"), 513 F.3d 702, 709 (7th Cir. 2008) ("Almost all

---

[20]     The cases cited by defendants relate to scienter, not falsity, and, in any event, are inapposite. In *Comshare*, plaintiffs alleged revenue recognition violations at defendant corporations' European subsidiary, arguing that scienter should be imputed to defendants at the parent company because the revenue recognition errors at the subsidiary "should have been obvious" and there were "'red flags.'" *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir. 1999). Here, by contrast, the allegations relate to FCStone's core business and plaintiffs have pled with particularity the defendants made affirmative false statements and misrepresentations while they knew (or were reckless in not knowing) specific facts showing that these statements were false and misleading. In *Elam*, unlike here, plaintiffs did not allege that defendant knew of any fact indicating that the company would incur additional costs but, rather, argued that scienter should be imputed based on the sophistication of the Company's estimating process. *Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008). Here, by contrast, plaintiffs allege that defendants made affirmative representations regarding the nature of FCStone's "hedging" and its ability to protect the Company from interest rate declines while they knew that the position they had taken did not protect from declines in interest rates but, rather, were risky bets on the spread between interest rates.

- 36 -

the false statements that we quoted emanated directly from [the CEO]. Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely."); *Boston Scientific*, 523 F.3d at 90-91; *Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) ("facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them"); *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.").

### 3. The Complaint's CW Supports a Strong Inference of Scienter

CW allegations satisfy the PSLRA's pleading requirements when the complaint "provid[es] documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Novak*, 216 F.3d at 314; *MoneyGram*, 626 F. Supp. 2d at 981 n.34 (same). To determine whether confidential witness allegations are sufficient under the PSLRA, courts evaluate "the level of detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Cabletron Sys. Inc.*, 311 F.3d 11, 29 (1st Cir. 2002); *Nash*, 502 F. Supp. 2d at 874 (same).

Defendants argue that the Complaint fails to provide enough detail about CW1's job description, and that the information provided by him was incorrect. Defs' Mot at 22-29. Despite the volume and repetition of their arguments, defendants fail to overcome the well-pled allegations.

The Complaint sets forth sufficient details to establish that CW1's account of the events is based on his personal knowledge. Plaintiffs allege that CW1 worked clearing trades for FCStone's customers throughout the entire Class Period up until January, 2009. ¶45. CW1 was able to properly identify Scott Adams as the trader who was behind the massive losses in the Energy

- 37 -

Account – a fact that had never been publicly disclosed and which defendants do not dispute. Likewise, CW1 was able to identify which FCStone subsidiary Adams was trading through (Geldermann), the exact type of trades Adams had entered into (future positions on natural gas products), exactly how much Adams had in his margin account with FCStone ($10 million), the exact month in which Adams began losing money on his trades, the amount that Adams margin account was in deficit, and precisely how those trades lost money. ¶¶45, 48. In addition, CW1 was able to identify Adams as one of the Company's oldest and biggest clients (a fact confirmed by defendants on the November 4, 2009 conference call), and that defendants would allow Adams to "do what he pleased" because of the size of his account. ¶49. Moreover, CW1 identified the Company's "Margin Department", knew exactly how it worked, including that the department was responsible for monitoring positions taken by traders, and that they were obligated to liquidate money-losing positions. ¶47. CW1 also identified the *exact* type of reports ("Deficit Sheets") that the Company generated on a daily basis, what type of information was contained in the reports (which traders where losing money and by how much those losses exceeded their capital accounts) and the software FCStone used to create the reports ("SCAN" or "RISK"). ¶50.

These facts confirm CW1's assertion that he was "100% familiar" with the losses in the Energy Account, and how he knew that defendants Anderson and Dunaway had knowledge of the details of those losses. As such, the allegations are sufficiently particularized to establish reliability at the pleadings stage. *Nash,* 502 F. Supp. 2d at 874-75 (finding plaintiffs' CW allegations had meet pleading burden by alleging (1) CWs were employed by the company during the class period; (2) the CWs' job title and responsibilities; and (3) and describing the information the CWs possessed).

The cases cited by defendants are clearly distinguishable from the facts here. For example, in *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 882 (D. Minn. 2007), the court declined to rely on the statements of three confidential witnesses who only made general statements, such as the

defendant was a "spin doctor" and there was a "inside joke" about the company's product, while not providing **any** basis for these opinions, such as how long the CW worked at the company, which company a CW worked for, or what their roles or responsibilities were. *Id*. The court did, however, rely on the statements of nine other confidential witnesses because those statements, like the statements alleged here, "are specific and matched to relevant job descriptions." *Id*. at 883.[21]

Moreover, defendants' demands for granular detail of CW1's identity are baseless. For example, defendants complain that the Complaint does not allege which "state, operating segment, or subdivision" of the Company CW1 worked for, or that he "actually cleared or executed any Energy Account trade." Defs' Mot at 24. No court has ever required a plaintiff to pled the "operating segment" or "subdivision" in which a CW works, especially where, as here, the Complaint alleges the exact description of the CW's position within the company. ¶45. Likewise, because of the Company's relatively small size – only 440 employees in the entire country – it is not surprising that CW1 would have direct knowledge of the fact that the Company's largest customer had suffered such staggering losses. ¶2.[22]

---

[21]    Defendants' other citations are similarly distinguishable. In *In re PDI Sec. Litig.*, No. 02-211 (GEB), 2006 U.S. Dist. LEXIS 80142 (D.N.J. Nov. 2, 2006), the court rejected the statements of confidential sources because plaintiffs lumped all of their CW allegations together, did not plead how many sources they relied on, when the sources worked for the company, or "**any detail** specifying the basis for the employees' personal knowledge." *Id*. at *95. Moreover, the only specific source cited by the plaintiffs provided **third-hand** information, and did not allege when the source worked for the company. *Id*. at *96. Likewise, in *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008), court found that the plaintiffs did "not even allege facts which demonstrate how the anonymous . . . employees had gained access to this information" but, even considering the information, the complaint failed to plead a claim. *Id*.

[22]    Defendants spend pages contesting the truth of CW1's statements in an improper attempt to prove that they "lack credibility." Defs' Mot at 26-29. *See In re Evci Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006) ("Defendants' effort to discount the statements of confidential witnesses" or "impugn their credibility" is "misguided" at the pleadings stage, particularly where "allegations based on [confidential] witness' statements . . . are detailed and specific about the practices that were fraudulent."); *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-

Thus, plaintiffs' CW allegations are sufficiently particularized because the Complaint describes the nature of CW1's employment at FCStone, alleges exact details regarding the interworkings of the Company's trading operation and Adams' account, and that the testimony is based on personal knowledge acquired during and after the Class Period and is corroborated by other contemporaneous facts. *See Nash*, 502 F. Supp. 2d at 875.

### 4. Defendants' Failure To Disclose The Cotton Trading Losses Supports A Strong Inference Of Scienter

As discussed in detail above, plaintiffs have alleged (and defendants have admitted) that defendants knew, in early March 2008, that a major disruption in the cotton trading market caused "a handful" of FCStone's customers to have margin calls exceeding their capital accounts. ¶¶39-41, 67. Defendants knew that the "handful of accounts" "just didn't have the leverage or the capital to adequately margin the account." ¶67. As a result, FCStone was required to take $1.1 million in bad debt losses. ¶111. Despite this knowledge, defendants failed to timely disclose the bad debt losses, as required by GAAP. Instead, over a month later, defendants misleadingly reported that FCStone's bad debt had decreased without informing that market that the Company had already incurred over ten times the losses reported. ¶¶110-111.

Moreover, because FCStone "ha[d] procedures in place to collect additional margin and deposits from customers, even on a same-day basis," defendants were promptly informed of difficulties in collecting additional margins and deposits from customers to cover the shortfall. Defs' Mot at 3. Plaintiffs also allege that FCStone had a "Margin Department" that tracked accounts with margin calls exceeding their capital accounts. ¶47. Further, the Complaint alleges that, on a daily

02204-PHX-FJM, 2009 U.S. Dist. LEXIS 8464 (D. Ariz. Jan. 30, 2009) ("Plaintiffs' confidential witness was in a position to have knowledge of both allegations and we therefore accept them as true for purposes of this motion.").

- 40 -

basis, the individual defendants received "Deficit Sheets," generated using the Company's SCAN or RISK software, which identified traders whose losses exceeded their capital accounts and by exactly how much. ¶50. As a result, defendants knew or had access to information suggesting that their public statements were materially inaccurate. *Green Tree*, 270 F.3d at 665 (scienter alleged where "defendants were informed of the actual prepayment rates 'on at least a monthly basis'").

### 5. Defendants' GAAP Violations Support a Strong Inference of Scienter

Defendants' argument regarding their violations of GAAP ignores the vast majority of plaintiffs' allegations, misstates the Complaint's contents, and misapplies the law. Defs' Mot at 17-21. The Complaint's GAAP allegations further support a finding of scienter.

Allegations of GAAP violations, when coupled with other evidence of fraud, create a strong inference of scienter. *MoneyGram*, 626 F. Supp. 2d at 981; *Dutton*, 2006 WL 1778884, at *9-*10; *In re Digit Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1096-99 (D. Minn. 1998), *aff'd*, 14 Fed. Appx. 714 (8th Cir. 2001); *In re Eng'g Animation Sec. Litig.*, 110 F. Supp. 2d 1183, 1196 (S.D. Iowa 2000); *In re Transcrypt Int'l Sec. Litig.*, No. 4:98CV3099, 1999 U.S. Dist. LEXIS 17540, at *27-*28 (D. Neb. Nov. 4, 1999) (allegations of improper accounting and public statements misrepresenting the veracity of the accounting sufficient to allege scienter).

The Complaint sets forth how defendants violated GAAP, by

- Failing to disclose bad debt losses from the cotton trading accounts in the Company's April 14, 2008 10-Q (¶¶94-101);

- Failing to disclose the credit risks and material loss contingencies related to the Energy Account in the Company's July 15, 2008 10-Q (¶¶102-115); and

- Failing to disclose risks and record adequate bad debt losses from the Energy Account in the 2008 10-K and November 30, 2008 10-Q (¶¶102-119).

Further, the Complaint recites the various portions of GAAP at issue (¶¶92-93, 96-97, 104), (listing each separate financial rule and policy statements defendants violated), and details how

FCStone's reported financial statements violated each of those GAAP provisions (¶¶91-119). The Complaint further alleges how defendants were aware of the cotton trading and Energy Account losses well in advance of reporting them, yet did not report them in a timely manner as required under GAAP. ¶¶94-119.

### 6. Defendants' Insider Trading Supports a Strong Inference of Scienter

Unusual insider sales can support a strong inference of scienter. *Green Tree*, 270 F.3d at 660. Insider sales "can give rise to the required inference of scienter when the insider trades are unusual either in the amount of profit made, the amount of stock traded, the portion of stocks sold, or the number of insiders involved." *In re Novastar Fin. Sec. Litig.* ("*Novastar II*"), No. 04-0330-CV-W-ODS, 2005 U.S. Dist. LEXIS 19946 (W.D. Mo. May 12, 2005). *See also Navarre*, 2006 U.S. District LEXIS 44509, at *5 (Strong inference of scienter where "[d]efendants sold their stock at financially advantageous times . . . and the trading activity was unusual compared to Defendant's prior trading activity."). Here, defendants Anderson and Dunaway's sales were suspicious in timing and amount. Defendant Dunaway unloaded 22% of his FCStone holdings just a month before the Company disclosed the bad debt and "hedge" losses, sending FCStone's stock plummeting 41% to $17.64. ¶¶120, 38. Likewise, Defendant Anderson sold 27.8% of his holdings in a one month period when FCStone's stock price *was near its all time high*. ¶120. Neither defendant had sold a share before or after these sales.

Defendants claim that these sales were pursuant to 10b-5-1 trading plans and therefore negate scienter and compel dismissal. Defs' Mot at 42. Not true. First, a review of defendant Dunaway's Form-4 filed at the time of his April 29, 2008 sale of common stock demonstrates that the sale was *not* made pursuant to a plan. *See* Exhibit 2, attached hereto (failing to identify sales as pursuant to a 10b-5-1 plan). Moreover, at the pleading stage, a 10b-5-1 plan is simply considered among the total mix of information in the Court's holistic analysis and does not prevent a finding that scienter is

properly pled.  *In re UTC Starcom Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, ***it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales***.").[23]  Where, as here, defendants' sales are suspicious on their face – selling at suspicious times, near all-time stock price highs when defendants had never sold before – defendants' claim that they sold pursuant to a 10b-5-1 plan does not discount the inference of scienter.  *Stocke*, 615 F. Supp. 2d at 1193. [24]

Defendants' remaining argument that these sales are not large enough to raise an inference of scienter is rebutted by the law.  These amounts and percentages far exceed amounts courts have found suspicious in other cases.  *Novastar II*, 2005 U.S. Dist. LEXIS, at *26-*27 (sale of 15% provides evidence of scienter); *Oxford Health Plans*, 187 F.R.D. at 140 (17%); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20%).  In addition at no other time in history did defendants sell as much as they did during the Class Period.  *See* ¶120 (no sales before or after Class Period).  These allegations, viewed holistically, are sufficient to create a strong inference of scienter that is at least as, if not substantially more, compelling than any opposing inference advanced by defendants.  *See Tellabs II*, 513 F.3d at 709-11.

--------

[23]     *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("[T]he Court cannot, as Defendants suggest, infer from the fact that [a] Defendant . . . entered into a 10b5-1 trading plan as a 'strong competing inference against scienter.'"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (same).

[24]     Even if defendants' trading plans were relevant, the plans do not provide a defense here.  For a Rule 10b5-1 trading plan to qualify as a viable affirmative defense, defendants must establish numerous elements, including that the plan was entered into in good faith and before the insider became aware of material nonpublic information.  *See* 17 C.F.R. §240.10b5-1(c)(1)(i),(ii).  Defendants do not and cannot do so at this juncture.

Further, because plaintiffs have adequately alleged a claim under §10(b), they have satisfied the "predicate violation" requirement of §20(a).

## IV. Conclusion

For the foregoing reasons, defendants' motion should be denied. Should the Court be inclined to dismiss all or any part of the Complaint, plaintiffs request leave to amend.

DATED: January 22, 2010        Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ARTHUR C. LEAHY
LUCAS F. OLTS
MATTHEW I. ALPERT

         s/ ARTHUR C. LEAHY
          ARTHUR C. LEAHY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

YONKE & POTTENGER, L.L.C.
JASON POTTENGER, No. 43354
1100 Main Street, Suite 2450
Kansas City, MO 64105
Telephone: 816/221-6000
816/221-6400 (fax)

Liaison Counsel

- 44 -

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 22, 2010.

s/ ARTHUR C. LEAHY
ARTHUR C. LEAHY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: artl@csgrr.com

# Mailing Information for a Case 4:08-cv-00514-HFS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@csgrr.com

- **Sean William Colligan**
  scolligan@stinson.com

- **Deborah R Gross**
  debbie@bernardmgross.com

- **David H Kistenbroker**
  david.kistenbroker@kattenlaw.com

- **Arthur C. Leahy**
  aleahy@csgrr.com,ldeem@csgrr.com,e_file_sd@csgrr.com

- **Luke Olts**
  lolts@csgrr.com

- **Jason M. Pottenger**
  jpottenger@yplawfirm.com

- **Norman Eli Siegel**
  siegel@stuevesiegel.com,marquart@stuevesiegel.com,perez@stuevesiegel.com

- **Pamela G. Smith**
  pamela.smith@kattenlaw.com,cynthia.jukovich@kattenlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)