UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| PAUL LUMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 4:08-cv-00514-C-W-HFS (Consolidated) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| PAUL G. ANDERSON, et al., | ) ) | |
| Defendants. | ) ) ) | |

DEFENDANTS' SUGGESTIONS IN REPLY TO PLAINTIFF'S OPPOSITION
AND IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS
CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

Introduction ........................................................................................................................1

I.   Plaintiffs' Opposition Presents the Wrong Governing Standards ...........................1

II.  Plaintiffs Fail to Refute the Grounds Warranting Dismissal of Their §10(b) Claims Based on Defendants' Alleged Energy Account Statements ...................................2

    A.   Defendants' Statements Regarding the Energy Account Were Forward-Looking and Protected by the Safe Harbor. ...........................................3

        1.   Plaintiffs' "Duty to Disclose" Argument Incorrectly Assumes Their CAC Pleads the "Omitted Facts" Existed. ...........................3

        2.   Plaintiffs' Mischaracterization of Defendants' Forward-Looking Statements as Statements of Fact Also Fails. .................................5

    B.   Contrary to Plaintiffs' Assertions, Defendants' Cautionary Statements Were Not Stale Boilerplate. ..................................................7

    C.   The Opposition Does Not Refute that the CAC Fails to Allege Particularized Facts Giving Rise to Any Inference of Scienter. .........................9

III. No Cause of Action Exists for Alleged GAAP Violations. ..............................12

IV.  Plaintiffs' Opposition Fails to Demonstrate FCStone's LIBOR Collar Was Speculation and Not Hedging. .........................................................13

    A.   Plaintiffs Fail To Demonstrate that the Defendants Made False Statements Relating to the Libor Hedge. ......................................16

V.   Plaintiffs Fail to Demonstrate Their CAC Alleges Particularized Facts Giving Rise to a Strong Inference of Any Defendant's Scienter. ...............................19

Conclusion .......................................................................................................20

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apex Oil Co. v. DiMauro*,
  641 F. Supp. 1246 (S.D.N.Y.1986), *rev'd, in part, on other grounds*,
  822 F.2d 246 (2d Cir. 1987) ............................................................................................ 15-16

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ............................................................................................ 9-10

*Caiola v. Citibank N.A.*,
  295 F.3d 312 (2nd Cir. 2002) ................................................................................................ 5

*Carney v. Cambridge Tech. Partners, Inc.*,
  135 F. Supp. 2d 235 (D. Mass. 2001) .................................................................................... 5

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ............................................................................................... 18

*Dutton v. D & K Healthcare Resources*,
  No. 4:04CV147SNL, 2006 WL 1778884 (E.D. Mo. June 23, 2006) ...................................... 2

*Evanston Bank v. Conticommodity Serv., Inc.*,
  623 F. Supp. 1014 (N.D. Ill. 1985) ...................................................................................... 15

*Fadem v. Ford Motor Co.*,
  No. 02 Civ. 0680 (SCH), 2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003) ....................... 14, 19

*FDIC v. Umic, Inc.*,
  136 F.3d 1375 (10th Cir. 1998) ........................................................................................... 15

*Fla. State Board of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .............................................................................................. 10

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) ................................................................................................. 4

*Harris v. Ivax Corp.*,
  182 F. 3d 799 (11th Cir. 1999) .............................................................................................. 8

*In re Aetna Sec. Litig.*,
  34 F Supp. 2d 935 (E.D. Pa. 1999) ...................................................................................... 12

*In re Ashanti Goldfields Sec. Litig.*,
  184 F.Supp.2d 247 (E.D.N.Y. 2002) ........................................................................ 15-16, 18-19

ii

*In re Comshare, Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999) .........................................................................13

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F.Supp.2d 1150 (S.D. Cal.. 2008) ........................................................11, 12

*In re I.P.O. Sec. Litig.*,
    241 F.Supp.2d 281 (S.D.N.Y. 2003) ..............................................................6

*In re K-Tel Int'l. Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) .............................................................. 3, 5-6, 11

*In re Kindred Healthcare, Inc. Sec. Litig.*,
    299 F. Supp. 724 (W.D.Ky. 2004) ..............................................................8, 13

*In re Moneygram Int'l Inc. Sec. Litig.*,
    626 F. Supp. 2d 947 (D. Minn. 2009) ............................................................5

*In re Nash Finch Co.*,
    502 F. Supp. 2d 861 (D. Minn. 2007) ............................................................10

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................................10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ................................................................................. 15-16

*Novak v. Kasaks*,
    216 F.3d 300 (2d. Cir. 2000) ........................................................................10

*PEC Solutions Inc. Sec. Litig.*,
    No. 04-1257, 2005 Wl 646070, at *7 (4th Cir. 2005) .........................................11

*Tellabs v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................11, 20

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Savs. Assoc.*,
    322 F.3d 1039 (9th Cir. 2003) ......................................................................13

*Tse v. Ventana Med. Sys., Inc.*,
    123 F. Supp. 2d 213 (D. Del. 2000) ..........................................................12-13

*United States v. N.Y. Coffee & Sugar Exch.*,
    263 U.S. 611 (1924) ...................................................................................15

## REGULATORY CASES

*Fed. Nat'l Mortgage Ass'n v. Comm'r*,
    100 T.C. 541 (1993) ...................................................................................17

**FEDERAL STATUTES**

15 U.S.C. §78u-5(c)(1) ...........................................................................................................9

**OTHER AUTHORITIES**

KEVIN M. KEYES, FED. TAX. FIN. INSTRUMENTS & TRANSACTIONS
¶ 14.02[2][a] (2009) ...............................................................................................13

C. Mollenkamp & M. Whitehouse, *Study Casts Doubt on Key Rate*,
WALL ST. J., May 29, 2008 at A-1 ........................................................................13

A. GOOCH & L. KLEIN, DOCUMENTATION FOR DERIVATIVES,
Collars & Corridors at 449 (4th ed. Vol. I 2002) ..................................................15

M.T. BELONGIA & G. J. SANTONI, HEDGING INTEREST RATE RISK WITH FINANCIAL
FUTURES: SOME BASIC PRINCIPLES at 22 (Fed. Reserve Bank of St. Louis 1984) ...........15, 17

**INTRODUCTION**

Defendants submit this memorandum in reply to Plaintiffs' Suggestions in Opposition to Defendants' Motion to Dismiss[1] and in further support of their Motion to Dismiss Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Amended Complaint" or "CAC"). As demonstrated below, Plaintiffs' Opposition relies on two consistent strategies: (i) mischaracterization of the law, the facts alleged in their CAC, and of Defendants' arguments, and (ii) the assumption, without argument, that the allegations Defendants identified as deficient simply satisfy the PSLRA's requirements. While these strategies provide their Opposition with a patina of credibility, Defendants' closer analysis establishes that the Opposition fails to refute Defendants' meritorious arguments. The Court should dismiss Plaintiffs' Consolidated Amended Complaint.

## I. PLAINTIFFS' OPPOSITION PRESENTS THE WRONG GOVERNING STANDARDS.

Plaintiffs do not expressly challenge Defendants' statement of the governing legal standards. (Opp'n at 10-11, 18-19, 33-34.) Instead, Plaintiffs incorrectly recast the standards governing scienter and the safe-harbor exception – the two most significant standards applicable to the Court's ruling on this motion. While Plaintiffs cite the Supreme Court's *Tellabs* decision, they ignore this binding precedent in favor of arguing standards set forth in non-securities cases and securities cases decided before *Tellabs*. (Opp'n at 10-11; *see also id.* at 34 (arguing incorrect "recklessness" scienter standard to Defendant's forward-looking statements).)[2] The pleading and scienter standards set forth in Defendants' Opening Brief govern this action, not

---

[1] Referred to as Plaintiffs' "Opposition" in text and "Opp'n" in citations; Defendants' Memorandum in Support of their Motion is referred to as their "Opening Brief" in text and "Defs' Br." in citations.

[2] Plaintiffs cite *SEC v. Shanahan*, an enforcement action; *Hardeman v. United States*, an employment action; *Stevans v. Spegal*, a civil rights action; and *Yellen v. Hake*, and *Fla. State Bd. v. Green Tree Fin. Corp.*, both of which were decided before *Tellabs*. (Opp'n at 10-11.)

those of an SEC enforcement case, an employment case, a civil rights case or securities cases before *Tellabs* – all of which the Opposition posits as authoritative. (*See* Opp'n at 9-11, 30.)

Plaintiffs also misstate the standards under the PSLRA's safe harbor for forward-looking statements. (Opp'n at 18-19.) With respect to the safe harbor, Plaintiffs' legal authority confirms Defendants' position – the safe harbor immunizes "forward-looking statements if they are identified and accompanied by risk disclosures, if they are immaterial, or if plaintiff(s) fail to" allege particularized facts giving rise to a strong inference that the defendant "making the subject statement" did so "with actual knowledge that the statement was false or misleading." *Dutton v. D & K Healthcare Resources,* No. 4:04CV147SNL, 2006 WL 1778884, at *8 (E.D. Mo. June 23, 2006) (*Compare* Defs' Br. at 10-11, 30 *with* Opp'n at 18-19.) Finally, Plaintiffs ignore that (i) statements of optimism are not actionable as a matter of law, and (ii) statements of opinion are not actionable unless plaintiffs allege facts giving rise to a strong inference that the speaker's opinion was actually false when made. (*See* Defs' Br. at 30.)

## II. PLAINTIFFS FAIL TO REFUTE THE GROUNDS WARRANTING DISMISSAL OF THEIR §10(b) CLAIMS BASED ON DEFENDANTS' ALLEGED ENERGY ACCOUNT STATEMENTS.

Defendants' Opening Brief established that the CAC fails to state a §10(b) claim based on statements made regarding the Energy Account because: (i) the statements alleged in CAC ¶¶ 9-10, 43-44, 52-62, 74-76, 82-83, and 108 are not actionable under the PSLRA's safe harbor for forward-looking statements; (ii) Plaintiffs' selective misquoting of Defendants' statements fails to demonstrate they falsely "assured" investors; (iii) FCStone complied with GAAP; (iv) the CAC fails to allege *facts* showing Plaintiffs' only confidential witness, CW1, was in a position to know the information he alleged; and (v) the CAC fails to allege particularized facts giving rise to a strong inference of any Defendant's scienter. (Defs' Br. at 12-35.) The Opposition fails to refute any of these grounds for dismissal.

2

## A. DEFENDANTS' STATEMENTS REGARDING THE ENERGY ACCOUNT WERE FORWARD-LOOKING AND PROTECTED BY THE SAFE HARBOR.

Defendants established their statements regarding the Energy Account were not actionable under the PSRLA's safe harbor because they forward-looking and accompanied by meaningful cautionary language. (Defs' Br. at12-22.)    Rather than concede Defendants' arguments, Plaintiffs' Opposition mischaracterizes Defendants' statements and refutes a straw man.  (Opp'n at 12-22.)  As demonstrated below, this strategy fails.

### 1. PLAINTIFFS' "DUTY TO DISCLOSE" ARGUMENT INCORRECTLY ASSUMES THEIR CAC PLEADS THE "OMITTED FACTS" EXISTED.

Plaintiffs contend that once the Defendants spoke about the Energy Account, they were required to "speak truthfully and disclose all *known* material facts about its risks."  (Opp'n at 12 (citing *MoneyGram*, 626 F.2d at 973; *K-Tel*, 300 F.3d at 898; *Caiola*, 295 F.3d at 331).)  None of Plaintiffs' cases stand for the rule asserted.  All state that "even absent a duty to speak, a party who discloses **material facts** in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects."  *In re K-Tel Int'l. Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (internal quotation omitted) (emphasis added).  Defendants' estimates of bad debt that FCStone expected to incur on the Energy Account were not "fact," but Defendants did publicly update these estimates and describe what they had done and were doing to mitigate the expense. (*See* Defs' Br. at 7-8, 13-14; CAC ¶¶43-44, 74-75, 83,86.)[3]

---

[3] On November 3, 2008, Defendants warned the market FCStone expected to post a bad debt provision in the amount of $25 million at the end of its first quarter (November 30, 2008) and that $20 million of this estimated amount related to a significant Energy Account.  (Defs' Br., Ex. E at Ex. 99.1; CAC ¶74.)  The next day, FCStone held a conference call to discuss and answer questions regarding this estimate. (Defs' Br., Ex. F; CAC ¶75.)  Even though the estimate related to its 2009 first quarter, FCStone repeated the estimate in its annual report for its *prior* fiscal year ending August 31, 2008.  (Defs' Br., Ex. B at 53.)  On January 8, 2009, when FCStone issued its first quarter 10-Q, FCStone reported it had increased its bad debt provision by the $25 million previously estimated.  (*Id.*, Ex. M at Ex. 99.1; *id.*, Ex. H at 7-8, 20-21.)  This 10-Q further warned investors that "because of the large number of contracts included in the energy

3

Nevertheless, Plaintiffs attempt to argue Defendants made misleading omissions. Their argument, however, rests exclusively on (i) Plaintiffs' selective quotations to create the appearance Defendants' forward-looking statements were of current "fact," and (ii) Plaintiffs' erroneous assumption that their CAC pleads the existence of undisclosed "facts." (Opp'n at 13-15.) For example, Plaintiffs argue Defendants failed to disclose that the Energy Account exposed FCStone to "four times more the liability" than its initial estimate. (Opp'n at 14.) This argument assumes Defendants knew – on November 3, 2008 – that the account would ultimately lead to a $100 million bad debt expense. (*Id.*) Yet, the CAC alleges facts that refute this assumption: on November 4, 2008, Mr. Anderson stated the account was still open, and instead of immediately liquidating the account, "which would cost additional capital or expense," FCStone decided "it was more effective just to let it settle off and liquidate over time, and over the tenor of the position, and that will happen basically over the next several months," and "then … we will know basically what our effective risk is at that time …." (CAC ¶76.) Because the CAC expressly alleges Mr. Anderson's statement was truthful, Plaintiffs' straw man fails. (*See id.* ¶77 (alleging quoted statements in ¶76 disclosed the truth).) Defendants *could not have known* in November 2008 the full scope of the bad debt expense FCStone ultimately incurred in March 2009. The CAC fails to allege that Defendants' estimates were false or misleading when made. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) (rejecting out of hand

---

account, market conditions and the positions' long-tenured settlement dates extending over the next few quarters, *there can be no assurances that we will not have to make significant adjustments to the estimate* in future periods," and because FCStone planned "to liquidate the energy account over the next several months, *there can be no assurances* given that any additional reduction in the value of the account will not necessitate an accelerated liquidation which could result in further significant losses." (*Id.*, Ex. H at 32.) On February 24, 2009, shortly before the end of FCStone's second quarter, FCStone disclosed it had increased its bad debt estimate on the account between $60 and $80 million. (*Id.,* Ex. I at Ex. 99.1.) Finally, on March 12, 2009, FCStone issued its second quarter 10-Q, reported the Energy Account had been fully liquidated, and that actual bad debt expense on the account was $110 million. (CAC ¶44.)

claim based on omission of alleged "facts" that did not exist at the time affirmative statement was made); *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 244 (D. Mass. 2001) (plaintiff failed to plead specific facts "indicating that undisclosed, adverse circumstances belying [defendants'] statements existed on" the date those statements were made).[4]

**2.**    PLAINTIFFS' MISCHARACTERIZATION OF DEFENDANTS' FORWARD-LOOKING STATEMENTS AS STATEMENTS OF FACT ALSO FAILS.

Plaintiffs also attempt to state a §10(b) claim on Defendants' forward-looking statements by mischaracterizing their CAC's allegations, selectively quoting or paraphrasing Defendants' statements inaccurately, and arguing Defendants falsely assured investors they had mitigated and thereby eliminated the risk that their estimated bad debt on the Energy Account would increase. (Opp'n at 12-13, 15, 9-20.) The CAC's specific allegations demonstrate this argument is a straw man. (*See* CAC ¶¶9, 34, 61, 71, 74, 76; *see also* Defs' Br. at 12-15, 20.) Each of Defendants' statements regarding their mitigation efforts and estimated bad debt expressly cautioned investors that no assurances were being given. (*See id.*)

For example, Plaintiffs argue that in FCStone's November 3, 2008 press release informing investors it was estimating a $20 million loss on the Energy Account, Defendants falsely "assured" investors that FCStone "***was currently and had already mitigated against additional losses ….***" (Opp'n at 19 (paraphrasing CAC ¶74 incorrectly).)[5] First, this alleged

---

[4] Plaintiffs' cases also support this conclusion. *See In re Moneygram Int'l Inc. Sec. Litig.,* 626 F. Supp. 2d 947, 973 (D. Minn. 2009) (Plaintiffs must assert "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements *when they were made*.") (emphasis added); *In re K-Tel Int'l, Inc. Sec. Litig.,* 300 F. 3d 881, 891 (8th Cir. 2002) ("Corporate officials need not be clairvoyant; they are only responsible for revealing facts reasonably available to them."); *Caiola v. Citibank N.A.,* 295 F.3d 312, 330-31 (2nd Cir. 2002) (defendants are required to speak truthfully and completely about *known* material issues once they have spoken).

[5] Plaintiffs also argue that CAC ¶75 evidences Defendants' alleged false assurances. (Opp'n at 19.) This paragraph not only fails to allege that Mr. Anderson's selectively quoted statements – of opinion and of FCStone's mitigation efforts – were false, it characterizes Mr. Anderson's statements as "admissions."

5

assurance is not expressed in the press release the CAC quotes. (*See* CAC ¶74 ("FCStone has taken is taking appropriate actions to mitigate these exposures.").)  Second, as the CAC demonstrates, immediately following the statement actually contained in the press release, Defendants warned, "***Nonetheless, no assurances can be given that additional losses on this account will not be recognized***."  (CAC ¶74 (emphasis added).)  In sum, false assurances were not made and Plaintiffs' attempt to save their claim from dismissal by characterizing Defendants' forward-looking statements as *fact*, fails.  *See In re I.P.O. Sec. Litig.*, 241 F.Supp.2d 281, 388, n.169 (S.D.N.Y. 2003) (rejecting as a straw man, argument by underwriter defendants' in which they "rewr[ote] [p]laintiffs' allegations and then attack[ed] only [defendants] version of the allegations.")  Plaintiffs further argue the safe harbor is inapplicable because Defendants supposedly "claimed that they had ***already reserved a sufficient amount*** to cover the losses from the Energy Account."  (Opp'n at 19 (emphasis in original).)  This is another blatant mischaracterization of Defendants' forward-looking statements and, not surprisingly, Plaintiffs offer no support for it.  (*See id.* 19-20 (citing no paragraph in their CAC).)

Finally, even if Defendants' statements regarding their efforts to mitigate FCStone's exposure, reduce the market risk, and neutralize the positions in the Energy Account had been of "fact," the CAC does not allege any facts to support the conclusion that FCStone had not taken, and was not then taking, these actions.  (Opp'n at 19 (quoting CAC ¶¶74, 75).)[6] Plaintiffs' hindsight speculation fails to state a claim under the PSLRA.  *See, e.g., K-Tel*, 300 F.3d at 893. In sum, Plaintiffs' arguments are nothing but straw men which fail to demonstrate that Defendants' Energy Account statements are actionable. (*See* Defs' Br. at 12-15 (establishing

---

(CAC ¶75.)  Moreover, CAC ¶¶ 116, 118-19 allege Defendants made "false assurances" and Defendants' Opening Brief establishes, without opposition, that no such assurances were made.  (Defs' Br. at 15-17.)

CAC ¶¶9, 10, 43-44, 52-62, 74-76, 79, 82-83, and 108 allege forward-looking statements).)

B. **CONTRARY TO PLAINTIFFS' ASSERTIONS, DEFENDANTS' CAUTIONARY STATEMENTS WERE NOT STALE BOILERPLATE.**

Defendants' Opening Brief established that Defendants' forward-looking statements regarding the Energy Account were accompanied by meaningful cautionary language. (Defs' Br. at 14-15.) Plaintiffs condemn Defendants' warnings as stale boilerplate, which supposedly did not "relate directly" to their statements. (Opp'n at 22.) But Plaintiffs' argument is merely another straw man – Plaintiffs selectively quote and ignore relevant cautions in FCStone's public filings and the characterize Defendants' cautions as insufficient. (*Id.*) This strategy fails. Contrary to Plaintiffs' assertions, throughout the putative class period, both before and after Defendants first disclosed that FCStone expected and estimated $20 million or more in bad debt on the Energy Account, Defendants explicitly cautioned investors of specific risks that were subsequently realized on the Energy Account. These risks included:

- "Although we have procedures for reviewing credit exposures to specific customers ... Some of our risk management methods depend upon the evaluation of information regarding markets, clients or other matters ... That information may not, in all cases, be accurate, complete, up-to-date or properly evaluated." (Defs' Br., Ex. A at 12-13.)

- "Our customers' ability to maintain and access adequate credit facilities is critical to our results. Throughout the agriculture and energy industries, higher commodity prices and continued volatility has ... placed a strain on working capital debt facilities, leveraging customers to unprecedented levels ... Recent volatility in the financial markets has tightened credit further ..." (Defs' Br., Ex. B at 29.)

- "Customer positions which represent a significant percentage of open positions in a given market or concentrations in illiquid markets may expose us to the risk that we are not able to liquidate a customer's position in a manner which does not result in a deficit in that customer's account." (Defs' Br., Ex. B at 9)

- "Generally, if a customer is unable to meet its margin call, we promptly liquidate the customer's account. However, there can be no assurance that in each case the liquidation of the account will not result in a loss to us or that a liquidation will be feasible, given market conditions, size of the account, and tenor of the positions." (Defs' Br., Ex. B at 10-11.)

---

[6] CAC ¶¶74-75 do not even allege conclusorily that the selectively quoted statements were false. (*Id.*)

- "In the case of the energy trading account, we are in control of the orderly liquidation of the account ... However, because of the large number of contracts included in the energy account, market conditions and the position's long-tenured settlement dates extending over the next few quarters, there can be no assurances that we will not have to make significant adjustments to the estimate in future periods … While we plan to liquidate the energy account over the next several months, there can be no assurances given that any additional reduction in the value of the account will not necessitate an accelerated liquidation which could result in further significant losses." (Defs' Br., Ex. H at 26, 32.)

Although Plaintiffs argue Defendants' cautionary language appeared *only* in the Company's Form 10-K filed on November 29, 2007, a year before any issues identified with the Energy Account (Opp'n at 22), this is simply another mischaracterization of the facts. Each of FCStone's quarterly reports incorporated by reference the full panoply of risks disclosed in the 10-K filed the prior year,[7] and on November 14, 2008, FCStone filed its annual report for fiscal year ending August 31, 2008 with the SEC on Form 10-K, which specifically addressed the foregoing risks and risks unique to the energy and renewable fuels markets. (*Compare* Opp'n at 22 *with* Defs' Br. at 13-14.) In particular, this 10-K further warned:

> Many of our customers are in the energy and related renewable fuels industries and our revenues could decline as a result of adverse developments in these industries ... Adverse developments in the energy markets could adversely affect the operations and profitability of our customers in these industries, which could adversely affect ... our revenues….

(Defs' Br., Ex. B at 12.)

FCStone specified the exact risks that actually led to FCStone's losses on the Energy Account. This is *more* than the law requires. *See, e.g.*, *Harris v. Ivax Corp.,* 182 F. 3d 799, 803 (11th Cir. 1999) (to be meaningful, warnings need only be of "risks of a significance similar to that actually realized;" the "'[f]ailure to include the particular factor that ultimately causes the

---

[7]  *See* Defs' Br., Ex. C at 29; Defs' Br., Ex. H at 36). The repetition of cautions also does not transform them into "boilerplate." *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 724, 739 (W.D.Ky. 2004). In addition, where plaintiffs rely on "fraud on the market theory," meaningful cautionary language in a 10-K immunizes subsequent oral statements and press releases even if they are not expressly

forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor'") (quoting H.R. Conf. Rep. 104-369, at 44 (1995)); (*see* Opp'n at 22 (citing *Parnes v. Gateway 2000 Inc.,* 122 F.3d 539, 548 (8th Cir. 1997) (holding, cautionary language sufficient to preclude liability for defendants' alleged misrepresentation of "Gateway's obligations to pay state sales taxes" because cautions warned that "taxing authorities in certain other states have solicited information from the Company to determine whether the Company has sufficient contacts with such states as would require payment of income taxes [and] ... the Company has not established any reserves for payment of such taxes."); *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1033 ("In order to be meaningful, the cautionary language must warn of risks of *similar significance* to the risk actually realized...") (emphasis added).)

As the foregoing and Defendants' Opening brief establish, because Defendants' forward-looking statements were accompanied by meaningful cautionary language, the statements are not, as a matter of law, actionable.   15 U.S.C. §78u-5(c)(1); (*see also* Defs' Br. at 10-15.)

### C. THE OPPOSITION DOES NOT REFUTE THAT THE CAC FAILS TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO ANY INFERENCE OF SCIENTER.

Defendants established that the CAC alleges no facts giving rise to any inference of any Defendant's actual knowledge his forward-looking statements or statements of opinion regarding the Energy Account were false when made.  (Defs' Br. at 30-35.)  Plaintiffs' Opposition fails to rebut of any of Defendants' arguments.

Plaintiffs cite a slew of cases that are distinguishable because plaintiffs therein plead, with particularity, the existence of *known contemporaneous facts*, which did in fact give rise to a strong inference the defendants actually knew their statements were false when made.  (Opp'n at

---

accompanied by that language.  *See Asher v. Baxter Int'l Inc*., 377 F.3d 727, 730 (7th Cir. 2004).

19-22.)[8]  The same cannot be said of Plaintiffs' CAC.  (*See* Defs' Br. at 30-35.)  Moreover, the

one statement Plaintiffs argue demonstrates Defendants' actual knowledge, establishes just the

opposite.  Plaintiffs quote Mr. Anderson saying "we dropped the ball on this account ... the

positions got large enough and long tendered enough that ***we should have recognized*** that before

it really showed up in the margin requirements.  And, ***unfortunately we didn't*** do that."  (Opp'n

at 13 (emphasis added).)  Plaintiffs mischaracterize Mr. Anderson's statement as an "admission"

that before FCStone first disclosed its estimated losses on the Energy Account, Defendants

actually knew and failed to disclose them.  (*Id.*)[9] Mr. Anderson admitted only that Defendants

---

[8]  *See Fla. State Board of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 665-666 (8th Cir. 2001) ("investors pleaded with particularity that defendants knew the prepayment assumptions on which their gain-on-sale accounting for the 1994 and 1995 pools were based, they knew that actual experience in 1995, 1996 and the first three quarters of 1997 deviated from these premises greatly, and they issued financials that did not take account of the disparity between the assumptions and actual experience."); *Asher,* 377 F.3d at 734 (defendants' projections were actionable because their internal estimates contradicted their public projections and they omitted known and important variables from cautionary language); *Novak v. Kasaks,* 216 F.3d 300, 311-12 (2d. Cir. 2000) (defendants specifically designed a scheme to hide serious, and widely known and discussed inventory problems, which included refusing to mark down inventory they knew to be "worthless," "obsolete," and "unsalable," and approving an inventory management practice that directly contradicted the company's stated policies); *In re Nash Finch Co.,* 502 F. Supp. 2d 861, 875 (D. Minn. 2007) (defendants actually knew projections and public statements were false because they were contradicted by documents defendants received, reviewed and discussed regarding problems within company at monthly meetings defendants attended); *In re Nortel Networks Corp. Sec. Litig.,* 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) (defendants actually knew statements were false because they "failed to disclose negative consequences from specific risks that had either already come to pass or were known to be imminent");  The last three cases cited by Plaintiffs did not address the safe harbor's scienter standard at all. (*See* Opp'n at 20-21 (citing *In re Giant Interactive Group, Inc., Sec. Litig.,* 643 F. Supp. 2d 562, 568 (S.D.N.Y 2009) (plaintiffs asserted §11 claim, not a §10(b) claim, and §11 claim *does not require* plaintiffs to allege *actual knowledge* of falsity); *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* No. 99 Civ. 12046 WHP, 2001 WL 300733 (S.D.N.Y 2001) (same); *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (statements were of present fact, not forward-looking).)

[9]  Plaintiffs argue that under GAAP the Defendants were required to disclose the "maximum amount of the loss" that could stem from the Energy Account and then they assert that the full $100 million loss was known months before they became aware of it.  (Opp'n at 16-17 & n.8.)  This argument blatantly misrepresents the CAC which asserts ***nothing*** to even suggest Defendants knew the Energy Account posed a potential bad debt of $100 million at any time before their March 2009 disclosure of the actual bad debt expense.  (CAC ¶¶ 48, 50, 108, 112; Opp'n at 16.)  Other than Plaintiffs' hindsight speculation, the scienter allegations related to the Energy Account are premised exclusively on information provided by CW1.  The CAC demonstrates he provided no such information. (*See* CAC ¶¶ 10, 44-51, 99-100, 102,

did *not* recognize the issue. (*See id.*) Therefore, this straw man gives rise only to an inference of Defendants' "nonfraudulent intent." *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 309 (2007) (holding, the inference of scienter "must be cogent and *at least as compelling as any opposing inference of* nonfraudulent intent").

Plaintiffs also present their hindsight conclusion that Defendants must have actually known their beliefs that they had "effectively neutralized" the risks from the energy account "and had taken appropriate steps to mitigate [their] exposure" were false because FCStone's estimates of Energy Account bad debt increased over time and the actual bad debt expense FCStone ultimately recorded exceeded Defendants' estimates. (Opp'n at 13-14.) Binding precedent prohibits this Court from considering Plaintiffs' hindsight as giving rise to *any* inference of scienter. *K-Tel*, 300 F.3d at 893 (rejecting, as hindsight, allegations that did not identify specific information that was available and loss could have been estimated, providing no "basis for" for claim "other than later financial disclosures made by K-Tel").[10]

Finally, Defendants established that the CAC's scienter allegations regarding Energy Account statements were based exclusively on information allegedly provided to Plaintiffs by their CW1 and these allegations fail because CW1 was not in a position to personally know the information he provided. (Defs' Br. at 22-30.)[11] Plaintiffs' Opposition does not identify any facts alleged or cite any law Defendants' Opposition overlooked. Instead, Plaintiffs rely on

---

108-115, 119.) *See PEC Solutions Inc. Sec. Litig.,* No. 04-1257, 2005 Wl 646070, at *7 (4th Cir. 2005) (rejecting alleged GAAP violation because it "adds nothing new; rather, it simply rides around in circles on the inadequate coattails of the scienter pleading.")

[10] *See also supra* at 4-7.

[11] *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F.S.upp.2d 1150, 1162-63 (S.D. Cal. 2008) is directly on point. Here as in *Dot Hill*, this Court should reject Plaintiffs' CW allegations because (i) fact company was "small" is irrelevant (*see Opp'n* at 39 (FCStone had only 440 employees)); and (ii) allegation of "vague" job title and a "virtually non-existent" description of CW1's "job responsibilities" fail to provide information necessary to conclude CW1 was "not merely regurgitating gossip and innuendo." *Id.*

mischaracterization of their CW1's position and circular reasoning. Thus, in Opposition, CW1, a former employee in a "trade support role" (CAC ¶45), is rebranded as a "high ranking former employee." (Opp'n at 9.) And CW1's "information" is transformed into "fact" simply because Plaintiffs say it is so. (*Compare* Opp'n at 38 (arguing "facts confirm CW1's" assertions and "defendants do not dispute" CW's naming the trader allegedly behind the Energy Account losses) *with* Defs' Br. at 26, n.20 (expressly arguing that CAC failed to demonstrate CW1 was in a position to know name of trade, Defendants were referring to the trader as the "Customer")); Defs' Br. at 25 n.19 (stating for purposes of motion only, Defendants' were assuming a Margin Department existed and duties of it were correctly alleged). Plaintiffs' blatantly circular "argument" fails. *See In re Aetna Sec. Litig.*, 34 F Supp. 2d 935, 943 (E.D. Pa. 1999) (rejecting plaintiffs' "circular" argument that "they can satisfy the heightened pleading requirement for information and belief allegations by facts alleged on information and belief"); *see also In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F.Supp.2d 1150, 1162 (S.D. Cal.. 2008) (rejecting plaintiffs' argument as it simply, but incorrectly presuppose[d] the adequate pleading" of plaintiffs' claim). CW1 was not in a position to know the information alleged; therefore, the CAC gives rise to no inference of any Defendant's scienter. *See, e.g.*, *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 226-27 (D. Del. 2000) (Because plaintiff's "conclusions [were] based upon demonstrably false assumptions, they cannot be used to establish that the defendant's conduct was reckless.").

For all of the foregoing reasons, Defendants' forward-looking statements are not actionable, as a matter of law, and to the extent Plaintiffs §10(b) claim is premised on statements made regarding the Energy Account, it must be dismissed. (*See also* Defs' Br. at 12-35.)

## III. NO CAUSE OF ACTION EXISTS FOR ALLEGED GAAP VIOLATIONS.

In opposing Defendants' motion to dismiss Plaintiffs' §10(b) claim based on statements made regarding the Energy Account and the Cotton Trading account, Plaintiffs argue Defendants

"violated" GAAP rules when they failed to disclose (i) in November 2008, "the scope of the risk from the Energy Account" (Opp'n at 15-18), and (ii) in its *second quarter* 10-Q, that the Company suffered "$1.1 million in cotton trading losses" during the *third quarter*. (Opp'n at 22-27). As Plaintiffs' cases demonstrate, no §10(b) cause of action exists for GAAP violations.[12] *See also, Kindred*, 299 F.Supp.2d at 732, n.7 ("failure to follow GAAP" does not state "an independent claim").[13] "[M]ere allegations that statements in one report should have been made in earlier reports [also] do not make out a claim of securities fraud." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999).

## IV. PLAINTIFFS' OPPOSITION FAILS TO DEMONSTRATE FCSTONE'S LIBOR COLLAR WAS SPECULATION AND NOT HEDGING.

Plaintiffs argue their CAC adequately pleads that Defendants falsely stated FCStone had entered into a LIBOR[14] collar[15] to hedge a portion of its investable funds against a decline in

---

[12] *See* Opp'n at 18 (citing *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1219 (N.D. Okla. 2003) ("Allegations of accounting irregularities or violations of … [GAAP or GAAS] are insufficient to state a securities fraud claim"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) (GAAP violations not alleged to be basis of §10(b) claim)); *see also id.* at 41 (citing *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) (holding, "GAAP are not 'a canonical set of rules.'" They are only "a series of general principles followed by accountants" which are derived from "19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.").

[13] Although failure to plead an actionable misstatement is dispositive, Plaintiffs also fail to rebut Defendants' arguments demonstrating the CAC gives rise to no inference of scienter regarding the Cotton Trading claim. (*See* Defs' Br. at 38-39.) Instead, Plaintiffs offer another straw man. They assume that "because" Defendants' Opening brief stated "FCStone has procedures in place to collect additional margin and deposits customers on a same-day basis" Defendants were "promptly informed of difficulties in collecting" additional margin on the cotton trading accounts. (Opp'n at 40 (citing Defs' Br. at 3).) Plaintiffs' false assumptions give rise to no inference of scienter. *Tse*, 123 F.Supp.2d at 226-27.

[14] LIBOR is the benchmark market-rate used in hedges designed to protect against interest rate fluctuations. *See* KEVIN M. KEYES, FED. TAX. FIN. INSTRUMENTS & TRANSACTIONS ¶ 14.02[2][a] (2009) ("FED. TAX") ("[T]he market rate is generally determined by reference to the current value of a preselected interest index, such as LIBOR."); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Savs. Assoc.*, 322 F.3d 1039, 1043 n.2 (9th Cir. 2003) ("LIBOR is the most widely used floating index for interest rate swaps."); C. Mollenkamp & M. Whitehouse, *Study Casts Doubt on Key Rate*, WALL ST. J., May 29, 2008 at A-1 (LIBOR is "the benchmark is used by lenders to set interest rates on everything").

[15] In an interest rate collar designed to hedge against falling interest rates, the holder of the asset earning interest sells a "cap" and purchases a "floor." FED. TAX ¶ 14.02[2][a], Ex. 14-7. A cap is a contract

interest rates. (Opp'n at 28.) Plaintiffs contend the "reasons why" Defendants' statement was false is that the LIBOR collar "was not a hedge on declining rates," but was, "in actuality, a risky bet on the spread between the Fed Funds rate and the LIBOR rate." (Opp'n at 29; CAC ¶¶30, 36 (alleging the "bet" was that "Fed Fund and LIBOR rates would correlate" and the LIBOR hedge would only remain "flat" or profitable if "the spread," *i.e.*, the difference between, the Fed Fund and LIBOR rates "remained small").) Plaintiffs are wrong and simply ignore that their claim rests on a conclusion of law, *i.e.,* that Defendants were "speculating" and not "hedging." Instead of citing any of the several cases that define and distinguish the difference between these activities,[16] Plaintiffs misstate: (i) the facts alleged in their CAC by asserting that FCStone suffered "losses" on the hedge, and (ii) the law, by claiming they were required to allege that FCStone suffered large losses and nothing more. (Opp'n at 30 ("Because large losses are inconsistent with a hedged position, nothing more is required.").) This strategy fails.

The legal definitions of "hedging" and "speculation" are dispositive and require dismissal of this claim. In the futures market, "hedging" is akin to the lay definition of "hedging one's bets" because "hedging [always] functions as a variety of insurance." *Fadem v. Ford Motor Co.*, No. 02 Civ. 0680 (SCH), 2003 WL 22227961, *4 (S.D.N.Y. Sept. 25, 2003). A hedge is a derivatives contract that is entered into for the purpose of protecting against a risk of rising, falling, or otherwise volatile prices or interest rates, which risk is inherent in an underlying asset or liability held by the party entering into the hedge. For example, commodities producers and

---

pursuant to which the seller agrees to make cash payments to the purchaser "on fixed dates during the contract term, but only if and to the extent that prevailing interest *rates exceed* the [cap] rate specified in the contract (referred to as the strike rate)." *Id.* ¶ 14.02[2][a], at *5 (emphasis added). A floor is a contract in which seller receives payments, "but only if (and to the extent that) the market rate drops below the [floor] strike rate specified in the contract." *Id.* at *6.

[16] Plaintiffs assert this is a subject for expert testimony and they need discovery before they can actually state a claim of this kind. (Opp'n at 29 & n.15.) As demonstrated herein, Plaintiffs are wrong.

sellers hedge when they use the futures market "to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business." *United States v. N.Y. Coffee & Sugar Exch.*, 263 U.S. 611, 619 (1924).[17]

The same legal definition applies when banks and other financial market participants, like FCStone, engage in derivative transactions for the purpose of protecting their deposits or debt against exposure to fluctuations in interest rates. *See, e.g., FDIC v. Umic, Inc.*, 136 F.3d 1375, 1378 (10th Cir. 1998) ("Employing a hedging strategy is not unlike buying an insurance policy… by purchasing long-term put options on Treasury bonds, an investor can hedge against potential losses in his bond portfolio."); A. GOOCH & L. KLEIN, DOCUMENTATION FOR DERIVATIVES, Collars & Corridors at 449 (4th ed. Vol. I 2002) (A company's "motivation in entering into the rate collar might well be … to hedge against the rising interest rates on floating debt.")

Speculation is defined in contrast to hedging, *i.e.*, speculators intend to generate *profits* from the futures trading itself. *See, e.g.*, M.T. BELONGIA & G. J. SANTONI, HEDGING INTEREST RATE RISK WITH FINANCIAL FUTURES: SOME BASIC PRINCIPLES at 22 (Fed. Reserve Bank of St. Louis 1984) ("HEDGING") ("Trading futures for hedging is *not* intended to generate profits from the trading itself."); *Evanston Bank v. Conticommodity Serv., Inc.,* 623 F. Supp. 1014, 1019 n.3 (N.D. Ill. 1985) (speculating "is any pattern of investment that is not hedging, *i.e.,* any investment made for appreciation in value, however modest" that is unrelated to hedging an existing underlying risk). Thus, the Supreme Court has held that, "*[t]hose who seek financial*

---

[17] *See also see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 359 (1982) (holding, "hedging performs an insurance function," although it is different from insurance in the allocation of risk and in that, unlike the beneficiary of an insurance policy, a party to a derivative transaction does not have to prove actual damages in order to realize the economic benefit of its position); *In re Ashanti Goldfields Sec. Litig.*, 184 F.Supp.2d 247, 254 (E.D.N.Y. 2002) (those "who seek to insure themselves against price changes" are hedging); *Apex Oil Co. v. DiMauro*, 641 F. Supp. 1246, 1250 (S.D.N.Y.1986) (explaining, a commodities "hedger is betting against his own cash market prospects by

*gain* by taking positions in the futures market generally are called 'speculators' or 'investors.'"
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 359 (1982) (emphasis
added), *aff'g sub nom.*, *Leist v. Simplot*, 638 F.2d 283, 287-88 (2d Cir. 1980).[18]

Given the Supreme Court decisions distinguishing speculation from hedging, to state
Plaintiffs' §10(b) claim based on their conclusion that FCStone was using the LIBOR collar for
speculation, their CAC was required to allege facts demonstrating that (i) FCStone did not posses
an asset, the value of which was capable of being impacted by fluctuating interest rates, and (ii)
FCStone did not enter into the LIBOR collar with an intent to protect its investable funds from
the risk associated with fluctuating interest rates.  The CAC alleges no such facts.

### A.   PLAINTIFFS FAIL TO DEMONSTRATE THAT THE DEFENDANTS MADE FALSE STATEMENTS RELATING TO THE LIBOR HEDGE.

The few facts alleged in the CAC, and the Company's SEC filings, incorporated by
reference into the CAC, demonstrate FCStone's LIBOR-based interest rate collar was, indeed, a
hedge. FCStone earned interest on its customer's investable funds.  (CAC ¶¶4, 24.)  Sixty
percent of these assets were held in short-term U.S. Treasury securities, 90-day Treasury Bills
("T-Bill").  (*Id.*; *see also* Defs' Br., Ex. D at 15.)   In approximately August 2007, FCStone
entered into a LIBOR collar for a 24-month term.  (CAC ¶6 (alleging 24-month term); Defs' Br.,
Ex. K at 12 (Mr. Anderson stating company had entered into a collar, "really a cap and a floor");
April 10, 2008 Conference Call Tr., at 12 (attached as Ex. N) (Mr. Dunaway stating collar was
tied to LIBOR).)  In September 2007, U.S. short-term interest rates began to decline.  (CAC ¶¶5,
25.)   Although FCStone benchmarked its interest earnings against the declining T-Bill rate (*id.*
¶4) and its collar was based on LIBOR (*see id.* ¶28), it is a common market practice to hedge an

---

using the futures market"), *rev'd, in part, on other grounds*, 822 F.2d 246 (2d Cir. 1987).)

underlying risk exposure to one rate with a futures position on another rate, if there is reason to believe that the two rates correlate. *See, e.g.*, HEDGING at 24.[19] For the prior twenty-years, a close correlation between these two rates had existed and, at the time, there is existed no reason to believe that such correlation would not continue to exist. (*See* Defs' Br., Ex. D at 12-13; *see also* Graphs Comparing LIBOR, Fed Funds and Prime Rates (attached as Ex. O).) Possible future lack of correlation between the two rates was even less of a concern for FCStone given the collar's relatively short 24-month term. (CAC ¶6.) Months later, in Spring 2008, an unprecedented disconnect between these two rates began – the Fed Funds rate continued to decline while LIBOR rose. (CAC ¶34.)[20]

Plaintiffs' assert FCStone actually speculated on the spread between the Fed Funds and LIBOR rates and the collar would only have been "profitable" if the spread remained flat or narrowed.[21] This illogical hindsight conclusion is premised on the fact that (i) FCStone recorded

---

[18] *See also Ashanti*, 184 F. Supp. 2d at 254 (same); *Apex Oil*, 641 F. Supp. at 1250 (same).

[19] This "imperfect hedging" can be driven by various factors *e.g.*, because a derivatives position may be obtained only, or on more favorable terms, in a different but correlated rate or index. *Id.* The fact that a derivatives position is not a perfect hedge does not change its status as a hedge and does not establish that it was entered into for speculative reasons. (*See id.*) Imperfect hedges present "basis risk," "the risk that the value of a hedge will not move exactly inversely to the value of the asset or liability being hedged." *Fed. Nat'l Mortgage Ass'n v. Comm'r*, 100 T.C. 541, 551 (1993).

[20] The disconnect led to FCStone realizing basis risk in its third-quarter. (*See supra* n.19.)

[21] Plaintiffs' assertion is demonstrably wrong. If the rates had disconnected drastically such that the Fed Funds rate rose and LIBOR declined below the floor rate, the collar would have provided a windfall to FCStone, as it would earn interest income at the higher U.S. rate and receive payment pursuant to the floor in its collar. In FCStone's third quarter, when LIBOR rose while the Fed Funds rate declined, the disconnect posed a risk of significant loss to FCStone. If FCStone had not exited the hedge, the Fed Funds rate remained low ,and LIBOR remained at its then current, higher rate – above the floor but below the cap strike rates in FCStone's collar, FCStone would receive no payments under the collar, *i.e.*, no protection against the lower U.S. interest rates. If Fed Funds rate remained flat or continued to decline, and LIBOR rose above the cap strike rate, FCStone would suffer an actual and significant loss, as it would earn interest income at the lower rate and be required to make payment pursuant to the cap. In short, if Plaintiffs had alleged or argued the way a collar actually works, their nonsensical assumptions would have become evident, including their assertion that there "could never have been 'far more risk carrying [a collar] forward than in keeping the collar on." (Opp'n at 31.)

mark-to-market gains on the collar in its first and second quarters, (ii) and the Fed Funds rate declined while LIBOR rose in FCStone's fiscal third quarter, (iii) at which time FCStone exited the hedge. (*See* Opp'n at 28-29; CAC ¶34.) This is nonsense unsupported by any facts alleged in the CAC. Because the collar was based on LIBOR, a move in the Fed Funds rate (either up or down) would have resulted in no mark-to-market gain or loss. Therefore, the only possible basis for FCStone's mark-to-market gains on the collar in its first and second quarters was a decline in LIBOR below the floor strike. Furthermore, when FCStone entered into the collar in August 2007, it could not have been betting on the spread between the Fed Funds and LIBOR rates because a close correlation between these two rates existed. (*See* CAC ¶¶32-34; *see also* Ex. O.) Plaintiffs do not allege, because they cannot, that when FCStone entered into the collar there existed any reason for market participants to believe the historical correlation between these two rates would not continue, and no rational market participant would have chosen to speculate on a non-existent spread. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case."). This Court should not indulge Plaintiffs' irrational conclusion.

Finally, the only case on which Plaintiffs rely to support their characterization of the LIBOR collar as "speculation" fails to do so. (Opp'n at 29-30, citing *Ashanti*, 184 F.Supp.2d at 249-50.) As in this case, in *Ashanti,* shareholders sued claiming the Company committed securities fraud because it falsely stated it had entered into hedges when it actually had engaged in speculation, taking a "reckless bet" on the price of gold, which caused Ashanti to suffer massive losses. 184 F.Supp.2d at 250. This, however, is where the similarities end.

Ashanti had publicly stated it was in the business of mining, processing and selling gold. *Id.* at 249. It also claimed to have entered into derivative financial instruments in gold futures to hedge the company's cash flows against the risk of *falling* gold prices. *Id.* at 252. However, "all of Ashanti's profits for 1997 and 1998 and two-thirds of its profits in 1996 were a product of its hedging operations," *not* its gold business. *Id.* at 257. By definition, "substantial profits" do not result from hedging activities; they result from speculation. Furthermore, when the European central banks announced that they were limiting sales and leases of gold, the price of gold rose steeply – to nearly $70 per ounce. *Id.* at 250. Because Ashanti had claimed to be hedging against a *decline* in the price of gold, a *price spike* should have had no impact on the value of Ashanti's hedges. Instead, the price spike caused a monumental, $860 million *decline* in the value of Ashanti's hedge book. *Id.* Moreover, in commenting on these effects publicly, Ashanti's CEO *admitted* that, contrary to Ashanti's public statements describing its derivative contracts as a hedge *against* the decline in gold prices, the Company took a "reckless" bet that the price of gold would decline. *Id.* at 257. Plaintiffs' CAC alleges no similar facts.[22]

For all of the foregoing reasons, the CAC fails to state any §10(b) claim based on the Defendants' statement that FCStone had hedged a portion of its investable of funds.

## V. PLAINTIFFS FAIL TO DEMONSTRATE THEIR CAC ALLEGES PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF ANY DEFENDANT'S SCIENTER.

Defendants' Opening Brief demonstrated that the CAC failed to allege particularized facts giving rise to a strong inference of any Defendant's scienter. (Defs' Br. at 30-34.) As further demonstrated *supra* at 9-13, Plaintiffs' Opposition fails to overcome the numerous

---

[22] Plaintiffs contradict a well-pleaded fact in their CAC and argue that FCStone suffered "losses" when it terminated the hedge. (*Compare* Opp'n at 30 *with* CAC ¶6 *and* Defs' Br. at 6-7.) Regardless, losses alone do not demonstrate a hedge was actually speculation. *See Fadem*, 2003 WL 22227961, at *3, *8 (rejecting as hindsight, claim that Ford's losses on a hedge constituted speculation).

deficiencies Defendants' identified in the CAC. Under the Supreme Court's ruling in *Tellabs*, the Court must consider opposing inferences of nonfraudulent intent. *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 309 (2007) ("[m]erely plausible or reasonable" inferences of scienter are insufficient; to survive dismissal, the inferences must be "cogent and *at least as compelling as any opposing inference of* nonfraudulent intent.") (emphasis added). As Defendants established, the most cogent and compelling reasons for FCStone's bad debt expense, unsuccessful LIBOR hedge, and declining stock price are, at worst, the result of honestly made but ultimately inaccurate predictions and the world-wide economic crisis. (Defs' Br. at 5-6, 44.)

CONCLUSION

For all of the foregoing reasons, Defendants FCStone Group, Inc., Paul G. Anderson and William J. Dunaway respectfully request this Court grant their motion, dismiss this case with prejudice, and award them such as other and further relief as this Court deems just and proper.

Dated: March 8, 2010　　　　　　　　Respectfully Submitted,


　　　　　　　　　　　　　　　　FCSTONE GROUP, INC., PAUL G. ANDERSON, AND
　　　　　　　　　　　　　　　　WILLIAM J. DUNAWAY


　　　　　　　　　　　　By: s/Pamela G. Smith
　　　　　　　　　　　　　　　　One of Their Attorneys

　　　　　　　　　　　　　　　　David H. Kistenbroker
　　　　　　　　　　　　　　　　Pamela G. Smith
　　　　　　　　　　　　　　　　Katten Muchin Rosenman LLP
　　　　　　　　　　　　　　　　525 West Monroe Street
　　　　　　　　　　　　　　　　Suite 1900
　　　　　　　　　　　　　　　　Chicago, Illinois 60661
　　　　　　　　　　　　　　　　(312) 902-5200
　　　　　　　　　　　　　　　　(312) 902-1061 (fax)
　　　　　　　　　　　　　　　　David.Kistenbroker@kattenlaw.com
　　　　　　　　　　　　　　　　Pamela.Smith@kattenlaw.com

　　　　　　　　　　　　　　　　-and-

Sean W.  Colligan
Stinson Morrison Hecker LLP
1201 Walnut Street
Suite 2900
Kansas City, Missouri 64106
(816) 842-8600
(816) 691-3495 (fax)

Counsel for Defendants