UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | |
|---|---|
| PAUL LUMAN, Individually and On Behalf of All Others Similarly Situated, | No. 4:08-cv-00514-C-W-HFS (Consolidated) |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | |
| PAUL G. ANDERSON, et al., | |
| Defendants. | |

LEAD PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE

## TABLE OF AUTHORITIES

                                                    **Page**

I. Introduction ............................................................................................................... 1

II. Argument ................................................................................................................. 3

    A. The Court May Take Notice and Consider Documents Filed in Another Litigation of the Purpose of Deciding the Motion to Dismiss ................................ 3

    B. The Adams Litigation Filings Support the Complaint's Allegations ....................... 3

III. Conclusion ............................................................................................................... 6

**I.     Introduction**

Lead Plaintiffs respectfully request that the Court take judicial notice of pleadings submitted in the litigation between defendant FCStone Group, Inc. ("FCStone" or the "Company") and its former customers Scott A. Adams ("Adams") and Robert W. Walford ("Walford") currently pending in the Northern District of Illinois and the Southern District of New York (the "*Adams* Litigation").[1] The pleadings and attached documents in the *Adams* Litigation corroborate many of the facts alleged by the Confidential Witness ("CW1") identified in Lead Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") – facts which defendants contested as "ludicrous" and "sophomoric[]" in their motion to dismiss – and further demonstrate that the Court should deny defendants' motion. Defendants' Suggestions in Support of Motion to Dismiss Consolidated Complaint for Violation of the Federal Securities Laws ("Defs.' Mot.") at 28, 33.

According to FCStone's own Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment in the *Adams* Litigation, Adams and his partner, Walford, were "customers of FCStone and engaged in commodities trading through accounts maintained at FCStone" and "accumulated an account deficit of approximately $127,000,000." Exhibit 1 at 3.[2] The parties entered into a Forbearance Agreement on March 11, 2009 that liquidated Adams' and Walford's FCStone account and required Adams and Walford to pay FCStone two-thirds of all tax refunds they received from the trading losses (estimated to be $15 million). *Id*. The final one-third of Adams' and Walford's tax refund was to be used to establish a new trading account, the profits of which Adams and Walford would use to repay to FCStone. *Id*. at 4. In exchange, FCStone agreed to

---

[1]     The cases are *FCStone, LLC v. Scott Adams, et al.*, No. 10-cv-508 (N.D. Ill.) and *Garbers-Adams et al. v. Adams et al.*, No. 1:10-cv-00726-RPP (S.D.N.Y.).

[2]     All exhibits are attached hereto.

forebear collecting the $127 million debt. *Id.* at 5. Allegedly, Adams and Walford have failed to turn over any tax refunds to FCStone, resulting in the *Adams* Litigation. *Id.*

The documents in the *Adams* litigation demonstrate that it was in fact Scott Adams whose trades resulted in FCStone being forced to take the $110 million bad-debt expense in 2009 – a fact alleged by CW1 in the Complaint before the information became public. ¶45.[3] In addition, the documents demonstrate that Adams' Account Agreement with FCStone required its customers to:

> deposit with [FCStone] ***sufficient funds to meet the applicable initial and maintenance margin requirements***. [FCStone] may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account. Customer shall, without notice or demand maintain adequate margins at all times so as to continuously meet the margin requirements established by [FCStone]. . . . If at any time Customer's account does not contain the amount of margin required, [FCStone] may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements.

*See* Exhibit 2, Ex. A at 5 (emphasis added).[4] Adams' Account Agreement corroborates the Complaint's allegations that FCStone was required to maintain adequate margins from its customers in order to cover their trading losses, and CW1's statements that FCStone was monitoring Adams' trades through its "Margin Department" and was able to liquidate his positions at anytime. ¶¶45-47. Moreover, the fact that Adams' and Walford's debt to FCStone is $127 million corroborates CW1's statement that Adams only maintained $10 million in his account with FCStone and that their positions "greatly exceeded the amount of capital that Adams had deposited with the Company." ¶48.

---

[3] All "¶_" or "¶¶__" references are to the Complaint.

[4] The Account Agreement was attached to Declaration of Lisa Walford in *Lisa Walford et. al. v. Scott Adams, Robert Walford and FCStone, LLC*, No. 10-CV-0726 (S.D.N.Y.).

- 2 -
528242_1

These facts soundly refute defendants' argument that CW1 is unreliable and should not be considered by the Court. Defs.' Mot. at 22-35. *In re MoneyGram Int'l, Inc.*, 626 F. Supp. 2d 947, 981 n.34 (D. Minn. 2009) (statements from confidential source "satisf[y] the Reform Act's requirements by providing 'sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs.'") (citation omitted). As the allegations should be taken as true, defendants' motion to dismiss should be denied.

## II. Argument

### A. The Court May Take Notice and Consider Documents Filed in Another Litigation of the Purpose of Deciding the Motion to Dismiss

The Court may take judicial notice of public records. *See* Fed. R. Evid. 201; *Kivel v. ABN AMRO Mortgage Group, Inc.*, No. 05-2926, 2006 U.S. Dist. LEXIS 35703, at *8-*9 (D. Minn. June 1, 2006) (court may take judicial notice "of the pleadings, documents, briefs, evidentiary submissions, [and] decisions" publically filed in another litigation).

Likewise, the Court may consider such documents in deciding a Rule 12(b)(6) motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007) (the court may consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice); *Kivel*, 2006 U.S. Dist. LEXIS 35703, at *9 (citing *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("'[t]he district court may take judicial notice of public records and may thus consider them on a motion to dismiss'").

Here, the documents at issue have been publicly filed, are attached hereto, and should be considered by the Court in ruling on defendants' motion to dismiss.

### B. The *Adams* Litigation Filings Support the Complaint's Allegations

The Complaint alleges that FCStone and individual defendants Paul G. Anderson and William J. Dunaway made materially false and misleading statements regarding FCStone's massive

losses sustained from a customer's trading account. ¶¶9-11, 43-51. Defendants misrepresented to investors that the Company adequately reserved for potential losses by customers by "requiring sufficient margining or security deposits" to cover all potential liability. ¶¶61, 71. Moreover, after announcing that the Company would have to incur $20 million in losses from the trading account, defendants materially misrepresented and omitted to investors the scope of the losses and the fact that the Company had the losses "effectively neutralized and/or the risks mitigated to a large extent" and that "what we have reserved is sufficient to cover that specific risk." ¶76. In the end, the Company was forced to admit an additional $90 million in losses from the customer's trading account, causing the Company's stock price to collapse and analysts to pronounce that FCStone's management "has completely lost its credibility." ¶¶87-88.

Defendants' motion to dismiss argues that CW1 – who identified Adams as the trader whose trades resulted in the $110 million bad-debt expense was not reliable and should be disregarded by the Court. Defs.' Mot. at 22. As set forth in the Complaint, not only was CW1 able to properly identify Adams as the customer behind the massive losses (a fact that had not been publicly disclosed), CW1 was able to identify which FCStone subsidiary Adams was associated with (Geldermann), the fact Adams had been trading in natural gas futures, the exact amount Adams had in his trading account, when those trades began to lose money, how the Company's "Margin Department" was responsible for monitoring positions taken by traders, and defendants had known through specific reports called "Deficit Sheets" that for months Adams' trades had exposed the Company to much greater losses than defendants had told investors. ¶¶45-50.

These allegations are corroborated by FCStone's filings in the *Adams* Litigation. For example, FCStone's Amended Complaint in the *FCStone, LLC v. Scott Adams, et al.*, No 10-cv-508 (N.D. Ill.) action identifies Adams and Walford as the traders that owe FCStone $127 million arising from trades before March 11, 2009. Exhibit 3 at 1-4.

Likewise, the Account Agreement entered into by Adams and Walford with FCStone states:

> Customer shall deposit with [FCStone] sufficient funds to meet the applicable initial and maintenance margin requirements. [FCStone] may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account. Customer shall, without notice or demand maintain adequate margins at all times so as to continuously meet the margin requirements established by [FCStone]. [FCStone] may establish margin requirements and from time to time, change such margin requirements in its sole and absolute discretion and said requirements may exceed the margin requirements set by any commodity exchange or other regulatory authority. Customer agrees, when requested by [FCStone], to immediately wire transfer funds to adequately maintain margins and to furnish [FCStone] with the names of bank officers for immediate confirmation of such transfers. Choosing not to demand wire transfer of funds or the acceptance of funds by mail shall not constitute a waiver of the right of [FCStone] to demand wire transfer of funds at any time. If at any time Customer's account does not contain the amount of margin required, [FCStone] may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements. Failure of [FCStone] to close out open position(s) in whole or in part in such circumstances shall not constitute a waiver of its rights to do so at any time thereafter, nor shall [FCStone] be subject to any liability to Customer for its acts or its failure to act. [FCStone] shall not be liable to Customer for the loss of any margin deposits which is the direct or indirect result of the bankruptcy insolvency, liquidation, receivership, custodianship, or assignment for the benefit of any bank, other clearing broker, exchange, clearing organization, or similar entity. Notwithstanding the above, [FCStone] may, in its discretion, refuse to accept an order from the Customer.

Exhibit 2, Ex. A at 5. The Account Agreement corroborates CW1's statement that FCStone was supposed to require its customers to supply sufficient margins to cover their trading exposure, that FCStone was monitoring Adams' trades through its "Margin Department" and was able to liquidate his positions at anytime. ¶¶45-47. Likewise, the fact that Adams' and Walford's debt to FCStone is $127 million corroborates CW1's statement that Adams only maintained $10 million in his account with FCStone and that their positions "greatly exceeded the amount of capital that Adams had deposited with the Company. ¶48.

As set forth in Lead Plaintiffs' Suggestions in Opposition to Defendants' Motion to Dismiss Consolidated Complaint ("Plaintiffs' Opp."), the Complaint states a claim for violation of the

- 5 -

528242_1

securities laws and should be upheld. Plaintiffs' Opp. at 12-22, 33-40. The filings in the Adams Litigation fully support and corroborate these allegations and should be considered by the Court. *MoneyGram*, 626 F. Supp. 2d at 981 n.34; *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 874 (D. Minn. 2007) (the reliability of a confidential source is strengthened where "'the corroborative nature of the other facts alleged (including from other sources)'" supports the source's allegations) (citations omitted).

## III. Conclusion

For the reasons stated above, the Court should take judicial notice of the documents attached hereto.

DATED: June 15, 2010  Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
LUCAS F. OLTS

  s/ ARTHUR C. LEAHY
        ARTHUR C. LEAHY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

- 6 -

528242_1

YONKE & POTTENGER, L.L.C.
JASON POTTENGER, No. 43354
1100 Main Street, Suite 2450
Kansas City, MO 64105
Telephone: 816/221-6000
816/221-6400 (fax)

Liaison Counsel

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone: 303/861-1764
303/395-0393 (fax)

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 15, 2010.

s/ ARTHUR C. LEAHY
ARTHUR C. LEAHY

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: artl@rgrdlaw.com

# Mailing Information for a Case 4:08-cv-00514-HFS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@csgrr.com
- **Sean William Colligan**
  scolligan@stinson.com
- **Deborah R Gross**
  debbie@bernardmgross.com
- **Stacey Marie Kaplan**
  skaplan@csgrr.com
- **David H Kistenbroker**
  david.kistenbroker@kattenlaw.com
- **Arthur C. Leahy**
  aleahy@csgrr.com,ldeem@csgrr.com,e_file_sd@csgrr.com
- **Luke Olts**
  lolts@csgrr.com
- **Jason M. Pottenger**
  jpottenger@yplawfirm.com
- **Norman Eli Siegel**
  siegel@stuevesiegel.com,marquart@stuevesiegel.com,perez@stuevesiegel.com
- **Pamela G. Smith**
  pamela.smith@kattenlaw.com,cynthia.jukovich@kattenlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)