IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| PAUL LUMEN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 08-0514-CV-W-HFS |
| ) | |
| PAUL G. ANDERSON, et al., ) | |
| ) | |
| Defendants. ) | |

ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION TO CERTIFY CLASS AND (2) DENYING MOTION TO STRIKE

Pending is Plaintiffs' Motion to Certify Class. Also pending – although not fully briefed – is Defendants' Motion to Strike. For the following reasons, latter motion (Doc. # 114) is denied and the former motion (Doc. # 66) is granted in part and denied in part.

I.  BACKGROUND

This case alleges violations of the Securities Exchange Act on the part of FCStone and certain of its officers and directors. A Consolidated Complaint was filed on September 25, 2009. In my November 2010 Order I addressed the three claims presented at that time: (1) false reassurances in April 2008 about a hedging arrangement, (2) failure to reveal the Cotton bad debt expense in March 2008, and (3) misstatements and concealments involving the Scott Adams account. Only the third of these claims was held to satisfy the Private Security Litigation Reform Act's ("PSLRA's") pleading requirements. Specifically, I held the case could proceed on the theory that "the Adams bad debt situation was willfully minimized on November 3 and 4, 2008," and in a footnote "reserve[d] a final ruling on whether actionable misrepresentation before November is alleged regarding" the Adams debt. I am now required to consider this issue because Plaintiffs are asking that the class period commence on April 14, 2008. Specifically, Plaintiffs suggest the following class definition:

> All persons or entities who purchased or otherwise acquired publicly
> traded securities of FCStone Group, Inc. from April 14, 2008 through
> February 24, 2009, inclusive.[1]

Plaintiffs' proposed definition is not binding, and I am free to modify it if I deem it necessary to do so. E.g., In re Monumental Life Ins. Co., 365 F.3d 408, 414 & n.7 (5th Cir.), cert. denied, 543 U.S. 870 (2004) (citing cases).

## II. DISCUSSION

### A. Class Definition and the PSLRA

The class definition must be ascertained before addressing Rule 23's requirements, and ascertaining the class definition requires consideration of the PSLRA. I previously held the statements made on November 3 and November 4, 2008, satisfied the pleading requirements. The statements made on that date announced FCStone's exposure on the Adams account but understated the extent of that exposure. I noted a more accurate – but still incomplete – statement was made on February 24, 2009. Plaintiffs propose February 24, 2009, as the date upon which corrective information was disclosed, and this is acceptable – but Plaintiffs also propose a beginning date that is well before the date when incorrect information was publicized. Plaintiffs justify this approach based on public statements made in April and July 2008 – statements that were not specifically pled as connected to the Adams debt until after I issued the November 2010 ruling. Therefore, unlike the November 2008 statements I have already considered, the April and June statements have not been held to be sufficient to maintain a cause of action. Plaintiffs insist the length of the class period is a merits question, but (1) before it can be a merits question it must be properly pled, (2) the class period cannot begin before an actionable statement or concealment occurs, and (3) I

---

[1]Certain customary exclusions have been specified, including defendants, officers and directors.

2

Case 4:08-cv-00514-HFS   Document 118   Filed 02/10/12   Page 2 of 16

must make a preliminary inquiry to ascertain the class period to determine whether a class can even be certified and to insure that proper notices can be distributed.

The PSLRA "dictates a modified analysis due to its special heightened pleading rules." Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 824 (8th Cir. 2003). The heightened pleading standard is intended to eliminate abusive securities litigation and put an end to the practice of pleading "fraud by hindsight." In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 889 (8th Cir. 2002). The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Kushner, 317 F.3d at 826 (citing 15 U.S.C. § 78u-4(b)(1)). "The PSLRA requires that the complaint state 'with particularity' facts giving rise to a 'strong inference' that the defendants acted with the scienter required for the cause of action." In re Navarre Corp. Sec. Litig., 299 F.3d 735, 745 (8th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(2)). "Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Cornelia I. Crowell GST Trust v. Possis Medical, Inc., 519 F.3d 778, 782 (8th Cir. 2008).

I conclude the class period cannot commence in April or June 2008. Plaintiffs allege that on April 14, 2008, FCStone filed with the SEC a Form 10-Q describing the company's business. The Form 10-Q explained that "[a]s a clearing broker, we act on behalf of our customers for all trades consummated on exchanges. Accordingly, we are responsible for our customers' obligations with respect to these transactions. We attempt to mitigate our credit risk by requiring sufficient margining or security deposits." Similar statements were made in next quarter's Form 10-Q, filed on July 15. Nothing about these statements suggests an intent to defraud, and Plaintiffs have failed to suggest any basis for believing an intent to defraud exists. All Plaintiffs have done is (1) identify a general statement about business operations, (2) allege the efforts described as an "attempt to mitigate risk" failed, and (3) conclude that this constitutes fraud. The allegations fall short of what is necessary under the law. "Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations, *i.e.*, to allege

3

facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a strong - *i.e.*, a powerful or cogent - inference." Tellabs, 551 U.S. at 310 (internal citations and quotations omitted). The Court must determine "'whether all of the facts, taken collectively, give rise to" an inference of scienter that is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" In re NVE Corp. Sec. Litig., 527 F.3d 749, 752 (8th Cir. 2008) (quoting Tellabs, 551 U.S. at 321-24). At most, Plaintiffs allege Defendants' hope that they had adequately protected FCStone from risk proved incorrect – but bad business decisions do not constitute securities fraud. K-Tel Int'l, 300 F.3d at 891; see also Santa Fe Indus. v. Green, 430 U.S. 462, 474-80 (1977).

     I conclude no inference of scienter has been created with respect to statements made before November 2008, so the class period cannot commence before then. The class period commences on November 3, 2008, when the first incorrect statement about the Adams account was made. In this regard, it is important to note that November 3 is the beginning date not because the stock price dropped precipitously on this day, but rather because this is the day that false statements about the extent of FCStone's exposure were made. A drop in stock price is not automatically the product of fraud; here the price dropped significantly because some quantum of bad news was disseminated, but arguably the price did not fall "enough" because complete and truthful information was not disseminated.

     There is another flaw in the class definition: it includes individuals who will not have damages. The Supreme Court has held a plaintiff cannot prevail if all they do is establish the stock's price was inflated due to fraudulent conduct. When the fraud on the market theory is employed (as Plaintiffs attempt here, and as will be discussed later in this Order), "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005). No loss is incurred at the moment of purchase; loss can be incurred only upon the sale of the security. Thus, if an investor purchases stock before the fraud occurs and sells after the fraud occurs (but before the truth is revealed), the investor cannot

4

have been harmed by the fraud. Similarly, if an investor both buys *and* sells the stock after the fraud occurs and before the truth is revealed, any fluctuation in the stock price cannot be attributed to the fraud. <u>Id</u>. at 342-43; <u>Glaser v. Enzo Biochem, Inc.</u>, 464 F.3d 474, 478-79 (4th Cir. 2006), <u>cert. denied</u>, 549 U.S. 1304 (2007); <u>see also</u> <u>FindWhat Investor Group v. FindWhat.com</u>, 658 F.3d 1282, 1312 n.29 (11th Cir. 2011). This means that the only people who have suffered legally cognizable damage are those who (1) purchased stock after the fraudulent statement was made on November 3, 2008 and (2) still held their stock when truthful corrective information was communicated on February 24, 2009.[2] The class definition must be modified accordingly, and the modified definition is the one that will be considered.

<u>B. Rule 23's Requirements</u>

Federal Rules of Civil Procedure 23(a) requires the moving party, as a prerequisite applicable to all class actions, to show: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. In addition to meeting the prerequisites of 23(a), the class must qualify under one of the provisions of Rule 23(b). Plaintiffs contend they have satisfied Rule 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominated over any questions affecting only the individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*1. Rule 23(a)'s Requirements*

---

[2] Of course, this assumes the announcement of corrective information on February 24, 2009, caused a drop in the stock price. This issue is not presently before me.

5

Rule 23(a)(1) requires the proposed class be "so numerous that joinder of all members is impracticable." The Record establishes good reason to believe this requirement has been satisfied even for the shortened class period described above and there is no dispute among the parties on this issue. Nothing more needs to be said about numerosity.

The commonality requirement of Rule 23(a)(2) and the typicality requirement of Rule 23(a)(3) are separate requirements, but they "tend to merge" and are often discussed together. General Tele. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982). The adequacy requirement of Rule 23(a)(4) also merges with typicality. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997). While these three components are distinct, the discussion may overlap.

Commonality exists when the "legal question linking the class members is substantially related to the resolution of the litigation." DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1174 (8th Cir. 1995). Commonality "does not require that every question of law or fact be common to every member of the class, and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." Paxton v. Union Nat'l Bank, 688 F.2d 552, 561 (8th Cir. 1982), cert. denied, 460 U.S. 1083 (1983) (quotation omitted). The link is sufficient if the class members have suffered the same injury, and a question is common if it will generate an answer that applies equally to all of the class members. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011). There is no serious dispute that common issues exist; the common issues include the nature of the public statements made, the extent to which those statements were false, and Defendants' knowledge of (or reckless disregard for) the truth.

Unlike commonality (which focuses on the class members), typicality and adequacy focus on the class representatives. Typicality requires the would-be representative have the same or similar grievances as the members of the class. Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996). The burden of demonstrating typicality is fairly easy to meet so long as other class members have

6

claims similar to the named plaintiff. DeBoer, 64 F. 3d at 1174. "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." Alpern, 84 F.3d at 1540. Adequacy generally requires "(1) that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit, and (2) that the interest of representative is not antagonistic to or in conflict with other members of the class." Griffin v. Carlin, 755 F. 2d 1516, 1533 (11th Cir. 1995).[3]

Defendants posit a series of arguments regarding the two proffered class representatives – Bruce Wells ("Wells") and Building Trades United Pension Trust Fund ("Building Trades") – that could apply equally to either typicality or adequacy. They first contend Wells is not an appropriate representative, and I agree because Wells is not a member of the class. Wells' transactions are summarized as follows:

- 450 shares purchased in May 2008
- 2000 shares purchased in June 2009
- all 2,450 shares sold on July 8, 2009

Wells did not purchase stock while the market was affected by Defendants' allegedly fraudulent statements. He is not a member of the class, so his claims are not typical and he cannot adequately represent the class.

Building Trades does not suffer from the same problem as Wells. Building Trades' transactions are summarized as follows:

- 38,900 shares purchased between July 2008 and September 2008
- 10,900 shares purchased on November 4, 2008
- 10,200 shares purchased on November 5, 2008
- all 60,000 shares sold between February 24 and February 26, 2009

While the initial purchases between July 2008 and September 2008 do not place Building Trades in the class, the purchases on November 4 and 5 do. Building Trades

---

[3]There are no arguments regarding the adequacy of counsel, so nothing more needs to be said about this issue.

also sold those 21,100 shares after Plaintiffs allege the truth was revealed, so Building Trades can claim to have suffered damage. Its claims are typical of other class members and Building Trades can adequately represent the interests of the class members.

Defendants argue Building Trades is not typical because it has been involved in other securities fraud cases, which will expose it to unique defenses that other class members will not have to face. I reject this argument because Defendants have not identified any defenses that will be uniquely applicable to Building Trades, and under Alpern this factual difference is of no legal consequence. Defendants also contend that Building Trades is involved in so many suits that it is "overstretched" and cannot give proper attention to this lawsuit. I am simply unpersuaded by this argument. Nothing in the Record suggests Building Trades is less capable than any other class representative. The fact that Building Trades may rely heavily on Class Counsel is not a negative factor, as I would expect any class representative to rely on the advice of counsel in making decisions for the benefit of the class.

### C. Rule 23(b)(3)'s Requirements

Plaintiff seeks certification under 23(b)(3), which requires that questions of law or fact predominate over any individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Amchem Products, Inc., 521 U.S. at 622. The predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation. Id. at 623. Predominance is a test readily met in certain cases alleging securities fraud. Id. at 625. This is so because the plaintiffs usually do not need to prove actual reliance on the fraudulent statement (as would be necessary in a case involving common-law fraud). As the Supreme Court explained, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed . . . ." Basic Inc. v.

8

Levinson, 485 U.S. 224, 247 (1988). Consequently, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." Id. As explained by the Seventh Circuit,

> When someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor *through the price of the stock.* And since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information. The price both transmits the information and causes the loss. This approach, dubbed the fraud-on-the-market doctrine, supplants "reliance" as an independent element by establishing a more direct method of causation. When a company's stock trades in a large and efficient market, the contestable elements of the Rule 10b–5 claim reduce to falsehood, scienter, materiality, and loss. Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable representative steps forward.

Schleicher v. Wendt, 618 F.3d 679, 682 (7th Cir. 2010) (internal citations omitted).

If the fraud on the market theory is employed, then individual class members need not demonstrate reliance. In that event, the only individual issues would relate to damages, and the common issues would predominate over the individual issues. On the other hand, if the fraud on the market theory is not employed, each class member must demonstrate reliance on the misstatements on November 3 – thereby preventing the common issues from predominating over the individual issues. The critical question, then, is: can Plaintiffs employ the fraud on the market theory?

*1.*

Defendants argue the "fraud on the market" theory is inapplicable because FCStone's stock did not trade on an efficient market. They makes this argument even though FCStone's stock traded on the NASDAQ: one of the two largest stock exchanges in the United States, the largest electronic-equity securities trading market in the United States, and one of the largest stock exchanges in the world. It would be

9

remarkable for a court to conclude NASDAQ is not an efficient market[4] – which is why "[s]ecurities traded on NASDAQ are often presumed to be traded on an efficient market." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 694 (11th Cir. 2010) (Tjoflat, J., concurring in part and dissenting in part); see also In re DVI, Inc. Sec. Litig., 639 F.3d 623, 634 (3d Cir. 2011) (listing "on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"); In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011) (discussing NYSE); In re Juniper Networks, Inc. Sec. Litig., 264 F.R.D. 584, 591 (N.D. Cal. 2009) ("Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because . . . Juniper's stock was actively traded on an efficient market – the NASDAQ."); In re HealthSouth Corp. Sec. Litig., 261 F.R.D. 616, 635 (N.D. Ala. 2009) (discussing NYSE); Wagner v. Barrick Gold Corp., 251 F.R.D. 112, 119 (S.D.N.Y. 2008).[5] Indeed, Basic itself recognized the NYSE as an efficient market, 485 U.S. 249 n.29 – and there is no material difference between NYSE and NASDAQ.

Nonetheless, Defendants contend the requirements of an efficient market are not satisfied. They rely on requirements derived from the District Court of New Jersey's decision in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), which have been adopted by many courts (but, interestingly, not the Eighth Circuit). Both parties invite me to consider the Cammer factors, and so I shall. However, in applying the Cammer factors it is important to note that even if the NASDAQ is not to be automatically accepted as an efficient market, the aforementioned cases (and others too numerous to cite) establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency – making it incumbent upon Defendants to rebut the presumption.

---

[4]This does not necessarily apply to stocks that trade over the counter or on the "Pink Sheets" – markets that typically have less volume, less market makers, and less analyst coverage than the NASDAQ's "main exchange."

[5]The Eighth Circuit's decision in In re NationsMart Corp. Securities Litig., 130 F.3d 309 (8th Cir. 1997), cert. denied, 524 U.S. 927 (1998) is not determinative. That case involved allegedly fraudulent statements made in connection with an IPO of stock that was going to trade on the NASDAQ in the future, not statements made in connection with stock that was already trading on the NASDAQ.

10

As explained by various courts, the Cammer factors are:

1. The average weekly trading volume;
2. The number of security analysts following and reporting on the stock;
3. The extent to which market makers trade in the stock;
4. Whether an SEC registration Form S-3 has been filed; and
5. Whether there is a relationship between material disclosures and the stock's price.

E.g., DVI, Inc., 639 F.3d at 633 n.14; Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 200 (2d Cir. 2008). These items are not a checklist, but rather are factors to be considered. E.g., Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005). Of the five factors, the fifth is the most important. E.g., Teamsters Local 445, 546 F.3d at 208.

Defendants do not contest the first four factors, but because they are factors they must be addressed (albeit briefly) so they can be properly considered with the fifth factor. During the relevant time period, FCStone had approximately 28 million shares outstanding and the average daily trading volume was approximately 700,000 shares. Between seventy and 140 institutional investors were shareholders, owning between eight and twenty million shares. Fifteen analysts covered FCStone stock during the class period, and there were twelve market makers. Finally, FCStone filed an SEC Form S-3 during the class period. I note that less-favorable facts have been found to substantiate an efficient market. Inasmuch as Defendants do not contest the issue, there is no need to belabor the point with detailed case citations or analysis.

The crux of Defendants' argument is that FCStone's stock price does not assimilate and react to public information because

- the price moved on days where no company-specific news was announced,
- such movements occurred on days as frequently as days when news about FCStone was disseminated to the market,
- stock returns were predictable.

11

There are several problems with Defendants' arguments. First, they rely on factors that are not legally relevant. This does not mean that Defendants (or their expert, Paul Gompers) are incorrect in what they say – it means that Defendants (and their expert) often describe a different conception of an efficient market than is used by the law.

> There are three versions of the efficient capital market hypothesis: weak, semi-strong, and strong. The weak version is that prices incorporate information in a way that prevents the historical pattern of prices from being used to predict changes in price. . . . The semi-strong version adds that the value of new information is itself reflected in prices quickly after release, so that only the *first* recipient of this information (or someone with inside information) makes a profit; everyone else might as well ignore the information and rely on the prices. The strong version adds a claim that the price set in this way is *right,* in the sense that it accurately reflects the firm's value.
> Many economists think that the strong form of the hypothesis has been refuted, but the weak and semi-strong forms are widely accepted. And the fraud-on-the-market doctrine rests on the semi-strong form.

Schleicher, 618 F.3d at 684-85 (internal citations omitted). Defendants contend (and their expert opines) the market for FCStone stock was inefficient because the stock price was not accurately valued. This implicates the "strong" form of efficient market, which is not the sort of market needed to support the fraud on the market described in Basic. "[T]he fraud-on-the-market presumption of reliance does not depend on the accuracy of the market price, and whether it mirrors the best possible estimates, in light of all available information, of the actual economic values of securities in terms of their expected risks and returns." In re Xcelera.com Sec. Litig., 430 F.3d 503, 510 (1st Cir. 2005) (internal quotations omitted). The only question is whether the market rapidly assimilates public information – not whether it behaves in a manner that is completely rational or accurate.

Second, Defendants argue that the market is inefficient because FCStone's stock experienced "statistically significant" price changes when there was no company-specific news. Gompers concluded that, for the time period examined, 35% of the days on which FCStone exhibited statistically significant price changes there was no

12

company-specific news.[6]  Of course, this means that 65% of the time FCStone's statistically significant stock price moves are related to company-specific news.  The expert also concluded FCStone's stock was approximately one-and-a-half to two times as likely to experience a change in stock price on days when company-specific news was announced than on days when it was not.  However, for legal purposes, the critical question is whether the price quickly absorbs and reflects news about the company because this is what allows the legal presumption that (1) the price incorporates public information and (2) the investor relied on the price as the repository of that public information.  Gompers' report establishes that when news about the company is made public, the company's stock price immediately incorporates the information.  This is the essence of an efficient market – perhaps not for an economist's purposes, but for purposes of Basic.

      Gompers indicated FCStone's stock did not incorporate public information, but I find his conclusion and explanation wanting.  His conclusion is based on only two days on which FCStone experienced no significant change in stock price despite the announcement of important news.  From this, he concludes the market was inefficient.  However, there is no comparison to the number of times there were significant price changes following important news.  What if the price changed significantly on important news fifty times and failed to do so only twice?  Knowing that the price did not move on two occasions does not mean anything out of context.

      More importantly, the facts suggest Defendants have placed undue emphasis on these two occasions.  Gompers notes that "on November 13, 2008, FCStone released earnings results for the fourth quarter and overall fiscal year of 2008, missing market consensus forecasts by a large margin. . . .  Despite the disappointing result, there was not a statistically significant decline in FCStone's stock price on that day."  Of course, this announcement came ten days after FCStone provided the bad (and allegedly incomplete) news about the Adams account.  The stock price incorporated the news

---

[6]The effects of industry or general economic news was accounted for in this analysis.

13

about unexpected losses on November 3 – meaning the subsequent "news" that FCStone would miss earnings expectations was already incorporated in the stock's price when the formal announcement was made on November 13.

The second alleged instance of inefficiency occurred on December 17, 2008, when "BMO Capital Markets 'dramatically' lowered its earnings forecasts for FCStone, but FCStone's stock price increased, although not significantly." However, as pointed out by Plaintiffs' expert (Bjorn Steinholt), BMO Capital took this action based on its assessment of industry-wide events, not company-specific information. Inasmuch as Gompers recognized the need to control for industry or market news in order to examine the correlation between "FCStone news" and FCStone's stock price, this event is of no consequence.

### 3.

Defendants have asked me to strike Plaintiffs' expert's report. I view this request unfavorably and see no reason to delay a ruling on the Motion to Certify to allow the Motion to Strike to be fully briefed. The briefing process for Plaintiffs' Motion to Certify was longer than usual, as both sides were permitted to file one additional brief after Plaintiffs' Reply Suggestions were filed. Defendants filed their Motion to Strike after all the briefing was completed. I see this as a delaying tactic: all of the arguments presented in the Motion to Strike could have been presented while addressing the Motion to Certify – and some of them were.[7]

I also note that Plaintiffs' expert's opinion is helpful, but not critical, to some of the conclusions reached herein. However, Steinholt's opinion was not germane to a great many of my conclusions. The NASDAQ is probably properly considered to be a *per se*

---

[7] I also note that many of Defendants' arguments are simply unavailing. They complain that Steinholt provided legal opinions (an ironic complaint, given that he did nothing that Gompers did not do), but I have not relied on Steinholt for any legal evaluations. They contend he did not evaluate whether the markets were efficient, but without passing judgment on this argument I note the critical part of Steinholt's opinion identifies deficiencies in Gompers' opinion.

efficient market. Even if it is not, the NASDAQ is entitled to a presumption of efficiency that Defendants have not rebutted. In this regard the crucial issue is whether the stock price reacts to publicly communicated news, and much of Defendants' argument relies on unrelated considerations. Only two instances of a failure to incorporate news were suggested, but one of those is readily discounted on the facts (and two instances of failure do not demonstrate the market is inefficient). Steinholt's report was helpful in that it (1) confirmed my conclusion that the stock price's failure to move on November 13 was attributable to the previous dissemination of "bad news" on November 3 and (2) countered Gompers' suggestion that the events of December 17 indicate inefficiency. (I note that none of Defendants' arguments regarding Steinholt apply to these aspects of his report). In short, Steinholt's report is not necessary to most of my rulings, and at most it merely confirms my conclusions.[8]

### 4.

The only remaining issue under Rule 23(b)(3) is whether a class action is superior to other available methods for adjudicating the controversy. As noted earlier, courts readily agree that class actions are a superior method for resolving security fraud claims for publicly traded stocks. There is little interest in individual investors controlling their own claims, and a class action is more efficient than entertaining a multitude of suits. Finally, Defendants have presented no arguments suggesting the superiority requirement is not satisfied.

### III. CONCLUSION

---

[8] It is also worth mentioning that the concern about unreliable expert opinions is at its height when considering evidence presented to the jury, and the cases governing admission of expert opinions have less force when presented to the court on issues related to class certification. See In re Zurn Pex Plumbing Products Liability Litig., 644 F.3d 604, 612-14 (8th Cir. 2011).

Defendants' Motion to Strike is denied. Plaintiffs' Motion to Certify Class is granted in part and denied in part. The Court approves Building Trades United Pension Trust Fund as a class representative for the following class:

> All persons or entities who purchased or otherwise acquired publicly traded securities of FCStone Group, Inc. ("FCStone") on or after November 3, 2008 and who sold those securities on or after February 24, 2009, *except* for (i) the defendants in this case, (ii) members of any defendant's immediate family, (iii) any entity in which a defendant has or had a controlling interest, (iv) officers and directors of FCStone, and (v) the legal representatives, heirs, successors or assigns of any such excluded party.

I also appoint the law firm of Robbins Geller Rudman & Dowd LLP as Lead Counsel for the Class, and the law firm of Yonke & Pottenger LLC as Liaison Counsel for the Class. Within thirty days, Lead Counsel shall propose an appropriate form of Notice to be distributed to class members as well as a proposed method of distribution.

IT IS SO ORDERED.

/s/ Howard F. Sachs
HOWARD F. SACHS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

February  10 , 2012

Kansas City, MO